# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                                OF THE TRIAL COURT

SOUTHCOAST HOSPITALS GROUP, INC.,

          Plaintiff,

v.                                              CIVIL ACTION NO.

THE MASSACHUSETTS DEPARTMENT
   OF PUBLIC HEALTH,
MONICA BHAREL, M.D., in her capacity as
   Commissioner of the Massachusetts
   Department of Public Health,
STEWARD ST. ANNE'S HOSPITAL
   CORPORATION, and
STEWARD HEALTH CARE SYSTEM, LLC,

          Defendants.

## VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF THE ACTION

1.     This is an action for declaratory and injunctive relief by Southcoast Hospitals

Group, Inc. ("Southcoast") arising from the effort by defendant Steward St. Anne's Hospital

Corporation ("Steward St. Anne's") to obtain authorization to provide cardiac catheterization

services at St. Anne's Hospital ("St. Anne's") in Fall River pursuant to a "Circular" published by

the Massachusetts Department of Public Health ("DPH").

2.     In 2008, DPH established a moratorium on accepting applications for new cardiac

catheterization services for hospitals located within 30 minutes' travel time (via emergency

1

ambulance) of a hospital that currently provides primary angioplasty 24 hours per day, seven days a week.

3.    The Circular, published by DPH in July 2014 at the behest of and after receiving written comments from defendant Steward Health Care System, LLC ("Steward Health Care"), creates an exception to that moratorium.  It permits an Accountable Care Organization ("ACO"), such as Steward Health Care, to transfer "the license" for cardiac catheterization services from a hospital in its system that is not performing the minimum required number of procedures to another hospital in its system, even if the new hospital would otherwise be barred by the moratorium from offering new cardiac catheterization services (the "ACO Exception Circular").

4.    In 2014, Steward Health Care owned and operated as part of its ACO, Quincy Medical Center ("QMC"), a hospital in Quincy, Massachusetts that had an underperforming cardiac catheterization service, as well as Steward St. Anne's .

5.    Relying upon the ACO Exception Circular, Steward Health Care seeks to transfer the cardiac catheterization service from QMC, which closed in December 2014, to St. Anne's.

6.    Upon information and belief, DPH will imminently approve the transfer of a "service license" to provide cardiac catheterization services to Steward St. Anne's, which is located less than two miles from Southcoast's Charlton Memorial campus in Fall River, and less than 15 miles from its St. Luke's campus in New Bedford.  Charlton Memorial provides primary angioplasty services 24 hours per day, seven days a week.  St. Luke's does not provide primary angioplasty services but does perform diagnostic cardiac catheterization.

7.    Southcoast seeks a declaration that DPH may not approve, and Steward St. Anne's may not establish and operate, a cardiac catheterization service at St. Anne's hospital pursuant to the Circular, for at least two reasons:

A.    <u>First</u>, the ACO Exception Circular constituted a non-interpretive regulation amending DPH's cardiac catheterization licensure regulations and was issued by DPH without complying with the Administrative Procedure Act or obtaining the approval of the DPH Public Health Council as required by M.G.L. c. 111, § 3, and, as such, is unenforceable; and

B.    <u>Second</u>, even if the ACO Exception Circular were enforceable, the cardiac catheterization service Steward Health Care seeks to transfer to its subsidiary, Steward St. Anne's, does not meet the requirements of the ACO Exception Circular because the service to be "transferred" has no legal existence apart from QMC's license, which license (i) QMC relinquished upon the permanent closure of the hospital in December 2014; and (ii) expired by its terms on September 30, 2015, at the latest.

8.    To avoid irreparable harm to Southcoast and harm to the public arising from Steward St. Anne's opening a cardiac catheterization service during the pendency of this action, Southcoast seeks, after notice and a hearing, an order enjoining (a) DPH and Monica Bharel, M.D., in her capacity as Commissioner of DPH, from authorizing or approving Steward St. Anne's establishment of a cardiac catheterization service at St. Anne's, and (b) Steward St. Anne's from operating a cardiac catheterization service at St. Anne's.

## PARTIES

9.    Plaintiff, Southcoast, is a tax-exempt Massachusetts non-profit Public Charitable corporation with a principal place of business at 101 Page Street, New Bedford, Massachusetts 02740.

3

10.    Defendant, DPH, is a duly organized state agency in the Commonwealth's Executive Office of Health and Human Services ("EOHHS") under G.L. c. 6A, § 16, with a principal place of business at 250 Washington Street, Boston, Suffolk County, Massachusetts 02108.

11.    Defendant, Monica Bharel, M.D., is the Commissioner of DPH, with a principal place of business at 250 Washington Street, Boston, Suffolk County, Massachusetts 02108.

12.    Defendant, Steward St. Anne's, is a Delaware corporation with a principal place of business at 500 Boylston Street, 5th Floor, Boston, MA 02116.

13.    Defendant, Steward Health Care, is a Delaware corporation with a principal place of business at 500 Boylston Street, 5th Floor, Boston, MA 02116.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to G.L. c. 231A.

15.    Under G.L. c. 214, § 5 and c. 223, § 1, venue is proper in this County because the defendants are located in Suffolk County, Massachusetts.

## FACTS

Southcoast
and Steward St. Anne's

16.    Southcoast  holds a license from DPH to operate hospital campuses at three locations: Charlton Memorial Hospital in Fall River, St. Luke's Hospital in New Bedford, and Tobey Hospital in Wareham, Massachusetts.

17.    Steward St. Anne's owns and operates St. Anne's.  St. Anne's is located less than two miles from Charlton Memorial Hospital and less than fifteen miles from St. Luke's Hospital. Steward St. Anne's parent corporation, Steward Health Care, owns numerous other hospitals in the Commonwealth.

4

Overview of the Relevant
Statutory and Regulatory Scheme

18.     M.G.L. c. 111, § 51, authorizes DPH to license for two years persons it "deems

responsible and suitable to establish or maintain a hospital." The statute provides further that

"[n]o original license shall be issued to establish or maintain a hospital . . . unless there is a

determination by the department that there is a need for such facility at the designated location."

19.     DPH's regulations promulgated pursuant to, among other statutes, M.G.L. c. 111,

§ 51, set forth standards for the maintenance and operation of hospitals. *See* 105 CMR 130.000,

*et seq.* (the "Regulation"). The Regulation, which is entitled "Hospital Licensure," "applies to

every hospital subject to licensure under M.G.L. c. 111, §§ 51 through 56," except as otherwise

stated in the regulation. *See* 105 CMR 130.003 and 130.010.

20.     Pursuant to the Regulation, each license must list, among other things, "the

specific service(s) which the hospital is licensed to deliver." 105 CMR 120.120.   "Service" is

defined to include, among numerous other things, "Cardiac Catheterization Services."  105 CMR

130.020(U).   If the hospital meets the relevant requirements, DPH "shall cause the license issued

to a hospital pursuant to 105 CMR 130.120 to indicate that the licensee is authorized to provide

cardiac catheterization services as a specific service of the hospital." 105 CMR 130.915(A).  To

the extent a licensed hospital wishes to provide cardiac catheterization services, it may apply for

an amended hospital license adding such service. *See* 105 C.M.R130.926 ("Upon approval of

the application to provide cardiac catheterization services, the Department shall issue an

amended hospital license which indicates that cardiac catheterization is an approved service

provided by the hospital.").

5

21.     The Regulation does not provide for DPH to issue separate licenses to perform

individual services.   Instead, the Regulation provides that DPH will issue a single license

identifying all of the services to be provided.

22.     In addition to licensure requirements, any hospital wishing to make substantial

capital expenditures for the construction of a health care facility or substantially change the

service of the facility must obtain a Determination of Need ("DoN") from DPH.  M.G.L. c. 111,

§ 25(C).

23.     According to DPH's website, the Massachusetts Legislature established the

Determination of Need ("DoN") program in 1971 to:

> encourage equitable geographic and socioeconomic access to health care services,
> help maintain standards of quality, and constrain overall health care costs by
> eliminating duplication of expensive technologies and services.  DoN receives
> applications from health care facilities planning substantial capital expenditures or
> substantial change in services.  It is the responsibility of DoN to evaluate
> proposals and make recommendations to the Public Health Council for approval
> or denial of the expenditures and/or new services.

(Emphasis added.)

24.     DPH's Determination of Need Regulations (the "Regulations"), 105 CMR

100.001, provide, in pertinent part,

> The objective of the determination of need process shall be the allocation of
> health care resources and the improvement of health care delivery systems such
> that adequate health care services are made reasonably available to every person
> within Massachusetts at the lowest reasonable aggregate cost and to ensure the
> non-duplication of services.

(Emphasis added.)

25.     While a DoN is not required to provide cardiac catheterization services, no

hospital may offer such services without DPH's prior approval.  *See* 105 CMR 130.900 and

130.915(A).

6

26.     The regulatory scheme established by the Legislature in G.L. c. 111, and by DPH in regulations it has promulgated, is designed, in part, to ensure delivery of quality patient care and to control costs by avoiding the duplication of services and expensive technology in a particular geographic area. Avoiding duplication of services in an area ensures sufficient patient volume for physicians to gain and maintain expertise in providing cardiac catheterization services. The scheme thus prevents wasteful competition that would be counterproductive to health care quality.

The Moratorium Circular

27.     In May 2008, after receiving extensive review and input from, among others, the Massachusetts Chapter of the American Heart Association, the Massachusetts Hospital Association, the Massachusetts College of Emergency Physicians, the Massachusetts Medical Society, and DPH's Invasive Cardiac Services Advisory Committee, DPH issued Circular Letter CHCQ 08-05-486 in which it announced

> The Department [of Public Health] will *monitor the existing system for the impact and effectiveness* of the cardiac point-of-entry plans. *To that end*, effective immediately, the Department will not accept an application for approval of a new cardiac catheterization service if the hospital is located within 30 minutes travel time (via emergency ambulance) of a hospital that currently provides primary angioplasty 24 hours/day, seven days/week.

(Emphasis added.) A true and accurate copy of that circular is attached hereto as *Exhibit 1* (the "Moratorium Circular").

28.     The rationale for the Moratorium Circular was to allow physicians to gain and maintain expertise in performing cardiac catheterization procedures by limiting the number of competing programs, thus ensuring their ability to provide quality patient care. DPH has long considered volume in cardiac catheterization procedures to be a surrogate for quality in performance of such procedures. *See* Memorandum attached hereto as *Exhibit 2*, at 1. For this

7

reason, DPH regulations require hospitals performing cardiac catheterization procedures to meet minimum volume requirements. *See* 105 CMR 130.935(A) and (B).

29.     Because Southcoast's Charlton Memorial is located within two miles from St. Anne's, and thus within 30 minutes' travel time via emergency ambulance, and because Charlton Memorial offers cardiac catheterization services, including 24-hour primary angioplasty services, seven days a week, the Moratorium Circular bars DPH from accepting an application from Steward St. Anne's for approval of a new cardiac catheterization service at St. Anne's.

Steward St. Anne's Applies for a DoN

30.     In 2012, Steward St. Anne's sought approval from the DoN Program to construct a new three-story wing at St. Anne's. Part of the proposed project involved construction of 11,476 square feet of "shell space," the purpose of which Steward did not disclose at the time it filed its request. The Public Health Council, the DPH body that reviews and makes final agency determinations on DoN requests, approved the requested DoN (DoN #5-3CO8) subject to the requirement that Steward St. Anne's submit a "Request for Significant Change Amendment" ("Significant Change Amendment") before devoting the shell space to clinical uses.

31.     In August 2013, Steward St. Anne's requested a Significant Change Amendment, declaring its intention to establish a new cardiac catheterization service in the previously denominated "shell space." A true and accurate copy of this Request is attached hereto as *Exhibit 3*.

32.     Southcoast opposed Steward St. Anne's request for a Significant Change Amendment on the grounds that, among other things, there was no established need for additional cardiac catheterization services in the Fall River/New Bedford area, and thus the St. Anne's cardiac catheterization service would duplicate Southcoast's service.

8

33.   In October 2013, DoN Director, Bernard Plovnik, advised Steward St. Anne's that the DoN program could not approve the Significant Change Amendment because under the Moratorium Circular, it was "clear that the finished project cannot be licensed for the service that is proposed. Likewise, [Steward St. Anne's] should understand that the submission of a DoN request cannot be used to circumvent clear guidance on a moratorium for the license of a particular service." A true and accurate copy of the letter from Mr. Plovnik is attached hereto as *Exhibit 4*.

The ACO Exception Circular

34.   According to DPH, Massachusetts diagnostic catheterization volume declined 27% from 2005 to 2012.

35.   Nevertheless, in early 2014, following Director Plovnik's response to Steward St. Anne's, then-Secretary of EOHHS, John Polanowicz—a Steward Health Care executive before he became Secretary who returned to Steward Health Care after leaving his position as Secretary—took steps to allow Steward St. Anne's to circumvent the Moratorium Circular to provide a cardiac catheterization service at St. Anne's. Not later than August 2014, and perhaps earlier, Steward Health Care began speaking with Secretary Polanowicz about returning to Steward Health Care in a senior executive position after his tenure as Secretary ended.

36.   At Secretary Polanowicz's direction, DPH began drafting a new cardiac catheterization "policy." After DPH had been working on the policy for a period of time, the Secretary reminded the Commissioner of DPH as follows: "I am trying to accomplish . . . [among other things, so]. . . an A[ccountable] C[are] O[rganization] (HPC or Pioneer hospital-based) can transfer from one site not meeting the requirements to the other site, if that location is

9

closed to catheterization (peripherals could still be done)." A true and accurate copy of this email is attached hereto as *Exhibit 5*.

37.    Internal DPH emails and drafts of the ACO Exception Circular reveal that DPH developed the new policy for the benefit of Steward Health Care hospitals, including Steward St. Anne's. *See* cover email from Nancy Murphy dated March 19, 2014, asking whether the language might "open the door" for certain non-Steward Health Care hospitals, and the last paragraph of the draft policies attached thereto titled "Questions," attached as *Exhibit 6*.

38.    Internal DPH emails also indicate that representatives of Steward Health Care provided comments on multiple drafts of the policy and repeatedly requested information on its status, as follows:

A.    In an email dated May 5, 2014, from Jill Judd, upon information and belief, then-Executive Assistant to Secretary Polanowicz, to then-DPH Commissioner Cheryl Bartlett, Ms. Judd wrote: "Hi Commissioner! Steward is asking for an update on cath labs, should I check in w/secretary on this? I know you discussed at your 1:1 last week, not sure if you have the next steps." A true and accurate copy of this email is attached hereto as *Exhibit 7*.

B.    In an email dated May 21, 2014, Nancy Murphy of DPH reminded Associate Commissioner Biondolillo that St. Anne's used to have a cardiac catheterization service, but closed because it did not have any volume. Associate Commissioner Biondolillo said she thought she remembered "Andy," Steward Health Care's outside counsel, telling her that St. Anne's had formerly had a cardiac catheterization service. A true and accurate copy of this email is attached hereto as *Exhibit 8*.

C.    Upon information and belief, Secretary Polanowicz met with Steward representatives on June 10 regarding the cardiac "cath lab" issue. *See* May 27 email from Jill

10

Judd ("[t]hey [Steward] will be here on June 10 for a masshealth [sic] meeting. They're very eager to hear back from us on this, I'll see if they can stick around for a little bit afterwards."). A true and accurate copy of Ms. Judd's email is attached hereto as *Exhibit 9*.

        D.      By email dated June 11, 2014, Director Allwes wrote to Commissioner Bartlett and Associate Commissioner Biondolillo, "You will notice I did not incorporate [in the attached draft of the cardiac cath moratorium] suggestions from Steward Healthcare. While their suggested edits were thoughtfully considered, I did not think they represented the launguage [sic] that DPH would want this to include." A true and accurate copy of this email is attached hereto as *Exhibit 10*.

        E.      In an email dated June 18, 2014, from Deborah Allwes, Director of Bureau of Health Care Safety and Quality, to Madeleine Biondolillo, Associate Commissioner of DPH, a true and accurate copy of which is attached hereto as *Exhibit 11*, Ms. Allwes wrote:

> Madeleine, attached is the most recent version of the moratorium. It is the one the secretary sent me (below). It does not have the rationales for why these changes are proposed. I was not involved in any discussions leading to the changes on the moratorium so am not sure what the exact rationales are.
>
> I will send you Stewart's [sic] recommended additions in a subsequent email. I do not propose including their recommended changes (they want to add a number 7 and 8 to the moratorium).

39.     After the repeated communications between Steward Health Care and DPH, in July 2014, the DPH issued ACO Exception Circular, DHCQ 14-6-617. A true and accurate copy of the ACO Exception Circular is attached hereto as *Exhibit 12*.

40.     DPH did not hold a public hearing or provide notice to interested parties before issuing the ACO Exception Circular, nor did it give any opportunity for affected parties to present arguments against the ACO Exception Circular.

41.     DPH also did not afford the Public Health Council the opportunity to deliberate on the merits of the policy changes reflected in the ACO Exception Circular, thus arrogating to itself the Public Health Council's statutory role as the arbiter and issuer of licensure regulations. *See* G.L. c. 111, § 3.

42.     The ACO Exception Circular provides, in relevant part,

The moratorium on establishment of a new cardiac catheterization service within 30 minutes of an existing percutaneous coronary intervention (PCI)-capable hospital remains in effect, except under the following limited circumstances.

1.      A hospital that proposes a new cardiac catheterization service within the geographic limitation set by the moratorium is part of a health care system recognized as a Pioneer ACO, a Medicare Shared Savings Plan ACO, or other ACO designation to be determined by the Department; the hospital system has an existing cardiac catheterization service at another hospital within its system that does not meet the minimum diagnostic volume (300 procedures); and the hospital system is proposing to transfer the existing service license to establish a new diagnostic cardiac catheterization service at another hospital in the same ACO system.

2.      The ACO will document, to the Department's satisfaction, the projected volume of diagnostic cardiac catheterization procedures at the proposed new site and the underlying assumptions associated with the volume projection, including:

   a.      Where the patient population the ACO assumes it would treat at the new site is currently receiving diagnostic cardiac catheterization procedures; and
   b.      How the ACO anticipates ensuring these patients will use the service at the new diagnostic cardiac catheterization site.

An eligible ACO should submit to the Department a letter of intent to transfer the location of a cardiac catheterization service from one hospital license to another within its ACO. The letter shall describe which hospital will close its cardiac catheterization service and which will open a proposed new cardiac catheterization service. The letter will include the information described in #2, above.

Thus, the ACO Exception Circular permits a facility that satisfies its requirements to perform diagnostic cardiac catheterizations.

43.     The ACO Exception Circular is inconsistent with DPH's existing licensure

regulations in multiple respects including, but not limited to, the following:

A.    The licensure regulations do not contemplate or authorize transferable separate "service licenses."

B.    The licensure regulations do not contemplate or authorize the transfer of a cardiac catheterization service between hospitals based on the hospitals' enrollment in a common ACO.

C.    Under 105 C.M.R. §§ 130.940, 130.950, and 130.955, an applicant is subject to detailed staffing, equipment, and supportive diagnostic service requirements, and DPH is required to conduct "an inspection or other investigation" to determine compliance with them. The ACO Exception Circular is silent in all these regards.

D.    Under 105 CMR 130.920, applicants are required to "list the specific procedures that are proposed to be provided by the cardiac catheterization service." The ACO Exception Circular does not require such a list.

E.    Under 105 CMR 130.920, a hospital that wishes to provide cardiac catheterization services must document how it will satisfy the detailed minimum workload requirements set forth in 105 CMR 130.935. Under the ACO Exception Circular, a hospital need only state "the projected volume of diagnostic cardiac catheterization procedures at the proposed new site and the underlying assumptions associated with the volume projection."

F.    Under 105 CMR 130.924(A), DPH is required to conduct "an inspection or other investigation of the facility" and has determined that the applicant complies with the regulations applicable to cardiac catheterization services. The ACO Exception Circular calls only for an "architectural plan review process for the new cardiac catheterization service."

G.    Under 105 CMR 130.920, a hospital that wishes to provide cardiac catheterization services must submit a notarized application to DPH signed under the pains and penalties of perjury. Under the ACO Exception Circular, a hospital can request to open a cardiac catheterization service by submitting only a "Letter of Intent."

44.     Steward operates an ACO. While the ACO Exception Circular, on its face,

applies to all ACOs, it was developed with the specific intention of benefiting Steward Health

Care hospitals, including Steward St. Anne's. *See* Ex. 6, Questions in draft policy.

13

45.     Steward quickly availed itself of the ACO Exception Circular.  In August 2014, Steward submitted a Notice of Intent to transfer its Cardiac Catheterization Service from QMC to St. Anne's.  A true and accurate copy of this Notice of Intent is attached hereto as *Exhibit 13* (the "Notice of Intent").

46.     In response to the Notice of Intent to Transfer, Southcoast submitted a letter to Mr. Plovnick arguing that allowing Steward Health Care to transfer a cardiac catheterization service license to St. Anne's would result in fragmentation and reduced quality of patient care, and create an unlawful bypass of DoN and licensing requirements.  A true and accurate copy of this response is attached hereto as *Exhibit 14*.  Southcoast also asserted that Steward Health Care's Notice of Intent failed to satisfy the standards of the ACO Exception Circular, and would result in reduced quality of patient care. *Id.*

47.     The DPH neither approved nor disapproved the Notice of Intent in 2014.

48.     Upon information and belief, no other hospital in the Commonwealth submitted a Notice of Intent to Transfer pursuant to the ACO Exception Circular.

Steward's Significant Change Amendment

49.     On December 10, 2014, the Public Health Council met to consider St. Anne's Request for Significant Change Amendment to the DoN previously granted to Steward St. Anne's for the construction of shell space.

50.     At that meeting, Southcoast called attention to the recommendations of the Invasive Cardiac Services Advisory Committee, and noted that the ACO Exception Circular materially changed DPH regulations regarding the licensing of cardiac catheterization services, yet was implemented with no notice, no public hearing, and no consideration by the Council

14

(which has the sole authority to approve all regulatory changes), such that the ACO Exception Circular violated G.L. c. 30A and thus was of no legal effect.

51.     The Council questioned DPH staff about the reasons behind  the issuance of the ACO Exception Circular, and whether a new cardiac catheterization service at St. Anne's would result in duplication of services.  At the conclusion of the meeting, the Council voted to table the Significant Change Amendment request "pending further information from health planning, further clarification regarding the [ACO Exception Circular], and an assessment of the potential impact on public health based upon projections in [the Fall River/New Bedford] area."  It asked staff to return to the Council with additional information in not more than six months.  A true and accurate copy of the minutes of the Council's December 10 meeting are attached hereto as *Exhibit 15*.  DPH staff did not do this.

Closure of Quincy Medical Center

52.     When it purchased QMC in 2011, Steward Health Care committed to the Attorney General of the Commonwealth that it would not close that facility for at least 6.5 years. *See* Statement of the Attorney General as to the Quincy Medical Center Transaction dated September 7, 2011, a true and accurate copy of which is attached hereto as *Exhibit 16*, at 4, ¶(d).

53.     Nevertheless, Steward Health Care decided in 2014 to close QMC.

54.     Before it closed, QMC was licensed to provide, among other services, cardiac catheterization services.

55.     Clearly concerned that the closing of QMC would leave Steward without a "cardiac catheterization license" to transfer to St. Anne's, on December 11, 2014, Steward Health Care's outside counsel, Andrew Levine, repeatedly attempted to obtain "confirmation from DPH that the transfer of the QMC cardiac catheterization service to St. Anne's was

15

effective subject to location only and without regard to the proposed closure of QMC." A true

and accurate copy of Mr. Levine's letter dated December 11, 2014, is attached hereto as *Exhibit*

*17*. True and accurate copies of his follow-up emails to DPH staff on December 23, 26, and 29,

2014, are attached hereto as *Exhibit 18*.

56.     DPH's  Deborah Allwes, Director of the DPH Bureau of Healthcare Safety and

Quality ("HCSQ"), responded to Mr. Levine that she needed to take the matter up with legal, and

would get back to him. *Id.*

57.     On December 26, 2014, QMC ceased all business operations.

58.     On December 30, 2014, Steward Health Care, through Mr. Levine, submitted the

requisite Facility Closure Form for QMC, and surrendered QMC's hospital license to DPH.  In a

letter accompanying these forms, Mr. Levine wrote: "Accordingly, the [QMC] has completed the

closure process.  Former patients of the Hospital may contact Steward Carney Hospital, Inc. in

Dorchester, MA regarding their prior medical records." A true and accurate copy of Mr.

Levine's letter with the Facility Closure Form and QMC's hospital license are attached hereto as

*Exhibit 19*.

59.     Even though QMC had closed, Mr. Levine reiterated in the cover letter Steward

Health Care's request that QMC's license to operate a cardiac catheterization service be

"preserved," for an eventual relocation of the service to St. Anne's. *Id.*

60.     Upon information and belief, DPH has never confirmed that QMC's license was

preserved.  Upon information and belief, DPH never made such confirmation because it knew

that neither the licensure statute, the Regulations, nor the ACO Exception Circular permitted the

transfer of any part or all of a hospital license and, in particular, the transfer of a cardiac

catheterization service from a hospital that was no longer licensed to provide that service or any other services to another hospital in the closed hospital's system.

61.     The hospital license QMC surrendered in December 2014 was scheduled, by its terms, to expire on September 30, 2015. *See* attachment 2 to Ex. 19. Thus, even if the license were somehow preserved following QMC's closure, it has expired.

DPH Suspends the ACO Exception Circular, and
Then Vacates the Suspension

62.     In January 2015, DPH issued a memorandum suspending the entirety of the ACO Exception Circular, including the new license transfer process for ACOs (the "Suspension Circular"). A true and accurate copy of the Suspension Circular is attached hereto as *Exhibit 20*.

63.     In the Suspension Circular, DPH stated, among other things:

The Department has suspended the July Circular Letter [i.e., the ACO Exception Circular] to allow the Department to re-evaluate the July Circular Letter guidance in the context of best practices, national guidelines, patient outcomes, safety and quality for cardiac catheterization. The Department expects to conduct its review during the next four to six months. At the conclusion of the Department's review, the Department plans to bring recommendations to the Public Health Council for input and guidance.

64.     By letter dated April 2, 2015, the DoN Program requested information from Southcoast and Steward St. Anne's in response to questions posed by the Council at the Council's December 2014 meeting. A true and accurate copy of that request for information is attached hereto as *Exhibit 21*.

65.     Southcoast responded to the request for information. A true and accurate copy of this response is attached as *Exhibit 22*. Even though Steward St. Anne opined that "[t]he information requested by the Department is very concerning and inappropriate for several reasons," it, too, responded to the request. *See,* a true and accurate copy of Steward St. Anne's response, at Exhibit 23 at 3, *et seq.*

17

66.    On April 28, 2015, without providing the Council with the information the Council had requested at the December 10, 2014, meeting, and without bringing recommendations to the Council as indicated in the Suspension Circular, DPH issued a circular revoking the Suspension Memorandum "effective immediately." In that circular, DPH stated that it "is currently reviewing best practices, national guidelines, patient outcomes, safety and quality for cardiac catheterization. The Department expects this review to be completed by May, 2015." A true and accurate copy of this circular is attached hereto as *Exhibit 24* (the "Revocation of Suspension Circular").

67.    Steward Health Care takes the position that the effect of the Revocation of Suspension Circular was to again give it the opportunity to transfer cardiac catheterization services from QMC to St. Anne's pursuant to the ACO Exception Circular.

The Council Defers Action on Significant
Change Amendment and Acknowledges
the "ACO Loophole"

68.    At the May 2015 Public Health Council meeting, Director Allwes presented a report concluding that the existing cardiac catheterization licensing regulations needed to be updated. She commented that ICSAC had concluded that no new percutaneous coronary intervention ("PCI") programs were needed in the Commonwealth.

69.    Council members supported the need for new regulations and suggested that the approval of Steward's Significant Change Amendment should not move forward until new regulations were issued.

70.    At the meeting, Dr. Woodward, a member of the Council, expressed concern about establishing another cardiac catheterization lab so close to Southcoast's. A true and accurate copy of the Minutes of the Public Health Council meeting on May 10, 2015, is attached

18

hereto as *Exhibit 25*, at 6. Another Public Health Council member, Dr. Rosenthal, noted that the "ACO loophole that was announced last [July] concerns me as it allows the entity to circumvent the [DoN] process." *Id.* When Dr. Woodward asked about the timing of the Steward DoN the Council had reviewed, DPH staff responded that it was "under review." *Id.*

Steward St. Anne's Withdrawal of its
Significant Change Amendment

71.     Steward St. Anne's thereafter decided to house the proposed cardiac catheterization service in an existing space within St. Anne's rather than in the "shell space." This decision meant that Steward St. Anne's would no longer need to pursue approval of its DoN Significant Change Amendment from the Council.

72.     By letter dated August 28, 2015, Steward Health Care's counsel, Andrew Levine advised DPH that Steward Health Care was withdrawing its request for a Significant Change Amendment. A true and accurate copy of this letter is attached hereto as *Exhibit 26*.

73.     Upon information and belief, after withdrawing the Significant Change Amendment, Steward Health Care requested approval from DPH to transfer cardiac catheterization services from QMC to St. Anne's pursuant to the ACO Exception Circular.

74.     Upon information and belief, the process for Steward St. Anne's to open a cardiac catheterization service at St. Anne's pursuant to the ACO Exception Circular is moving forward on an expedited basis.

75.     Upon information and belief, DPH approval for St. Anne's to open a cardiac catheterization service at St. Anne's is imminent.

76.     Upon information and belief, Steward St. Anne's has not commenced providing cardiac catheterization services at St. Anne's.

77.     From the outset of its attempt to provide cardiac catheterization services at St. Anne's, Steward St. Anne's has been unable to demonstrate a need for such services in the area given that Southcoast is providing them, the demand for them at St. Luke's is barely above the minimum mandated by DPH, and Charlton is operating below capacity.

Irreparable Harm to Southcoast of Steward
St. Anne's Opening A Cardiac Catheterization Unit

78.     The number of diagnostic cardiac catheterization procedures performed at St. Luke's has declined annually from 656 in 2011 to 440 in 2014.  If the frequency of such procedures thus far in 2015 continues for the remainder of the year, St. Luke's will perform only 387 procedures in 2015.  Because 45% of the procedures in 2014 at St. Luke's were performed by Steward Health Care physicians, and Steward Health Care physicians would almost certainly perform their diagnostic cardiac catheterization procedures at St. Anne's if DPH so authorized, there is a strong likelihood that would cause the number of diagnostic procedures performed at St. Luke's to fall below the minimum 300 annual procedure threshold, putting  the cardiac catheterization services at St. Luke's at risk of closure.

79.     In calendar year 2014, Southcoast's Charlton Hospital performed 1,766 diagnostic cardiac catheterization procedures.  Of these, 634 were performed by physicians employed by hospitals in Steward Health Care's ACO.  At St. Luke's Hospital, 440 diagnostic cardiac catheterization procedures were performed.  Of these, 199 were performed by physicians employed by hospitals in Steward Health Care's ACO.  Accordingly, if Steward St. Anne's were able to perform cardiac catheterization services, Steward Health Care physicians would presumably perform them at Steward St. Anne's, thus causing Southcoast to lose revenue that it will never be able to recover even if it obtains the declaratory relief requested in this action.

20

The Balance of Harms Favors
Entry of an Injunction

80.     As noted above, there is substantial risk that Southcoast will suffer irreparable

harm if DPH were to authorize Steward St. Anne's to provide cardiac catheterization services at

St. Anne's before Southcoast's requests for declaratory relief are resolved.

81.     There would be no harm to DPH if it were enjoined from authorizing Steward St.

Anne's to provide cardiac catheterization services at St. Anne's before Southcoast's requests for

declaratory relief are resolved, as the injunction would simply maintain the status quo.

82.     There would be no harm to Steward St. Anne's if it were enjoined from providing

cardiac catheterization services at St. Anne's before Southcoast's requests for declaratory relief

are resolved, as the injunction would simply maintain the status quo.

Harm to the Public Interest of Steward
St. Anne's Opening A Cardiac Catheterization Unit

83.     Permitting St. Anne's to perform diagnostic cardiac catheterization procedures

would also adversely affect the public interest in at least four ways.

> A.     First, based on Southcoast's experience, approximately 30% of all patients who received a diagnostic cardiac catheterization procedure required an interventional procedure, including the potential for open heart surgery. If cardiac catheterization procedures were permitted at St. Anne's, it would be reasonable to project that approximately 30% of the patients who received diagnostic cardiac catheterization there would need to be transferred to another facility for an interventional procedure. This would result in additional costs in connection with the transfer of patients, not to mention significant inconvenience and heightened risk to patients.

> B.     Second, physician peers and surgical consultants who are qualified to review therapeutic options are not likely to be present in a low-volume setting with no advanced cardiac services. As a result, patients are less likely to receive the benefit of the "real time" discussion and consultation between physicians that occurs naturally in comprehensive cardiac programs.

21

    C.    Third, transporting patients with arterial access sutured in place from the diagnostic procedures to another facility for PCI puts the patients at risk of bleeding and local complications at the arterial access site. Removing the arterial access and performing another puncture at another location exposes patients to unnecessary risk.

    D.    Fourth, at St. Luke's, 84% of the catheterization lab patients are Medicare (primarily elderly) or Medicaid (lower income) patients. These elderly and low-income patients rely heavily on public transportation. The closure of St. Luke's service would cause additional hardships for this vulnerable population for whom transportation to Fall River is not only an inconvenience, but also an additional financial burden.

84.    Further, 42% of the St. Luke's patients are low income, i.e., residing in zip codes with median incomes below 200% of the federal poverty level. St. Anne's admits that it intends to transfer patients who require interventional cardiac services to other hospitals within the Steward Health Care system. See Ex. at 10, B3. The Steward Health Care hospital that performs interventional cardiac services that is closest to St. Anne's is Good Samaritan, in Brockton, 34 miles from St. Anne's. Requiring cardiac patients to travel 34 miles for interventional cardiac services will, upon information and belief, be detrimental to their health and inconvenient for their families, families who, as noted above, are heavily dependent on public transportation.

## COUNT I
## (Declaratory Judgment)

85.    Southcoast realleges and incorporates by reference the allegations of the preceding paragraphs.

86.    The Administrative Procedure Act states that "a public hearing is required prior to the adoption, amendment or repeal of any regulation if . . . a public hearing is required by the enabling legislation of the agency or by any other law, or a public hearing is required as a matter of constitutional right." M.G.L. c. 30A, § 2.

22

87.     Even if a public hearing is not required by section 2, the agency must "give notice and afford interested persons an opportunity to present data, views or arguments" at least 21 days before the proposed action.  M.G.L. c. 30A, § 3.

88.     The ACO Exception Circular makes non-interpretative, substantive amendments to the Cardiac Catheterization Licensing regulations promulgated by DPH and codified at 105 CMR 130.900, *et seq*., in that it permits the transfer of a license to operate a cardiac catheterization service from one hospital to another, does so based on participation in an ACO, and does not require the hospital that will be receiving the license to satisfy the licensing requirements of 105 C.M.R. 130.915, *et seq*.

89.     Because the ACO Exception Circular makes material and substantive changes to the Regulations, and it was not promulgated pursuant to the notice and comment provisions of the Administrative Procedures Act, it is of no force and effect.

90.     Because the ACO Exception Circular makes material and substantive changes to the Regulations, and the Public Health Council did not approve it as required by M.G.L. c. 111, § 3, it is of no force and effect.

91.     There is an actual controversy as to whether the ACO Exception Circular violates the APA and/or M.G.L. c. 111, § 3, and thus whether it is enforceable in accordance with its terms.

92.     Entry of a declaratory judgment will end the controversy as to whether the ACO Exception Circular is enforceable in accordance with its terms.

WHEREFORE, Southcoast respectfully requests the relief set forth below:

## COUNT II
## (Declaratory Relief)

93.     Southcoast realleges and incorporates by reference the allegations of the preceding paragraphs.

94.     Steward Health Care proposes to transfer what had been a license to provide cardiac catheterization procedures at QMC to Steward St. Anne's pursuant to the ACO Exception Circular and Steward St. Anne's Notice of Intent.

95.     Steward Health Care chose to close QMC permanently in December 2014.

96.     QMC returned its hospital license, including the notation thereon of its ability to operate cardiac catheterization services, to DPH in or about December 2014.

97.     On September 30, 2015, the license to operate a hospital that QMC had held expired by its terms, if not earlier.

98.     The ACO Exception Circular authorizes the transfer of a license where the ACO hospital system "has an *existing* cardiac catheterization service at another hospital within its system that does not meet the minimum diagnostic volume (300) procedures; and the hospital system is proposing to transfer the *existing* service license to establish a new diagnostic cardiac catheterization service at another hospital in the ACO system." (Emphases added.)

99.     Without a valid existing license to transfer, Steward Health Care cannot satisfy the requirements of the ACO Exception Circular to be able to provide cardiac catheterization services at St. Anne's.

100.    There is an actual controversy as to whether Steward Health Care may transfer what had been the QMC license to Steward St. Anne's pursuant to the ACO Exception Circular to enable St. Anne's to operate a cardiac catheterization service.

24

101.    Entry of a declaratory judgment will end the controversy as to whether Steward

Health Care may transfer what had been the QMC license to Steward St. Anne's pursuant to the

ACO Exception Circular to enable St. Anne's to operate a cardiac catheterization service.

WHEREFORE, Southcoast requests the relief set forth below:

## COUNT III
### (To Compel DPH to Produce Withheld Documents Responsive to Southcoast's Public Records Request)

102.    Southcoast realleges and incorporates by reference the allegations of the

preceding paragraphs.

103.    On November 26, 2014, Southcoast sent a public records request, pursuant to

G.L. c. 66, § 10, to DPH. A true and accurate copy of a letter to DPH dated June 17, 2015,

following up on that request is attached hereto as *Exhibit 27*.

104.    In that Request, Southcoast requested the following documents:

All communications including letters, applications, recordings, transcripts,
memoranda, and documents of any kind whatsoever by and/or between the
Massachusetts Department of Public Health, including the Public Health Council,
and any of it employees, lawyers, or other agents, and Steward Health Care
System, and any of its employees, lawyers, or other agents, regarding:

1.    Steward St. Anne Hospital Corporation Determination of Need
Project #5-3C08;

2.    Steward's Request for Significant Change Amendment to DoN #4-
3C08;

3.    Steward's Intent to Transfer Quincy Medical Center's cardiac
catheterization license to St. Anne's Hospital;

4.    Circular Letter DHCQ14-6-617 regarding policy updates for
cardiac catheterization services; and

5.    The decision to close the Quincy Medical Center.

*Id.*

25

105.    While DPH has produced some documents responsive to the Request, by letter dated August 12, 2015, DPH advised Southcoast that it was "continu[ing] to assert the deliberative process exemption to the public records law, M.G.L. c. 4, § 7(d), to emails regarding [Steward St. Anne's Corporation's Significant Change Amendment to Determination of Need Project #5-3C08] that are dated January 2015 to the present.  We assert that these emails remain exempt from disclosure because the Department has not made a decision on this application."  A true and accurate copy of this letter is attached hereto as *Exhibit 28*.

106.    In connection with that letter, DPH delivered a "privilege log" to Southcoast. *See Exhibit 29*.

107.    Although Steward St. Anne's withdrew the Significant Change Amendment request in August 2015, thus terminating any need for DPH to make a decision on the application, DPH has not produced the documents it withheld on the basis of the deliberative process exemption.

108.    In addition, although DPH acknowledged in internal emails that it had received comments on the draft ACO Exception Circular from Steward Health Care's counsel, Mr. Levine (*see* Exs. F, I, and J), DPH has failed to produce documents concerning or evidencing Mr. Levine's comments.

109.    DPH should be compelled to produce all documents responsive to the Public Records Request within ten (10) days after entry of an Order compelling it to do so because Southcoast is entitled to the documents under M.G.L. c. 66, § 10(b) and the public records access regulations at 950 C.M.R. 32.00, *et seq.*

WHEREFORE, Southcoast requests the relief set forth below.

## REQUESTS FOR RELIEF

Southcoast respectfully requests that this Court:

A.      Enter judgment in its favor on Count I against DPH declaring that the ACO Exception Circular is unenforceable because it was issued in violation of the Administrative Procedure Act and/or M.G.L. c. 111, § 3.

B.      Enter judgment in its favor on Count II against Steward Health Care declaring that even if the ACO Exception Circular is enforceable in accordance with its terms, Steward Health Care cannot satisfy the requirements of the ACO Exception Circular so as to enable it to transfer cardiac catheterization services that had been performed at QMC to Steward St. Anne's.

C.      Enter judgment in its favor on Count III against DPH requiring DPH to produce all documents responsive to Southcoast's public records request within ten days after entry of such order.

D.      On Counts I-II, after notice and a hearing, entry of an order preliminarily enjoining defendants Massachusetts Department of Public Health and Monica Bharel, M.D., in her capacity as Commissioner of the Massachusetts Department of Public Health, from authorizing or approving a cardiac catheterization service for Steward St. Anne's Hospital Corporation to provide at St. Anne's Hospital;

E.      On Counts I-II, after notice and a hearing, entry of an order preliminarily enjoining  defendant Steward St. Anne's Hospital Corporation from providing cardiac catheterization services at St. Anne's Hospital; and

F.      On all Counts, granting Southcoast such other relief as may be appropriate and just.

Respectfully submitted,

Dated:  October 15, 2015

SOUTHCOAST HEALTH SYSTEMS, INC.,

By its attorneys,

Thomas O. Bean, BBO No. 548072
Rachel Wertheimer, BBO No. 625039
Jeffrey L. Heidt, BBO No. 228960
VERRILL DANA, LLP
One Boston Place, Suite 1600
Boston, Massachusetts  02108
(617) 309-2600
tbean@verrilldana.com
rwertheimer @verrilldana.com
jheidt@verrilldana.com

28

**VERIFICATION**

I, Linda Bodenmann, am the Chief Operating Officer of plaintiff Southcoast Health Systems, Inc. ("Systems"). I have been employed in this capacity since July 2011. Prior to that time, I served as COO of the plaintiff, Southcoast Hospitals Group, Inc. As COO of Systems, I am responsible for Southcoast Hospitals Group operations, and the operations of certain related entities.

I have read the foregoing Verified Complaint. Except as to matters stated to be on information and belief, the facts set forth above are true and correct to the best of my knowledge and belief based on my personal knowledge, information provided to me by others employed or otherwise engaged by Southcoast, and the books and records of Southcoast. As to those facts stated to be on information and belief, I believe them to be true.

Signed under the pains and penalties, the 15th day of October, 2015.

Linda Bodenmann

Linda Bodenmann, COO

29

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

SOUTHCOAST HOSPITALS GROUP, INC.,

        Plaintiff,

v.

THE MASSACHUSETTS DEPARTMENT
   OF PUBLIC HEALTH,
MONICA BHAREL, M.D., in her capacity as
   Commissioner of the Massachusetts
   Department of Public Health,
STEWARD ST. ANNE'S HOSPITAL
   CORPORATION, and
STEWARD HEALTH CARE SYSTEM, LLC,

        Defendants.

CIVIL ACTION NO.

## PLAINTIFF'S EXHIBITS TO VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

SOUTHCOAST HOSPITALS GROUP, INC.,

By its attorneys,

Thomas O. Bean, BBO No. 548072
Rachel Wertheimer, BBO No. 625039
Jeffrey Heidt, BBO No. 228960
VERRILL DANA, LLP
One Boston Place, Suite 1600
Boston, Massachusetts  02108
(617) 309-2600
tbean@verrilldana.com
rwertheimer @verrilldana.com
jheidt@verrilldana.com

8808649_1

# EXHIBIT 1

# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Public Health
### Bureau of Health Care Safety and Quality
### 99 Chauncy Street, 2nd Floor, Boston, MA 02111
### 617-753-8000

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

JUDYANN BIGBY, MD
SECRETARY

JOHN AUERBACH
COMMISSIONER

## MEMORANDUM

**Circular Letter: DHCQ 08-05-486**

To:       All Ambulance Services
                Acute Care Hospital Chief Executive Officers
                Acute Care Hospital Directors of Emergency Services
                EMCAB Members

From:    Paul I. Dreyer, Ph.D., Director
                Bureau of Health Care Safety and Quality

                Jon Burstein, M.D., FACEP, Medical Director
                Office of Emergency Medical Services

                Abdullah Rehayem, Director
                Office of Emergency Medical Services

Re:        Implementation of Statewide STEMI Triage (Point-of-Entry) Criteria

Date:     May 5, 2008

### Background

After extensive review and input from the Massachusetts Chapter of the American Heart Association, the Massachusetts Hospital Association, the Massachusetts College of Emergency Physicians, the Massachusetts Medical Society, the EMS community, the Department of Public Health's Invasive Cardiac Services Advisory Committee and Office of Emergency Medical Services' (OEMS) Medical Services Committee and Emergency Medical Care Advisory Board, as well as review by national experts in the field, the Department is moving forward with implementation of point-of-entry (POE) criteria to allow for direct delivery of patients with ST-elevation myocardial infarction (STEMI) from the field to hospitals capable of providing 24-hour percutaneous coronary

intervention (PCI). Currently, there are three special projects allowing for this ambulance redirection, in Boston, Cambridge, and Winchester. The data developed through these projects have supported the international findings (in Canada, Wisconsin, and North Carolina, among other places) that this will improve care for STEMI patients eligible for PCI by reducing the time from symptom onset to reperfusion by PCI. A recent article on the Ottawa experience may be found in the January 17, 2008 edition of the *New England Journal of Medicine*.

The New Statewide STEMI Treatment Protocols

To implement the change in the point-of-entry plan, the Statewide Treatment Protocols for Acute Coronary Syndrome have been revised to incorporate criteria for the redirection of certain STEMI patients. The revised protocols, which are available on the Department's website at http://www.mass.gov/Eeohhs2/docs/dph/emergency_services/treatment_protocols_703.pdf , state on page 30:

> "**If the patient's ECG is consistent with STEMI, and the patient is hypotensive, in congestive heart failure, has contraindications to thrombolytics, or the nearest PCI-capable hospital *as established in a Department approved STEMI POE plan* is within 30 minutes further transport, medical control may order transport direct to the PCI facility.**"

A flowchart of the protocol as described in the Statewide Treatment Protocols is attached (see Algorithm for Cardiac Point-of-Entry for ALS Transported Patients).

In brief, a patient with a STEMI diagnosed by field 12-lead ECG is to be transported directly to a PCI-capable hospital as long as such transport does not add more than 30 minutes to field time, or the patient meets certain specific clinical criteria regardless of distance, and the destination change is so ordered by the online medical control physician. Note that this POE protocol applies only to patients with STEMI; because other forms of acute coronary syndrome do not generally need time-sensitive PCI, there should be NO change in destination for the vast majority of patients with potential cardiac syndromes. Medical control (i.e., physician) concurrence with the presumptive diagnosis of STEMI is required for destination change under the protocol. Destination alterations under this plan will be subject to medical review. While all Massachusetts paramedics are already trained in acquisition and interpretation of 12-lead electrocardiography, a STEMI-recognition training program will be made available to reinforce their capabilities.

Until full implementation of EMS electronic data collection, **the Department is requiring** that copies of the trip records and 12-lead electrocardiograms of all patients with destination altered to a PCI-capable hospital be submitted to OEMS within 90 days of the event, UNLESS the service involved was part of a Special Project Waiver for this protocol as of May 5, 2008.

2

Regional Point-of-Entry Plans

With the exception of those ambulance services participating in the special projects mentioned above, the bypassing of the nearest hospital for STEMI patient transport to a PCI-capable hospital may only begin in a region after that region's STEMI POE plan has been approved by the Department. The Regional EMS authorities are responsible for creating the POE plans for their regions. The Regional Offices will receive separate instructions regarding submissions of cardiac POE plans to OEMS. As part of the process of developing these plans, OEMS expects that the regional authorities will convene representatives of the regions' hospitals, EMS agencies, and physicians to prepare the POE plans. OEMS staff, such as Dr. Burstein, will be available to attend any such meetings to discuss the initiative. We also hope that sub-regional network planning for STEMI care grows out of this process, as has already occurred in many parts of the Commonwealth.

Assuming timely approval of the plans, **the Department expects full implementation of the program by the end of 2008.** Until full implementation in an EMS Region, standard current point-of-entry criteria will apply in that region. PCI hospitals enrolled in this program must meet stringent time-to-treatment and quality improvement criteria as conditions for maintaining their status.

New Cardiac Catheterization Services

The Department will monitor the existing system for the impact and effectiveness of the cardiac point-of-entry plans. To that end, effective immediately, the Department will not accept an application for approval of a new cardiac catheterization service if the hospital is located within 30 minutes travel time (via emergency ambulance) of a hospital that currently provides primary angioplasty 24 hours/day, seven days/week.

Goals

This STEMI protocol is only a small part of the Commonwealth's collaborative efforts to improve care for patients with acute coronary syndromes. We hope and expect that community, EMS, and hospital partners will continue to strive to improve coronary care and survival through means such as AED placement, training, improved EMS dispatch and deployment policies, and hospital and EMS systems designed for rapid treatment, and when needed, transfer of cardiac patients to appropriate facilities for their care. New policies facilitating this might include, for example:
- ED rapid ECG acquisition and physician evaluation,
- Hospital multidisciplinary teams for rapid treatment of ACS,
- ED/EMS planning for rapid transfer of STEMI "walk-ins",
- "Sub-regional" ED and hospital policies linking with PCI centers for standardized treatment regimens and communications pathways,
- ED and hospital policies minimizing drips in transferred cardiac patients,
- Hospital and medical system policies to assure that STEMI patients are referred back to their local facilities for convenient continuing care.

3

If you or your organization has questions regarding this policy, please contact Tom Quail, RN, Clinical Coordinator for OEMS, at 617-753-7318 or by email at tom.quail@state.ma.us . Dr. Burstein or other OEMS staff will also gladly be available to discuss this policy and may be contacted at 617-753-7300 or by email at jon.burstein@state.ma.us .

Thank you for your cooperation and continued assistance in providing quality EMS care to patients throughout the Commonwealth.

Attachment: Algorithm for Cardiac Point-of-Entry for ALS Transported Patients

cc     DPH Invasive Cardiac Services Advisory Committee
        OEMS Regional Medical Directors

4

## Algorithm for Cardiac Point-of-Entry for ALS Transported Patients (1)



(1) Patients in arrest, with compromised airway, or transported by BLS will go to the nearest facility
(2) Ambiguous cases transported by ALS will go to nearest facility
(3) Bypassing the nearest facility must be approved by On Line medical control
(4) PCI  facility will be notified
(5) Use Patient preference/history and established relations if multiple PCI facilities

# EXHIBIT 2

MEMORANDUM

TO:      Cheryl Bartlett, RN
         Commissioner

FROM:    Madeleine Biondolillo, MD
         Associate Commissioner

RE:      DPH Cardiac Catheterization Service Hospital Licensure Regulations
         and Volume Minimums

DATE:    May 29, 2014


In 1997, DPH promulgated cardiac catheterization service licensure regulations.  The regulations
included minimum operator and institutional volume requirements (as a surrogate for quality) based on:

- o  1991 American College of Cardiology/American Heart Association (ACC/AHA) Guidelines
     for Cardiac Catheterization for 300 diagnostic procedures per year per institution; the
     guidelines also included an **operator** minimum recommendation of 150 per year, but
     DPH's Invasive Cardiac Services Advisory Committee (ICSAC) recommended and the
     regulations included a minimum of 100 procedures per **operator** per year.   The
     diagnostic **institutional** and **operator** minimums were removed in 2001 American
     College of Cardiology/Society for Cardiac Angiography and Interventions (ACC/SCAI)
     Clinical Expert Consensus Document on Cardiac Catheterization Laboratory Standards.
- o  1993 ACC/AHA Guidelines for Percutaneous Transluminal Coronary Angioplasty (PTCA ,
     now Percutaneous Coronary Interventions or PCI) were for 75 PCIs per **operator**;
     recommendation in American College of Cardiology Foundation /American Heart
     Association/Society for Cardiovascular Angiography and Interventions (ACCF/AHA/SCAI)
     2013 Update on Clinical Competence Statement on Coronary Artery Interventional
     Procedures reduced to 50 PCIs/year (averaged over two years).
- o  **Institutional** PCI volume recommendation in 1993 was 200 PCIs; remains in 2013 Clinical
     Competency Document for PCI.
- o  Under regulations, new labs have 2 years to reach the **institutional** volume minimums
     (ramp up).

Subsequent to the promulgation of cardiac catheterization service licensure regulations in 1997, the
Division of Health Care Quality (DHCQ) collected cardiac catheterization service volume data (diagnostic,
therapeutic/PCI, and electrophysiology procedure volume) between 1998 and 2012.  In FY13, data was
not collected due to various operational issues, but the process has recommenced including needed
revision of the CPT codes. The responsibility for collecting volume data will revert from the DPH
Commissioner's Office back to the DHCQ now that a Bureau Director is in place.

Massachusetts Data Analysis Center (Mass-DAC), a contracted agent of DPH under the Office of Health
Planning, has been collecting and adjudicating PCI data since 2002.  Based on 2000 legislation, Mass-DAC
was created to assess the quality of angioplasty and coronary artery bypass graft procedures.  The first
report on angioplasty risk-adjusted mortality outcomes was presented in 2002.

The previous ICSAC (inactive after 2006) was presented with annual volume data, but from the beginning, focused on creating a way to allow community hospitals without cardiac surgery backup to perform primary angioplasty. Hospitals were precluded from eligibility for participation in the primary angioplasty special project if they did not meet the diagnostic volume minimum. Some hospitals were required to undergo a review by Society for Cardiovascular Angiography and Interventions or the American Medical Foundation (AMF), e.g., Quincy in 1999, Norwood in 2001, NEBH in 2002, Melrose-Wakefield in 2003, either due to chronic low diagnostic volume, as part of the first C-PORT Trial (the initial pathway to providing primary angioplasty), or as a means of documenting a quality service when they did not meet the minimum volume and wished to participate in the primary angioplasty special project.

The MASS COMM Trial (a randomized trial to assess whether non-emergency angioplasty was no less safe when performed in a hospital without cardiac surgery on site than a hospital with surgery on site) began in 2006. During the randomization period and subsequent Cohort Study (non-randomization phase of the Trial), MASS COMM required operators to meet the 75 PCI procedure minimum, but there was no institutional minimum for the participating hospitals. The community hospitals that participated in the trial were notified by the Bureau in the MASS COMM Closeout Memorandum of July 31, 2013 that effective FY14, they would be subject to the 200 PCI institutional volume minimum. In 2009, STEMI Point of Entry Plans were implemented and DPH instituted a moratorium on the approval of any new cardiac catheterization service that would be within a 30 minute ambulance ride of a PCI-capable hospital. That moratorium continues today.

DPH regulations were revised in 2009 to eliminate only the previous 100 procedure diagnostic operator minimum. The section of the regulations regarding quality assurance was expanded. If hospitals do not meet the 300 diagnostic volume minimum, the regulations require submission of the hospital's quarterly quality assessment and performance improvement reports. Few of the low volume diagnostic labs have been compliant with this requirement. If volume is below 150, the hospital should request a review by a peer review organization approved by the Department. There are similar requirements for hospitals below the therapeutic volume minimums.

Despite a lack of indicators from complaint or incident reports that quality has been affected, the Department has become increasingly concerned about these hospitals' lack of conformance with requirements under licensure. Therefore, for this reason as well as the closure of the MASS COMM Trial, DPH reconstituted its ICSAC to address cardiac policy issues. This ICSAC has met twice (October 2013 and April 2014). Between those two meetings, the ICSAC's PCI Oversight subcommittee met four times. The subcommittee presented its recommendation regarding the need for additional PCI services in Massachusetts to the ICSAC in April. The ICSAC unanimously approved the recommendation that no new PCI services in Massachusetts are needed at this time. An exception is the former Jordan Hospital, now Beth Israel Deaconess Hospital-Plymouth, which applied to provide primary angioplasty under the guidelines in effect in October and is in the process of being approved. The subcommittee will meet again June 5 and the issue of diagnostic cardiac catheterization volume minimums is on that day's agenda.

**Mass-DAC Hospital PCI Fiscal Year Volume - Sorted smallest to largest FY 2013**

Fiscal Year is from Jul-Jun; PCI Data from July 2010-June 30, 2013

| | FY 2011 | FY 2012 | FY 2013 | FY12-13 change % (shaded= increase) | |
|---|---|---|---|---|---|
| *Saints Medical Center | 96 | 120 | 30 | 75% | cardiac cath service closed 9/12 |
| Beverly Hospital | 46 | 73 | 75 | 3% | 200 PCI volume  minimum not applicable to primary angioplasty special project |
| Melrose-Wakefield Hospital | 52 | 77 | 92 | 19% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Holy Family Hospital | 113 | 184 | 152 | 17% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Norwood Hospital | 158 | 225 | 209 | 7% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Lawrence General Hospital | 204 | 241 | 217 | 10% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| MetroWest Medical Center | 161 | 232 | 219 | 6% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Brockton Hospital | 173 | 195 | 264 | 35% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Mount Auburn Hospital | 263 | 354 | 324 | 8% | |
| North Shore Med Ctr Salem Hosp | 300 | 308 | 326 | 6% | |
| *Lowell General Hospital | 152 | 164 | 335 | 104% | 2012 merger with Saints; Saints cardiac cath service closed;200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Good Samaritan Medical Center | 125 | 244 | 337 | 38% | 200 PCI volume minimum not applicable to community MASS COMM hospitals |
| Cape Cod Hospital | 475 | 448 | 421 | 6% | |
| South Shore Hospital | 317 | 364 | 426 | 17% | met 200 PCI volume minimum these 3 years, although not applicable to community MASS COMM hospitals |
| Boston Medical Center | 530 | 481 | 438 | 9% | |
| Saint Elizabeths Medical Center | 681 | 503 | 453 | 10% | |
| Tufts Medical Center | 607 | 576 | 554 | 4% | |
| Saint Vincent Hospital | 924 | 660 | 627 | 5% | |
| Southcoast Charlton Mem Hosp | 639 | 655 | 685 | 5% | |
| Brigham and Womens Hospital | 924 | 773 | 756 | 2% | |
| Lahey Hospital and Med Ctr | 1066 | 868 | 798 | 8% | |
| Beth Israel Deaconess Med Ctr | 1132 | 996 | 943 | 5% | |
| Massachusetts General Hospital | 1109 | 1058 | 1093 | 3% | |
| UMass Memorial Med Ctr-Univ | 1335 | 1215 | 1124 | 7% | |
| Baystate Medical Center | 1245 | 1276 | 1198 | 6% | |
| Total | 12827 | 12290 | 12096 | 2% | |

In August 2013, expanded inclusion/exclusion criteria for former MASS COMM community hospitals; PCI volume will increase

MASS COMM community hospital participants          <200 PCIs

| Massachusetts Hospitals that Perform only Diagnostic Cardiac Catheterization Procedures (12) FY11-13 Volume | | | |
|---|---|---|---|
| | Diagnostic Volume | | |
| **Hospital** | **FY11** | **FY12** | **FY13** |
| Anna Jaques Hospital | 127 | 108 | 104 | |
| Berkshire Medical Center | 131 | 107 | 150 | |
| Carney Hospital | 72 | 54 | 45 (CY13) | |
| Cooley Dickinson Hospital | 95 | 32 | 14 | At end of April 2013, Medical Director's contract expired and hospital 'suspended service internally'; have not done any caths since April 2013 (cardiology group owned by Baystate Med Ctr) |
| Falmouth Hospital | 238 | 149 | 149 | yes, it's the same as FY12, but they provided the individual physician volume to back it up |
| Mercy Hospital | 166 | 162 | 159 | |
| New England Baptist Hospital | 146 | 137 | 124 | |
| Quincy Hospital | 123 | 70 | 18 | "no one credentialed to do caths at this time"; have not done any since June 2013; hiring more cardiologists (since Granite cardiology group moved on) |
| Sturdy Memorial Hospital | 157 | 130 | 141 | |
| *Jordan Hospital | 179 | 370 | did not call | |
| Milford Regional Medical Center | 327 | 401 | did not call | |
| St. Luke's Hospital | 710 | 645 | did not call | |
| In FY12, 3 of the 12 programs exceeded the 300 annual diagnostic procedure minimum in DPH licensure regulations | | | |
| *application to perform primary angioplasty pending | | | |
| In FY11 and 12, two hospitals performing angioplasty procedures did not meet the diagnostic volume minimum. In FY13 one of these hospitals did not meet the diagnostic volume minimum: | | | |
| Beverly | 290 | 268 | 317 | Exceeded the 300 diagnostic minimum in FY13. Also performed 46, 72, and 75 primary angioplasty procedures in FY 11, FY12, and FY13, respectively. (FY11&12 from DPH data collection;FY13 is from Mass-DAC data)  Just looking at Mass-DAC state FY11-13 PCI volume: 46, 73 and 75, respectively |
| Melrose-Wakefield | 229 | 223 | 292 | Also performed 54, 76, and 92 PCI procedures in FY11, FY12, and FY13, respectively (FY11&12 from DPH data collection;FY13 is from Mass-DAC data) Just looking at Mass-DAC state FY11-13 PCI volume: 52, 77 and 92, respectively |

# EXHIBIT 3



DONOGHUE
BARRETT
& SINGAL

August 16, 2013

Via Email and Hand Delivery – Return Receipt Requested

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
99 Chauncy Street, 2nd Floor
Boston, MA 02116

Re:     Request for Approval of Significant Amendment to Determination of Need Project #5-3C08, Steward St. Anne's Hospital Corporation

Dear Mr. Plovnick:

We write on behalf of Steward St. Anne's Hospital Corporation (the "Applicant" or "Hospital"), current holder of approved Determination of Need ("DoN") Project #5-3C08 ("Project"). The DoN approval for the Project authorized new construction and renovation for a three-story wing to replace existing medical/surgical beds. The approval also allowed for the construction of certain shell space within the new wing to be built at a later time. The Applicant hereby submits this request for a significant amendment to the approved DoN authorization in accordance with 105 C.M.R. §§100.753 and 100.756. We offer the following comments in support of this request.

Background

On April 11, 2012, the Department of Public Health ("Department") approved the Applicant's DoN Project. A copy of the approval letter is enclosed at Exhibit A. The Project included new construction and renovation to build a three-story wing in order to replace forty (40) existing medical/surgical beds. The approval also authorized construction and renovation to connect the new wing to the Applicant's existing hospital facility. In addition, the Project included 11,476 gross square feet ("GSF") of shell space on the first floor of the new wing to be built out at a later time based on the Applicant's future needs.

The Applicant's DoN approval allowed for a maximum capital expenditure ("MCE") of $21,559,477 (December 2011 dollars). Consistent with 105 C.M.R. §100.551(I)(6), the final approved Project cost as approved by the DoN Program with the addition of inflation to the date of final plan approval is $22,411,079. The total approved GSF for the project is 57,952 GSF, comprised of 57,163 GSF for new construction and 789 GSF for renovation. Of the 57,163 GSF for new construction, 11,476 GSF is shell space for the first floor.

Donoghue Barrett & Singal
One Beacon Street, Suite 1320
Boston, MA 02108–3106
T  617.598.6700
F  617.722.0276
www.dbslawfirm.com

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 2



The Applicant is seeking to build out the 11,476 GSF of shell space located on the first floor of
the new wing at this time. Following a careful review of its service needs, the Applicant
determined that the first floor shell space can be used to house services. This decision was made
following a careful review of the Hospital's programmatic and facility information to determine
the best use of the shell space. The build out of the shell space will result in changes to the
approved MCE for the Project.

Review of Requested Change to Approval

The Applicant respectfully requests the Department's approval to build out 11,476 GSF of shell
space located on the first floor of the new three-story addition. At the time of filing the DoN
application, the Hospital was undecided as to how best to use the shell space for administrative,
clinical, and support functions and sought the inclusion of shell space in the DoN as it resolved
its plans. The Applicant determined that the shell space on the first floor will be the location of
its new cardiac catheterization service as well as a cardiac outpatient program. The proposed
build out will eliminate all shell space associated with this DoN and allow the Applicant to fully
utilize all available space for its services.

The Applicant participates in Steward Health Care System's ("Steward") Integrated Risk
Bearing Organization ("ACO"). As a member of the ACO, the Applicant participates in
Steward's care management system and provider contracting arrangements, including global
payment contracts as envisioned by Chapter 224 of the Acts of 2012 ("Chapter 224"). Consistent
with the intent of Chapter 224, these global payment contracts incent and encourage the
coordination of care as a means to increase communication among providers to improve care and
lower costs. Steward and the Applicant are seeking to establish cardiac catheterization services at
the Hospital to enhance care coordination in a lower cost setting. By offering this service,
Steward and the Applicant will be able to better manage population health for quality and cost
efficiency.

     1.     Changes to Approved Scope

The Applicant evaluated its service and clinical function needs since the approval of the Project
to determine the best use for the shell space. As part of this review process, the Applicant
examined the need for cardiac catheterization service and cardiac outpatient program at the
Hospital. The Applicant determined that the best use of the shell space would be for these
purposes. By locating the services on the first floor of the new wing, the Applicant will not need
to disrupt or relocate existing operational services as the cardiac catheterization service will
occupy space that currently is unlicensed. The proposed build out also will change the MCE. The

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 3



following discussion details the changes to the DoN approval as proposed by this request for a significant amendment.

      a.    <u>Need for Cardiac Catheterization</u>

The Applicant now seeks to build out all 11,476 GSF of shell space on the first floor of the new wing in order to accommodate a new cardiac catheterization service and cardiac outpatient program. Following a review a referral patterns and projected volume, the Applicant determined that the best use of the shell space would be for a new cardiac catheterization service. A detailed review of these factors indicated that the Applicant could support a cardiac catheterization service. Offering cardiac catheterization services on-site at the Hospital will prevent the fragmentation of care that occurs when patients must utilize other providers for this critical clinical service, allowing the Applicant to ensure its patients receive care that meets its high quality standards.

The Applicant's staff currently refers a high volume of patients to other providers for cardiac catheterization services. At present, one hundred thirty-six (136) primary care physicians and twenty (20) cardiologists of the Hospital actively refer patients for cardiac catheterization services. This represents a high volume of patients who must seek time-sensitive and critical treatment outside of the Hospital. Furthermore, fragmentation of care develops when patients are forced to utilize other providers for services that could be more appropriately managed and integrated with patients' overall care at the Hospital. Patients may not receive care consistent with the Hospital's quality standards. Additionally, patients must coordinate with multiple providers for their treatment.

Based on the number of referred patients, the Applicant determined that patient care would be best served by establishing and offering cardiac catheterization services on-site at the Hospital. Dr. Joseph Carrozza will serve as the Program Director for the new cardiac catheterization service. Dr. Carrozza is board-certified in cardiovascular medicine, has 5 years' experience in cardiac catheterization, and performed at least 200 cardiac catheterization procedures per year in his experience. Three physicians initially will be granted privileges to perform cardiac catheterization services at the Hospital: Paul G. Vivino, MD, FACC will perform interventional catheterization; Jonathan D. Bier, MD, FACC will perform interventional catheterization; and Ravi Chander, MD will perform diagnostic catheterization only. The Hospital also will staff the service with qualified and trained assistants who will be present during all cardiac catheterization procedures.

The Applicant developed proposed projections for the utilization of the cardiac catheterization service over a four year period. Due to the number of referring physicians and current volume of

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 4



patients referred for cardiac catheterization, the Applicant projects that the service will exceed 300 procedures within twenty-four (24) months of opening. The Applicant expects that the service will undergo modest increases in utilization of 5% per year over the first four years. The following chart details these projections.

| Year of Operation | Number of Cardiac Catheterization Procedures |
|---|---|
| Year 1 | 300 procedures |
| Year 2 | 315 procedures |
| Year 3 | 330 procedures |
| Year 4 | 346 procedures |

As the data shows, the Applicant anticipates sufficient volume to support the establishment of the cardiac catheterization service. While more physicians are expected to be privileged to perform cardiac catheterization over time, the Applicant is not predicting a large increase in utilization over the first few years of operations of the service as only 3 physicians will be performing procedures. In addition, the modest demand projections account for the fact that certain patients will continue to seek alternative providers of cardiac catheterization services for reasons including lower level of acuity, proximity to the patient's home, or another provider of the patient's choice. The Applicant will meet the required number of procedures necessary to comply with the Department's licensure regulations for a cardiac catheterization service.

     b.    <u>Scope of Proposed Build-Out of Shell Space</u>

The proposed cardiac catheterization service and cardiac outpatient program will comply with all of the Department's architectural requirements for such a service. The cardiac catheterization service will be located in a separate suite dedicated solely to cardiac catheterization. Space will not be shared with other services. All procedure rooms will meet applicable standards for floor area and clear floor area as necessary to support such a service. The procedure rooms also will be designed to meet all other standards necessary to carry out cardiac catheterization on patients in an outpatient hospital setting.

In addition to accommodate procedure rooms, the fit-out of the shell space also will include necessary support space areas related to the cardiac catheterization service. Support areas include waiting areas, bathroom facilities, storage locations, patient dressing areas, and patient preparation, holding, and recovery areas. Other support areas will be more technical and include a control area and related equipment, a work room, scrub facilities, a viewing room, an electrical equipment room, a clean workroom or supply room, a soiled work room or holding room, and an environmental services room. A staff changing area also will be provided to ensure that staff can

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 5



enter the suite, change clothes, and move directly to the cardiac catheterization space. All of these support areas are necessary for the operation of a cardiac catheterization service.

Cardiac catheterization services require certain support services to be available to patients. These services are not part of the shell space build out as they presently are offered at the Hospital. As a result, they are not included in the scope of the build out. These services include hematology and coagulation disorders services, electrocardiography, diagnostic radiology, clinical pathology, nuclear medicine, nuclear cardiology, Doppler echocardiography, pulmonary function testing, microbiology, exercise stress testing, and a cardiac pacemaker station. The Applicant will ensure that it provides all necessary support services as required by the cardiac catheterization service.

In addition, the cardiac outpatient program will be located on the first floor of the new wing. This program will include nine (9) exam rooms as well as three (3) offices. The cardiac catheterization service and the cardiac outpatient program will occupy all of the shell space.

2.    Changes to GSF

The Applicant proposes to build out all of the shell space included in the DoN approval. The DoN approval authorized a total GSF of 57,952 GSF. This was comprised of 57,163 GSF of new construction, including 11,476 GSF of shell space, and 789 GSF for renovation. To date, the Applicant has built the approved 45,687 GSF for new construction and 789 GSF for renovation, with the 11,476 GSF of shell space remaining to be fit-out. The proposed cardiac catheterization service will occupy all of the 11,476 GSF of shell space located on the first floor of the new wing. The amount of DoN approved shell space will be eliminated in connection with this request.

As previously stated, the 11,476 GSF associated with the build-out of the shell space will be used to accommodate a cardiac catheterization service, including necessary procedure rooms and support spaces, as well as a cardiac outpatient program. The Hospital presently does not offer a cardiac catheterization service. The Applicant determined that the best usage of the shell space in the new wing to provide needed patient care will be served through a fit-out to house the cardiac catheterization service and cardiac outpatient program.

The Applicant notes that the proposed amendment will not change the approved total GSF for the Project. The proposed significant amendment will result in the reallocation of the approved GSF for shell space. Upon completion of the build-out, all 11,476 GSF of shell space will be constructed and no shell space will remain unused. The approved GSFs associated with new construction and renovation will not change in connection with this amendment.

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 6



3.    Changes to Approved MCE

The Applicant requests certain changes to the approved MCE for the Project as a result of the build out of the shell space and changes to the scope of the Project. In accordance with 105 C.M.R. §100.551(I)(6), the final approved Project cost is deemed to be $22,411,079 in November 2012 dollars, which represents the MCE approved by the DoN Program with the addition of inflation to the date of final plan approval. The Applicant now seeks certain changes to the MCE related to the build out of the shell space in order to establish a cardiac catheterization service. The following chart details the changes in the cost categories for the Project.

| Category of Expenditure | Final Approved New Const (11/12 $) | Final Approved Renovation (11/12 $) | Requested New Construction (8/13 $) | Requested Renovation (8/13 $) |
|---|---|---|---|---|
| Land Costs | | | | |
| Land Acquisition | $0 | $0 | $0 | $0 |
| Non Depreciable Land Dev. | $269,193 | $0 | $269,193 | $0 |
| Site Survey and Soil Invest. | $45,239 | $0 | $45,239 | $0 |
| **Total Land Costs** | $314,432 | $0 | $314,432 | $0 |
| Construction Costs | | | | |
| Depreciable Land Dev. Costs | $173,375 | $1,134 | $173,375 | $1,134 |
| Construction Contract | $18,283,384 | $119,590 | $21,474,884 | $119,590 |
| Fixed Equip. Not in Contract | $0 | $0 | $0 | $0 |
| Architect. & Engineering Costs | $2,347,818 | $15,056 | $2,730,797 | $15,056 |
| Pre-filing Planning and Dev. | $84,272 | $551 | $134,272 | $551 |
| Post-filing Planning and Dev. | $43,077 | $333 | $93,077 | $333 |
| Other: PM Fee, PreCon CM Fee | $880,872 | $5,813 | $1,119,232 | $5,813 |
| Other: furnishings, move, clean, builders risk, signs | $140,540 | $832 | $320,540 | $832 |
| Net Interest Exp. During Constr. | $0 | $0 | $0 | $0 |
| Major Movable Equipment | $0 | $0 | $2,445,000 | $0 |
| **Total Construction Costs** | $21,953,338 | $143,309 | $28,491,177 | $143,309 |
| Financing Costs | | | | |
| Costs of Securing Financing | $0 | $0 | $0 | $0 |
| **Total Financing Costs** | $0 | $0 | $0 | $0 |
| **Total Capital Expenditure** | $22,267,770 | $143,309 | $28,805,609 | $143,309 |

As previously stated, the requested increase to the MCE results from the build out of the DoN-approved shell space located in the first floor of the new wing. The total projected cost for the

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 7



build out is $28,948,918 (August 2013 dollars). In order to accommodate the construction, the Applicant seeks to change the new construction costs associated with the construction contract, architectural and engineering, pre-filing planning and development, post-filing planning and development, other costs, and major moveable equipment. The costs associated with the construction of the shell space based on the scope of work to be performed to fit-out the space for use as a cardiac catheterization service and cardiac outpatient program.

The Applicant respectfully requests an increase in the approved MCE for the Project to $28,948,918 (August 2013 dollars). The requested change reflects increases related to the build out of the shell space in order to establish the cardiac catheterization service and cardiac outpatient program. The changes to the MCE result in an increase of 29.17% from the final cost figures of November 2012. The proposed changes are reasonable in light of the scope of work to be performed to build out the shell space.

<u>Request for Significant Change</u>

In accordance with the provisions of 105 C.M.R. §100.753(D), the Applicant respectfully requests the Department's approval of the proposed significant change to its DoN authorization. Approval of this amendment will enable the Applicant to fully build out all approved shell space in order to accommodate a cardiac catheterization service, cardiac outpatient program, and related support spaces. Upon completion of the proposed work, there will be no outstanding shell space associated with this Project. The approval of the significant amendment will allow the Applicant to implement its cardiac catheterization service and cardiac outpatient program in an appropriate physical plant location that will not disrupt existing services. In addition, it will provide the Applicant with the opportunity to enhance the range of services it provides to patients and increase access to such health services.

Pursuant to the regulations applicable to significant changes set forth at 105 C.M.R. §§100.753 and 100.756, the Applicant states the following:

1.  This original request and two (2) copies are being submitted to the DoN Program. A copy of the request also is being submitted to the Southeast Regional Health Office, the Center for Health Information and Analysis, and the Health Policy Commission.

2.  In accordance with 105 C.M.R. §100.756, this request provides a detailed description and comparison of the approved project and the proposed change, a description of cost implications, and the rationale for the proposed change.

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 8



3. Enclosed at <u>Exhibit B</u> is an Affidavit of Truthfulness and Proper Submission per 105 C.M.R. §100.324, certifying to the truthfulness of the facts contained in the request and that the requisite number of copies of the request have been sent to the DoN Program, the Southeast Regional Health Office, the Center for Health Information and Analysis, and the Health Policy Commission.

4. Pursuant to 105 C.M.R. §§100.330 and 100.331(A) of the DoN regulations, notice of this request for significant change will be published in *The Herald News* on August 19, 2013. Original copies of the notice and the original Return of Publication Affidavit will be provided to the DoN Program when available.

In conformance with the requirements of 105 C.M.R. §§100.533(B)(9) and 100.551(J), the Applicant will commit five percent of the requested $6,537,839 increase in the MCE, or $326,892, in order to support primary and preventative health care services and related community benefits. The Applicant will pay this amount in equal installments of $65,378 over a five (5) year period in accordance with programmatic priorities determined through discussions between the Applicant and the Office of Healthy Communities. The Applicant will file all reports related to the community benefits as required by the Department and the Office of Healthy Communities.

Approval of this request will conform with the Department's mandate to guarantee access to affordable health care services. The Applicant's request for a significant amendment complies with the requirements of 105 C.M.R. §§100.753 and 100.756 of the DoN Program regulations. In furtherance of this end The Applicant respectfully requests the Department's approval of a significant change to its DoN approval.

We thank you for your attention to this request. Please do not hesitate to contact Nicole Sexton, Esq. or me if you have any questions or require additional information.

Sincerely,

Andrew S. Levine

Enclosure (2)

213065.3

Bernard A. Plovnick, Program Director
Department of Public Health
Determination of Need Program
August 16, 2013
Page 9



cc:     M. Crowley, Steward Health Care
        J. Maher, Esq., Steward Health Care
        P. Murphy, Steward Health Care
        K. Whalen, Steward Health Care
        S. McCabe, Center for Health Information and Analysis
        R. O'Connor, Southeast Regional Health Office
        C. O'Connor, Department of Public Health
        S. Lohnes, Department of Public Health
        C. Balulescu, Department of Public Health
        M. Biondolillo, Department of Public Health
        D. Seltz, Heath Policy Commission
        K. Feldmar, Division of Medical Assistance

# **Attachment/Exhibit**

# **A**



# The Commonwealth of Massachusetts

Executive Office of Health and Human Services
Department of Public Health
Determination of Need Program
99 Chauncy Street, 2nd Floor
Boston, MA 02116
(617) 753-7340
Fax: (617) 753-7349

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**JUDYANN BIGBY, MD**
SECRETARY

**JOHN AUERBACH**
COMMISSIONER

April 11 , 2012

CERTIFIED MAIL
RETURNED RECEIPT REQUESTED

NOTICE OF DETERMINATION OF NEED
Steward St. Anne's Hospital Corporation d/b/a
Saint Anne's Hospital
Project Number 5-3C08
(New Construction and Renovation to Replace
40 Existing Medical/Surgical Beds)

Andrew S. Levine, Esq
Donoghue, Barrett & Singal, P.C
One Beacon Street, Suite 1320
Boston, MA 02108

Dear Mr. Levine:

At their meeting of April 11, 2012, the Commissioner and the Public Health Council, acting together as the Department, voted pursuant to M.G.L. c.111, § 25C and the regulations adopted thereunder, to approve with conditions, the application filed by Steward St. Anne's Hospital Corporation d/b/a Saint Anne's Hospital ("Applicant" or "Saint Anne's" or "Hospital" ) for a Determination of Need. The project involves new construction and renovation to build a three-story wing on Saint Anne's main campus in Fall River to replace 40 existing medical/surgical beds and to connect the new wing to the existing facility. This Notice of Determination of Need incorporates by reference the Staff Summary and the Public Health Council proceedings concerning this application.

The total gross square feet ("GSF") for this project shall be 57,952 GSF, which will include 57,163 for new construction, of which 11,476 GSF will be shell space, and 789 GSF for renovation. Saint Anne's will be required, under Section 105 CMR 100.756 of the DoN regulations, to file a request with the DoN Program Director for an amendment for a significant change to its approved DoN prior to undertaking any build-out of the shell space for clinical purposes.

The approved maximum capital expenditure ("MCE") of $21,559,477 (December 2011 dollars) is itemized below:

Saint Anne's Hospital                           2                        5-3C08

|                                                           | New Construction | Renovation |
|-----------------------------------------------------------|-----------------:|-----------:|
| Land Costs:                                               |                  |            |
| Site Survey and Soil Investigation                        | $      43,520    | $        0 |
| Other Non-Depreciable Land Development                    |        258,964   |          0 |
| Total Land Costs                                          |        302,484   |          0 |
| Construction Costs:                                       |                  |            |
| Depreciable Land Development Cost                         |        166,787   |      1,091 |
| Construction Contract                                     |     17,588,633   |    115,046 |
| Architectural and Engineering Costs                       |      2,258,600   |     14,484 |
| Pre-filing Planning and Development Costs                 |         81,070   |        530 |
| Post-filing Planning and Development Costs                |         41,440   |        320 |
| Other (A): PM Fee and PreCon CM Fee                       |        847,400   |      5,592 |
| Other (B): Furnishings, Move, Clean, Builders Risk, Signs |        135,200   |        800 |
| Total Construction Costs                                  |     21,119,130   |    137,863 |
| Total                                                     |     21,421,614   |    137,863 |
| Estimated Total Maximum Capital Expenditure               | $21,559,477      |            |

The approved MCE will be funded with a 100% equity contribution provided by Saint Anne's parent, Steward Health Care System, LLC.

The approved annual incremental operating costs of $1,262,034 (December 2011 dollars) for the project's first full year of operation (FY 2014) are itemized as follows:

| Salaries, Wages, Fringe Benefits        | $   182,612 |
|-----------------------------------------|------------:|
| Purchased Services                      |      37,027 |
| Supplies and Other Expenses             |     276,804 |
| Depreciation                            |     765,591 |
| Total Incremental Operating Costs       | $ 1,262,034 |

The reasons for this approval with conditions are as follows:

1. Saint Anne's proposes new construction and renovation to build a three-story wing on its main campus in Fall River to replace 40 existing medical/surgical beds and to connect the new wing to the existing facility.

2. The health planning process for the project was satisfactory.

3. The proposed new construction and renovation is supported by current and projected medical/surgical utilization, as discussed under the Health Care Requirements factor of the Staff Summary.

4. The project, with adherence to a certain condition, meets the operational objectives factor of the DoN regulations.

5. The project, with adherence to a certain condition, meets the standards compliance factor of the DoN regulations.

6. The recommended maximum capital expenditure of $21,559,477 (December 2011 dollars) is reasonable compared to similar, previously approved projects.

7.   The recommended operating costs of $1,262,034 (2011 dollars) are reasonable compared to similar, previously approved projects.

8.   The project is financially feasible and within the financial capability of the Applicant.

9.   The project meets the relative merit requirements of the DoN regulations.

10.   The proposed community health service initiatives are consistent with the DoN regulations.

11.   The Applicant meets the standards of the Department's Determination of Need Guidelines for Environmental and Human Health Impact ("Green Guidelines").

This Determination is effective upon receipt of this Notice. The Determination is subject to the conditions set forth in Determination of Need Regulation 105 CMR 100.551, including sections 100.551 (C) and (D) which read in part:

(C)   ...such determination shall be valid authorization only for the project for which made and only for the total capital expenditure approved.

(D)   The determination...shall be valid authorization for three years. If substantial and continuing progress toward completion is not made during the three year authorization period, the authorization shall expire if not extended by the Department for good cause shown (see 105 CMR 100.756).... Within the period of authorization, the holder shall make a substantial and continuing progress toward completion; however, no construction may begin until the holder has received final plan approval in writing from the Division of Health Care Quality.

This Determination is subject to the following conditions, in addition to the terms and conditions set forth in 105 CMR 100.551. Failure of the Applicant to comply with the conditions may result in Department sanctions, including possible fines and/or revocation of the DoN.

1.   Saint Anne's shall accept the maximum capital expenditure of $21,559,477 (December 2011 dollars) as the final cost figure except for those increases allowed pursuant to 105 CMR 100.751 and 100.752.

2.   The total gross square feet (GSF) for this project shall be 57,952 GSF, which will include 57,163 for new construction, of which 11,476 GSF will be shell space, and 789 GSF for renovation.

3.   Saint Anne's shall contribute 100% in equity of the maximum capital expenditure of $21,559,477 (December 2011 dollars).

4.   Saint Anne's shall implement the recommendations for policies and procedures related to language access for limited English proficient and non-English speaking patients as described in the document prepared by the Office of Health Equity, which is appended as Attachment 2 to the Staff Summary and incorporated herein by reference.

Saint Anne's Hospital                4                                          5-3C08

5.   Saint Anne's shall contribute a total of $1,077,974 ( December 2011 dollars), or $215,595 per year for a period of five years, to fund community health services initiatives and shall comply with the Office of Healthy Communities reporting requirements as described in Attachment 3 of the Staff Summary.

FOR THE PUBLIC HEALTH COUNCIL

Madeleine Biondolillo, MD
Director, Bureau of Health Care Safety and Quality

MB/BP/jp

cc:   Sherman Lohnes, Division of Health Care Quality
      Steve McCabe, Division of Health Care Finance and Policy
      Terri Yannetti, Division of Medical Assistance
      Kristin Golden, Commissioner's Office
      Cathy O'Connor, Office of Healthy Communities
      Samuel Louis, Office of Health Equity
      Decision Letter File
      Public File
      MIS

# **Attachment/Exhibit**

## **B**

## AFFIDAVIT OF TRUTHFULNESS AND PROPER SUBMISSION

We, the undersigned, on behalf of Steward St. Anne's Hospital Corporation, hereby certify as follows:

1.    We have read the Massachusetts Department of Public Health's (the "Department") Determination of Need regulations, 105 CMR 100.00 et seq. (the "Regulations").

2.    We have read the foregoing Request for Significant Amendment, including all exhibit and attachments (the "Request"), prepared on behalf of Steward St. Anne's Hospital Corporation.

3.    We have caused to be submitted the required copies of this Request to the Program Director of the Determination of Need Program, the appropriate Regional Health Office of the Department, and the Center for Health Information and Analysis in accordance with 105 CMR 100.756(A). No filing with the Department of Elder Affairs or the Department of Mental Health was required by 105 CMR 100.152 or 105 CMR 100.153.

4.    We have arranged for notices to be published in the Fall River Herald News on August 19 _____, 2013 and to have an original of such notice forwarded to the Determination of Need Program in accordance with 105 CMR 100.330-100.332 and 105 CMR 100.756(C) of the Regulations.

5.    The material submitted to the Department by or on behalf of Steward St. Anne's Hospital Corporation with respect to the Request is true and does not, to the best of our knowledge, contain any false statement or misrepresentation of fact.

Signed on this 14 day of August _____ 2013, under the pains and penalties of perjury.

For Corporation:



By:  Craig Jesiolowski
Its:  President

For Board of Directors



By:  Sr. Vimala Vadakumpadan
Its:  Chairman of the Board

On this 14 day of August _____, 2013, Craig Jesiolowski personally appeared before me, the undersigned notary public, and proved to me through satisfactory evidence of identification, which was a driver's license, to be the person whose name is signed above and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

On this 14 day of August _____, 2013, Sr. Vimala Vadakumpdan appeared before me, the undersigned notary public, and proved to me through satisfactory evidence of identification, which was a driver's license, to be the person whose name is signed above and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

Notary Public Signature:

My Commission
Expires: 06/29/2018 _____



CHERYL DUBE
Notary Public
Commonwealth of Massachusetts
My Commission Expires June 29, 2018

Notary Public Signature:

My Commission
Expires: 06/29/2018 _____

CHERYL DUBE
Notary Public
Commonwealth of Massachusetts
My Commission Expires June 29, 2018

# EXHIBIT 4



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Public Health
## Bureau of Health Care Safety and Quality
## Determination of Need Program
## 99 Chauncy Street, Boston, MA 02111

**DEVAL L. PATRICK**
GOVERNOR

**JOHN W. POLANOWICZ**
SECRETARY

**CHERYL BARTLETT, RN**
COMMISSIONER

Tel: 617-753-7340
Fax: 617-753-7349
www.mass.gov/dph/don

October 7, 2013

Andrew S. Levine, Esq.                          Re: Determination of Need Project # 5-3C08
Donoghue Barrett & Singal                            Request for Significant Change
One Beacon Street, Suite 1320                        Steward St. Anne's Hospital Corporation
Boston, MA 02108-3106

Dear Mr. Levine:

This letter is in response to your request dated August 16, 2013 for a significant amendment to the previously-approved above-referenced Determination of Need ("DoN") for build out of 11,476 GSF of shell space in order to construct a new cardiac catheterization service as well as a cardiac outpatient program.

Your request states that Steward St. Anne's Hospital Corporation ("St. Anne's" or "Applicant") participates in Steward Health Care System's ("Steward") Integrated Risk Bearing Organization, and that Steward and St. Anne's are seeking to establish cardiac catheterization services at St. Anne's to enhance care coordination in a lower cost setting. Your request then goes on to outline "Need for Cardiac Catheterization."

The Department's authority under DoN for this particular project rests on the fact that the Applicant proposed a substantial capital expenditure. The DoN program generally reviews proposed expenses, and the proposed services to be provided, based on the projections provided by an applicant for future use of the services, with the assumption that the services are permissible and that the project will ultimately obtain a license to use the clinical space for the services as proposed.

As you know, on May 5, 2008, the Department issued Circular Letter DHCQ 08-05-486 ("Circular Letter") to, among others, acute care hospital chief executives. A copy of the Circular Letter is enclosed for your reference. Among its provisions, the Circular Letter clearly states that ". . . effective immediately, the Department will not accept an application for approval of a new cardiac catheterization service if the hospital is located within 30 minutes travel time (via emergency ambulance) of a hospital that currently provides primary angioplasty 24 hours/day, seven days/week."

The request that you submitted on behalf of the Applicant does not make any argument that its proposal to establish a cardiac catheterization service is in accordance with the circular letter. Thus, although the request sets out projected volume, it nowhere acknowledges that for this particular service, the details provided are irrelevant to the question of licensure of the service.

Steward St. Anne's Hospital Corporation               -2-                          Project Number 5-3C08

This leaves the DoN program questioning the request as submitted.  The Applicant should understand that the DoN program cannot approve a substantial capital expenditure, or in this case an amendment to a previously-approved project that involved a substantial capital expenditure, where it is clear that the finished project cannot be licensed for the service that is proposed.  Likewise, the Applicant should understand that the submission of a DoN request cannot be used to circumvent clear guidance on a moratorium for the licensure of a particular service.

An analogous situation would be one in which a DoN application is submitted for a transfer of ownership, where it is clear that the potential owner could not be deemed suitable for the issuance of a license.  In such a situation, pursuit of the DoN would be pointless, as licensure is certain to be denied.

As such, I am asking that you confer with the Applicant and consider an amendment to the request that would enable the Department to move forward with a review of a request for services that have a reasonable likelihood for successful licensure.

If you have any questions, please call me at 617-753-7344 or email me at bernard.plovnick@state.ma.us.


Sincerely,


Bernard Plovnick
Director, Determination of Need Program

# EXHIBIT 5

Allwes, Deborah (DPH)

| | |
|---|---|
| From: | Polanowicz, John (EHS) |
| Sent: | Monday, May 05, 2014 3:22 PM |
| To: | Bartlett, Cheryl (DPH) |
| Cc: | Allwes, Deborah (DPH); Ann Hwang; Judd, Jill (EHS) |
| Subject: | FW: Cath Lab |
| Attachments: | 105 CMR 130.900-982 eff 6 12 09.pdf; ICSAC Summary Actions 4-17-14.docx; ICSAC Actions 4-17-14.docx; Policy Regarding Proposal for a New Cardiac Catheterization Service mb - draft 4 28 14.docx |

Take a quick look at the updated memo. I am trying to accomplish three things:

- Folks need to meet the minimum or have plan in place to do so
- An ACO (HPC or Pioneer -- hospital based) can transfer from one site not meeting the requirements to the other site, if that location is closed to catheterization (peripherals could still be done)

Ann, I've looped you for some thoughts on this from a policy perspective.

# EXHIBIT 6

Buonasaro, Michelle (DPH)

| | |
|---|---|
| **From:** | Murphy, Nancy (DPH) |
| **Sent:** | Thursday, March 20, 2014 11:29 AM |
| **To:** | Biondolillo, Madeleine (DPH) |
| **Cc:** | Svizzero, Kathy (DPH) |
| **Subject:** | revisions to policy regarding new cath services |
| **Attachments:** | Policy Regarding Proposal for a New Cardiac Catheterization Service - draft 3 19 14 tracked changes.docx; Policy Regarding Proposal for a New Cardiac Catheterization Service - draft 3 19 14.docx |
| | |
| **Categories:** | Red Category |

I've revised the draft to reflect hospitals "owned by an ACO".  Attached are 2 versions - one with tracked changes, one without.

Nancy Murphy
(617)624-5675

-----Original Message-----
From: Biondolillo, Madeleine (DPH)
Sent: Thursday, March 20, 2014 6:28 AM
To: Murphy, Nancy (DPH)
Subject: RE: p.s. new cath svcs - ACO

good question. perhaps we should address that in the document as a proposal (to be potentially shot-down). e.g., Affiliation is not the same as owned?  Also, Emerson said they wanted a cath lab because they are in an ACO with Partners, not Atrius.

From: Murphy, Nancy (DPH)
Sent: Wednesday, March 19, 2014 5:34 PM
To: Biondolillo, Madeleine (DPH)
Subject: p.s. new cath svcs - ACO

Madeleine,
I looked at who the ACO's actually are in Mass. and drafted the attached document to show the hospitals in their systems without cath services (at least through my googling).  In addition to the 12 hospitals that are in these ACOs that don't already have a cath service, it raises this question:

does the language as drafted open the door for the hospitals affiliated with Atrius (Emerson, Newton-Wellesley, and Winchester) to open a cath service.  We know Emerson and Winchester have expressed interest.   Newton-Wellesley had a cath service years ago; it closed due to low volume.

Nancy Murphy
Department of Public Health
250 Washington St., 6th fl.
Boston, MA 02108
(617)624-5675
Nancy.Murphy2@massmail.state.ma.us<mailto:Nancy.Murphy2@massmail.state.ma.us>

1

Policy Regarding Proposal for a New Cardiac Catheterization Service – draft 3 ~~1920~~-14

**Version A**

The moratorium on establishment for a new cardiac catheterization service within 30 minutes of an existing PCI-capable hospital remains, **unless all of the following criteria are met:**

1) the hospital proposing the new cardiac catheterization service is <u>wholly owned and operated by, i.e. not just affiliated with,</u>~~part of~~ an accountable care organization (ACO);

2) all the existing cardiac catheterization services in the hospitals <u>owned by or affiliated with</u>~~that make up~~ the ACO meet the minimum facility (and operator?) volume minimums in the DPH hospital licensure regulations. These minimums are:
   a. For a service only performing diagnostic procedures, 300 diagnostic procedures per year
      i. for Steward, Carney (54 in FY12) and Quincy (70 in FY12) do not meet
   b. For hospitals performing both diagnostic and therapeutic (interventional) procedures, 600 procedures per year, of which 200 are percutaneous coronary interventions (PCIs).
      i. One of the four Steward hospitals that perform interventional cardiac catheterization procedures did not meet the 200 PCIs in FY12. Holy Family performed 193 PCIs.
   c. For interventionalists, currently 75 PCI procedures per year; may be reduced to 50 per year consistent with recommendation of PCI Oversight Subgroup and current national guidelines.

3) If the ~~ACO's~~ existing cardiac catheterization service(s) <u>in hospitals owned by the ACO</u> that perform only diagnostic <u>cardiac catheterization</u> procedures do not meet the DPH facility diagnostic volume minimum, the organization agrees to immediately cease performing cardiac catheterization procedures at each site not meeting the diagnostic volume minimum, as a condition of approval of a new cardiac catheterization service at a new site.

4) The organization documents to the Department's satisfaction:
   a. where the patient population they assume they would treat at the new site is currently receiving diagnostic <u>cardiac</u> catheterization procedures;

**Comment [1]:** Could it be a brand new dealer or must the hospital have been owned by the ACO for a period of time? If yes, how long?

**Comment [2]:** Do we broaden it here to include affiliated hospitals? If existing affiliates are low volume shouldn't the ACO direct their patients there first? Or, if distance is an issue, create another affiliation rather than build a new cath lab?

**Comment [3]:** Limit criteria to facility diagnostic volume minimum? I.e., delete b and c? See version B p.3

**Comment [4]:** Do we need to get into therapeutic volume at all?

**Comment [5]:** Do we need to get into operator volume? It's only relevant for sites that perform therapeutic procedures

**Comment [6]:** Here it would only be owned because they couldn't close an affiliate

**Comment [7]:** Could still do peripheral caths; DPH does not regulate.

1

b. the projected volume of diagnostic cardiac catheterization procedures and the underlying assumptions associated with the volume projection; and

c. how they ensure these patients will use their service at the new diagnostic cardiac catheterization site.

Any approval of a new diagnostic cardiac catheterization service under these terms in no way guarantees that the new cardiac catheterization service will be approved in the future through any separate DPH process to provide emergency or non-emergency angioplasty at that site.

---

Question: Four of Steward's existing acute care hospitals do not currently provide cardiac catheterization services. Under this policy, would we allow all four to open a cardiac catheterization service? If leveraging the 2 low volume sites in exchange for St. Anne's DPH would have nothing to leverage if Steward already agreed to stop performing *cardiac* catheterization procedures (they could still do peripheral caths; DPH does not regulate) at Quincy and Carney.

2

Policy Regarding Proposal for a New Cardiac Catheterization Service – draft 3-19-14

**Version B**

The moratorium on establishment for a new cardiac catheterization service within 30 minutes of an existing PCI-capable hospital remains, unless all of the following criteria are met:

1) the hospital proposing the new cardiac catheterization service is wholly owned and operated by, i.e. not just affiliated with, part of an accountable care organization (ACO);

   > **Comment [ 8]:** could it be a brand new deal or must the hospital have been owned by the ACO for a period of time? if yes, how long?

2) all the existing cardiac catheterization services performing only diagnostic procedures in the hospitals owned by or affiliated with that make up the ACO meet the annual minimum facility diagnostic volume (300 diagnostic procedures) in the DPH hospital licensure regulations;

   > **Comment [ 9]:** Do we broaden it here to include affiliated hospitals?? If existing affiliates are low volume shouldn't the ACO direct their patients there first? Or, if distance is an issue, create another affiliation rather than build a new cath lab?

   > **Comment [ 10]:** Carney (54 in FY12) and Quincy (70 in FY12) do not meet

3) If the ACO's existing cardiac catheterization service(s) in hospitals owned by the ACO that perform only diagnostic cardiac catheterization procedures do not meet the DPH facility diagnostic volume minimum, the organization agrees to immediately cease performing cardiac catheterization procedures at each site not meeting the diagnostic volume minimum, as a condition of approval of a new cardiac catheterization service at a new site.

   > **Comment [ 11]:** Here it would only be owned because they couldn't close an affiliate

   > **Comment [ 12]:** Could still do peripheral caths; DPH does not regulate.

4) the organization documents to the Department's satisfaction:
   a. where the patient population they assume they would treat at the new site is currently receiving diagnostic cardiac catheterization procedures;
   b. the projected volume of diagnostic cardiac catheterization procedures and the underlying assumptions associated with the volume projection; and
   c. how they ensure these patients will use their service at the new diagnostic cardiac catheterization site.

Any approval of a new diagnostic cardiac catheterization service under these terms in no way guarantees that the new cardiac catheterization service will be approved in the future through any separate DPH process to provide emergency or non-emergency angioplasty at that site.

3

Policy Regarding Proposal for a New Cardiac Catheterization Service – draft 3-20-14

### Version A

The moratorium on establishment for a new cardiac catheterization service within 30 minutes of an existing PCI-capable hospital remains, unless **all of the following criteria are met**:

1) the hospital proposing the new cardiac catheterization service is wholly owned and operated by, i.e. not just affiliated with, an accountable care organization (ACO);

> **Comment [ 1]:** could it be a brand new deal or must the hospital have been owned by the ACO for a period of time? If yes, how long?

2) all the existing cardiac catheterization services in the hospitals owned by or affiliated with the ACO meet the minimum facility (and operator?) volume minimums in the DPH hospital licensure regulations. These minimums are:

> **Comment [ 2]:** Do we broaden it here to include affiliated hospitals? If existing affiliates are low volume shouldn't the ACO direct their patients there first? Or, if distance is an issue, create another affiliation rather than build a new cath lab?

> **Comment [ 3]:** Limit criteria to facility *diagnostic* volume minimum? I.e., delete b and c? See version B p.3

    a. For a service only performing diagnostic procedures, 300 diagnostic procedures per year
        i. for Steward, Carney (54 in FY12) and Quincy (70 in FY12) do not meet
    b. For hospitals performing both diagnostic and therapeutic (interventional) procedures, 600 procedures per year, of which 200 are percutaneous coronary interventions (PCIs).
        i. One of the four Steward hospitals that perform interventional cardiac catheterization procedures did not meet the 200 PCIs in FY12. Holy Family performed 193 PCIs.

> **Comment [ 4]:** Do we need to get into therapeutic volume at all?

    c. For interventionalists, currently 75 PCI procedures per year; may be reduced to 50 per year consistent with recommendation of PCI Oversight Subgroup and current national guidelines.

> **Comment [ 5]:** Do we need to get into operator volume? It's only relevant for sites that perform therapeutic procedures

3) If the existing cardiac catheterization service(s) in hospitals owned by the ACO that perform only diagnostic cardiac catheterization procedures do not meet the DPH facility diagnostic volume minimum, the organization agrees to immediately cease performing cardiac catheterization procedures at each site not meeting the diagnostic volume minimum, as a condition of approval of a new cardiac catheterization service at a new site.

> **Comment [ 6]:** Here it would only be owned, because they couldn't close an affiliate

> **Comment [ 7]:** Could still do peripheral caths; DPH does not regulate.

4) The organization documents to the Department's satisfaction:
    a. where the patient population they assume they would treat at the new site is currently receiving diagnostic cardiac catheterization procedures;

1

   b.   the projected volume of diagnostic cardiac catheterization procedures and the
        underlying assumptions associated with the volume projection; and
   c.   how they ensure these patients will use their service at the new diagnostic cardiac
        catheterization site.


Any approval of a new diagnostic cardiac catheterization service under these terms in no way
guarantees that the new cardiac catheterization service will be approved in the future through any
separate DPH process to provide emergency or non-emergency angioplasty at that site.


Question: Four of Steward's existing acute care hospitals do not currently provide cardiac
catheterization services. Under this policy, would we allow all four to open a cardiac catheterization
service? If leveraging the 2 low volume sites in exchange for St. Anne's DPH would have nothing to
leverage if Steward already agreed to stop performing *cardiac* catheterization procedures (they could
still do peripheral caths; DPH does not regulate) at Quincy and Carney.

2

Policy Regarding Proposal for a New Cardiac Catheterization Service – draft 3-19-14

**Version B**

The moratorium on establishment for a new cardiac catheterization service within 30 minutes of an existing PCI-capable hospital remains, unless **all of the following criteria are met:**

1) the hospital proposing the new cardiac catheterization service is wholly owned and operated by, i.e. not just affiliated with, an accountable care organization (ACO);

2) all the existing cardiac catheterization services performing only diagnostic procedures in the hospitals owned by or affiliated with the ACO meet the annual minimum facility diagnostic volume (300 diagnostic procedures) in the DPH hospital licensure regulations.

3) If the existing cardiac catheterization service(s) in hospitals owned by the ACO that perform only diagnostic cardiac catheterization procedures do not meet the DPH facility diagnostic volume minimum, the organization agrees to immediately cease performing cardiac catheterization procedures at each site not meeting the diagnostic volume minimum, as a condition of approval of a new cardiac catheterization service at a new site.

4) the organization documents to the Department's satisfaction:
   a. where the patient population they assume they would treat at the new site is currently receiving diagnostic cardiac catheterization procedures;
   b. the projected volume of diagnostic cardiac catheterization procedures and the underlying assumptions associated with the volume projection; and
   c. how they ensure these patients will use their service at the new diagnostic cardiac catheterization site.

Any approval of a new diagnostic cardiac catheterization service under these terms in no way guarantees that the new cardiac catheterization service will be approved in the future through any separate DPH process to provide emergency or non-emergency angioplasty at that site.

3

**Comment [ 8]:** could it be a brand new deal or must the hospital have been owned by the ACO for a period of time? If yes, how long?

**Comment [ 9]:** Do we broaden it here to include affiliated hospitals?? If existing affiliates are low volume shouldn't the ACO direct their patients there first? Or, if distance is an issue, create another affiliation rather than build a new cath lab?

**Comment [ 10]:** Carney (54 in FY12) and Quincy (70 in FY12) do not meet

**Comment [ 11]:** Here it would only be owned because they couldn't close an affiliate

**Comment [ 12]:** Could still do peripheral caths; DPH does not regulate.

# EXHIBIT 7

**From:** Judd, Jill (EHS)
**Sent:** Monday, May 05, 2014 11:10 AM
**To:** Bartlett, Cheryl (DPH)
**Subject:** Cath Lab

Hi Commissoner!
Steward is asking for an update on cath labs, should I check in w/ secretary on this? I know you discussed at your 1:1 last week, not sure if you have the next steps.


Jill Judd
Executive Assistant
Executive Office of Health and Human Services
617-573-1800
Learn more on our blog
Follow us on Twitter @Mass_HHS

# EXHIBIT 8

**Buonasaro, Michelle (DPH)**

| | |
|---|---|
| From: | Murphy, Nancy (DPH) |
| Sent: | Wednesday, May 21, 2014 1:49 PM |
| To: | Biondolillo, Madeleine (DPH) |
| Cc: | Svizzero, Kathy (DPH) |
| Subject: | RE: looking for trends |
| Attachments: | cath svcs less than 300 procedures.xls |

The diagnostic volumes are the same as those that you sent, but
1) this table includes other hospitals (ones that came on and off depending on their volume) and
2) shows *total* volume for Beverly and Melrose-Wakefield, including their PCI volume, which I doubled checked and is not consistent so I corrected and I am resending for you. It is an immaterial change and does not affect what you already sent. (The reason there is a change is because I probably took the total volume as submitted, but when it was entered in the system, it didn't add up and was corrected – but this table hadn't been. But again, doesn't affect what you sent the Secretary earlier).

And re St. Anne's, yes, they never really had any volume.

Nancy Murphy
(617)624-5675

From: Biondolillo, Madeleine (DPH)
Sent: Wednesday, May 21, 2014 1:16 PM
To: Murphy, Nancy (DPH)
Cc: Svizzero, Kathy (DPH)
Subject: RE: looking for trends

Thanks I sent the '11-'12 data already. Those two columns on this spreadsheet would be the same as that right?

This is very helpful to have, including the fact that St. Anne's used to have a lab. I think I remember Andy saying that. Did they close due to low volume?

Madeleine Biondolillo, MD
Associate Commissioner
Massachusetts Department of Public Health
Phone (617) 624-5200

From: Murphy, Nancy (DPH)
Sent: Wednesday, May 21, 2014 1:12 PM
To: Biondolillo, Madeleine (DPH)
Cc: Svizzero, Kathy (DPH)
Subject: looking for trends

Only one hospital has given me their volume so far. In the meantime, I don't know if you want to send this or just have for yourself, but I had tracked labs less than 300 diagnostic procedures since '98. It includes in the list of hospitals those that were once less than 300 but then were above, so there are 18 hospitals listed. When they were above 300, I didn't include their volume any further (e.g., Norwood, Brockton). Three closed their *cardiac* cath service – may still do peripheral procedures, which we don't regulate (Faulkner, Holyoke – and St. Anne's).

Nancy Murphy

1

# EXHIBIT 9

**Allwes, Deborah (DPH)**

| | |
|---|---|
| From: | Judd, Jill (EHS) |
| Sent: | Tuesday, May 27, 2014 8:18 AM |
| To: | Polanowicz, John (EHS) |
| Cc: | Allwes, Deborah (DPH); Hwang, Ann (EHS); Bartlett, Cheryl (DPH) |
| Subject: | Re: Cath Lab |

They will be here on June 10 for a masshealth meeting. They're very eager to hear back from us on this, I'll see if they can stick around for a little bit afterwards.

Jill Judd

# EXHIBIT 10

**Allwes, Deborah (DPH)**

| | |
|---|---|
| From: | Allwes, Deborah (DPH) |
| Sent: | Wednesday, June 11, 2014 9:02 PM |
| To: | Biondolillo, Madeleine (DPH) |
| Cc: | Bartlett, Cheryl (DPH) |
| Subject: | Cardiac Cath |
| Attachments: | Policy_Proposal_New_Cardiac_Catheterization_Service_6-11-2014.docx |

Commissioner and Madeleine, attached is the revised and fully edited cardiac cath moretorium. I would like to send this to the Secretary by the end of the week. Madeleine, plesae review this and give me any edits / feedback by Friday. I want to be sure you think this captures the intent of the work group.

You will notice I did not incorporate the suggestions from Steward Healthcare. While their suggested edits were thoughtfully considered, I did not think they represented the launguage that DPH would want this to include.

Thank you,

Deborah

Deborah S. Allwes, BS, BSN, MPH
Director of Bureau of Health Care Safety and Quality
Massachusetts Department of Public Health

# EXHIBIT 11

**Buonasaro, Michelle (DPH)**

| | |
|---|---|
| **From:** | Biondolillo, Madeleine (DPH) |
| **Sent:** | Wednesday, June 18, 2014 8:50 AM |
| **To:** | Svizzero, Kathy (DPH) |
| **Subject:** | FW: Cath Lab |
| **Attachments:** | Policy Regarding Proposal for a New Cardiac Catheterization Service 5.20.14.docx; Cath Volume.xlsx |

Madeleine Biondolillo, MD
Associate Commissioner
Massachusetts Department of Public Health
Assistant, Kathy Svizzero
Phone (617) 624-5200

**From:** Allwes, Deborah (DPH)
**Sent:** Wednesday, June 18, 2014 7:59 AM
**To:** Biondolillo, Madeleine (DPH); Murphy, Nancy (DPH)
**Subject:** Fw: Cath Lab

Madeleine, attached is the most recent version of the moratorium. It is the one the secretary sent me (below). It does not have rationales for why these changes are proposed. I was not involved in any discussions leading to the changes on the moratorium so am not sure what the exact rationales are.

I will send you Stewart's recommended additions in a subsequent email. I do not propose including their recommended changes (they want to add a number 7 and 8 to the moratorium).

When you and I discussed Stewart's recommended additions, you hadn't realized they added these 2 new sections because apparently Kathy only printed the first 2 pages for you, not all 3 pages. I will resent it in a minute.

Thank you,

Deborah
Deborah S. Allwes, BS, BSN, MPH
Director, Bureau of Health Care Safety and Quality
MA Department of Public Health

**From:** Polanowicz, John (EHS)
**Sent:** Tuesday, May 27, 2014 08:14 AM
**To:** Allwes, Deborah (DPH); Hwang, Ann (EHS); Bartlett, Cheryl (DPH)
**Cc:** Judd, Jill (EHS)
**Subject:** Re: Cath Lab

Updated document. We can schedule time for them to come in. I'd like to understand the implications on the attached spreadsheet, we have some work to do on this.

**From:** <Allwes>, "Deborah (DPH)" <Deborah.Allwes@MassMail.State.MA.US>
**Date:** Monday, May 5, 2014 at 6:52 PM
**To:** Ann Hwang <Ann.Hwang@MassMail.State.MA.US>, John Polanowicz <john.polanowicz@massmail.state.ma.us>, Cheryl Bartlett <Cheryl.Bartlett@MassMail.State.MA.US>

1

# EXHIBIT 12



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
## Department of Public Health
## Bureau of Health Care Safety and Quality
### 99 Chauncy Street, 11th Floor, Boston, MA 02111
### 617-753-8000

DEVAL L. PATRICK
GOVERNOR

JOHN W. POLANOWICZ
SECRETARY

CHERYL BARTLETT, RN
COMMISSIONER

### Circular Letter: DHCQ 14-6-617

| | |
|---|---|
| **TO:** | Chief Executive Officers, Acute Care Hospitals |
| **FROM:** | Madeleine Biondolillo, MD<br>Associate Commissioner |
| | Deborah Allwes, BS, BSN, MPH<br>Director, Bureau of Health Care Safety and Quality |
| **DATE:** | July 14, 2014 |
| **RE:** | Policy Updates for Cardiac Catheterization Services |

The purpose of this Circular Letter is to inform you of updated policies related to the provision of hospital-based cardiac catheterization services licensed by the Department of Public Health (the Department or DPH) pursuant to 105 CMR 130.900-.982. The three issues addressed in this document are:

1. Clarification of requirement to meet volume minimums for cardiac catheterization services;

2. Amended policy applicable only to certain Accountable Care Organizations (ACOs) regarding the moratorium on new cardiac catheterization services; and

3. New policy regarding percutaneous coronary intervention (PCI) services.

**Clarification of requirement to meet volume minimums for cardiac catheterization services:**

Hospitals must meet the facility and operator volume minimums set forth in the DPH hospital licensure regulations. These minimums include:

1. For a hospital performing only diagnostic procedures - 300 diagnostic procedures per year.
2. For hospitals performing both diagnostic and therapeutic (interventional) procedures - 600 procedures per year, of which at least 200 are percutaneous coronary interventions (PCIs).

Page 1 of 4

3. For interventionalists, current minimum is 75 PCI procedures per year. However, consistent with current national guidelines supported by the Department's Invasive Cardiac Services Advisory Committee (ICSAC), the Department plans to revise the regulation to reflect a minimum of 50 per year (averaged over two years).

If a hospital has not met, or does not meet, for two years in a row, the DPH volume minimums -- in addition to meeting quality assurance as described in 105 CMR 130.965: In-house Evaluation of Quality -- the hospital must develop a plan, for approval by DPH, to meet the volume minimums within one year.   If the hospital does not submit a plan that is accepted by the Department, the hospital may be required to cease performing cardiac catheterization procedures within thirty days of receipt of notice from the Department that either the plan is not accepted, or that the Department did not receive a plan as required.  Any hospital that has not met the volume minimums for the past two years should submit by September 30, 2014 its plan to meet the volume minimums within one year to:  the Hospital Complaint Unit Manager at the Bureau of Health Care Safety and Quality, at Debbie.Ulin@state.ma.us.  For future instances of non-compliance with the volume minimums, the plan should be submitted within 90 days of the hospital's identification of non-compliance.

**Accountable Care Organization Proposals for a New Cardiac Catheterization Service:**

The moratorium on establishment of a new cardiac catheterization service within 30 minutes of an existing percutaneous coronary intervention (PCI)-capable hospital remains in effect, except under the following limited circumstances.

1. A hospital that proposes a new cardiac catheterization service within the geographic limitation set by the moratorium is part of a health care system recognized as a Pioneer ACO, a Medicare Shared Savings Plan ACO, or other ACO designation to be determined by the Department; the hospital system has an existing cardiac catheterization service at another hospital within its system that does not meet the minimum diagnostic volume (300 procedures); and the hospital system is proposing to transfer the existing service license to establish a new diagnostic cardiac catheterization service at another hospital in the same ACO system.

2. The ACO will document, to the Department's satisfaction, the projected volume of diagnostic cardiac catheterization procedures at the proposed new site and the underlying assumptions associated with the volume projection, including:

    a. where the patient population the ACO assumes it would treat at the new site is currently receiving diagnostic cardiac catheterization procedures; and
    b. how the ACO anticipates ensuring these patients will use the service at the new diagnostic cardiac catheterization site.

3. The hospital agrees to supply the Department with its diagnostic cardiac catheterization procedure volume data on a quarterly basis for the first twenty-four months of operation of the new cardiac catheterization service.  After that period, consistent with the DPH hospital licensure regulation, if the hospital has not met the regulatory volume minimum, the hospital shall submit to the Hospital Complaint Unit Manager at the Bureau of Health Care Safety

and Quality, its quarterly quality assessment and performance improvement (QAPI) program report findings, recommended actions, progress on implementation and supporting data, as described in 105 CMR 130.965: In-house Evaluation of Quality. The hospital will continue to submit these reports until the hospital receives a notice from the Department to discontinue submission of the reports.

4. If a hospital receives approval from DPH for a transfer as proposed in #1 above, ==the transfer of the existing cardiac catheterization service failing to meet the minimum volume requirement shall occur within sixty days after notice of an approval to create a new cardiac catheterization service at the hospital== seeking the new service as a condition of the approval, and prior to licensure of the cardiac catheterization service at the new site.

An eligible ACO should submit to the Department a letter of intent to transfer the location of a cardiac catheterization service from one hospital license to another within its ACO. The letter shall describe which hospital will close its cardiac catheterization service and which will open a proposed new cardiac catheterization service. The letter will include the information described in #2, above. It must also include language acknowledging that the ACO will submit:

   a. **a plan to address any other facility within the ACO that is not meeting the current volume minimums under licensure, as summarized in "Clarification of requirement to meet volume minimums for cardiac catheterization services" above;** and
   b. the information required in #3 above.

The letter should be sent to the Director, Bureau of Health Care Safety and Quality, at Deborah.Allwes@state.ma.us. Upon written approval by the Department, the hospital may proceed with the Department's architectural plan review process for the new cardiac catheterization service.

*Such approval of a new diagnostic cardiac catheterization service under the above terms in no way guarantees that service will be approved in the future, through any separate DPH process, to provide emergency or non-emergency angioplasty at that site.*

New Percutaneous Coronary Intervention Services:

At its meeting on April 17, 2014, based on the recommendation of its PCI Oversight Subcommittee, the Department's ICSAC voted to recommend to the Department that upon consideration of several factors, including the declining PCI volume in Massachusetts and that at least eighty-six percent of the population lives within a 30-minute ambulance ride of a PCI-capable hospital, there is no demonstrable need for any additional emergency or non-emergency PCI programs in the Commonwealth and that any additional programs may have an adverse impact on the existing quality of PCIs performed[1].

The ICSAC further recommended that if there are changes to the current state of PCI volume or services in Massachusetts, new emergency or non-emergency PCI programs should be

---

[1] An application for primary PCI that was filed before April 17, 2014 is pending Department action.



Page **3** of 4

considered solely on the basis of evaluating a patient–based need assessment for PCI services through a comprehensive review of:

    a.   Geographic need for PCI services, through a demonstration of a lack of availability of emergency PCI services within a 30-minute ambulance drive from the proposed facility and a facility that currently provides this service;

    b.   A detailed program proposal to DPH that would assure quality and safety of the PCI procedures performed at the proposed center; and

    c.   An impact assessment, to be performed by DPH and in conjunction with the ICSAC, to assess the potential impact of any new PCI program on existing PCI programs in Massachusetts in terms of quality, safety and procedural volumes.

The Department has adopted the ICSAC's recommendations and therefore these terms are in effect.

Questions about this letter should be directed to: Nancy Murphy at Nancy.Murphy2@massmail.state.ma.us



# EXHIBIT 13

August 21, 2014



DONOGHUE
BARRETT
& SINGAL

<u>Via Email and Hand Delivery – Return Receipt Requested</u>

Deborah Allwes, Director
Bureau of Health Care Safety and Quality
Department of Public Health
99 Chauncy Street
Boston, MA 02111

     Re:    <u>Notice of Intent to Transfer Cardiac Catheterization Service</u>

Dear Ms. Allwes:

We write on behalf of Steward Health Care System ("Steward"), a recognized Pioneer
Accountable Care Organization ("ACO"). Steward hereby submits this notice to the Department
of Public Health ("Department") of its intent to transfer an existing cardiac catheterization
service license to establish a new diagnostic cardiac catheterization service at another hospital
within its ACO. Steward seeks to transfer the cardiac catheterization service currently operated
by Quincy Medical Center, A Steward Family Hospital, Inc. ("Quincy Medical Center") to
Steward St. Anne's Hospital Corporation ("St. Anne's Hospital") to establish a new diagnostic
cardiac catheterization service. This notice is filed in accordance with the requirements of
Circular Letter DHCQ 14-6-617 issued by the Department on July 14, 2014 ("Circular Letter").

The Steward ACO was established to offer high-quality medical care in community-based
settings to lower health care costs and improve patient outcomes. Steward engages in a care
management system and coordinates provider contracting arrangements, such as the global
payment contracts envisioned by Chapter 224 of the Acts of 2012. The global payment contracts
encourage and incentivize coordination of patient care to increase communication among
providers in order to improve care and lower costs. The Steward ACO is comprised of nine (9)
acute care hospitals, one (1) rehabilitation hospital, and multiple physician practices. Through
the ACO, Steward is able to offer comprehensive health care services to meet patient needs.

As part of its commitment to deliver integrated care in community-based settings, Steward is
dedicated to the provision of high quality cardiovascular services. Steward is seeking to offer
diagnostic cardiac catheterization services at St. Anne's Hospital, a licensed hospital located at
795 Middle Street in Fall River, in order to enhance its cardiac service offerings in the greater
Fall River community. In order to do so, the Steward ACO will transfer the existing cardiac
catheterization service license at Quincy Medical Center, located a 114 Whitwell Street in
Quincy. Quincy Medical Center's cardiac catheterization service is underperforming and the
transfer of location will allow cardiac catheterization services to remain within the Steward
ACO. The transfer of the existing license to St. Anne's Hospital will allow Steward to better
meet the needs of its patient population with a demonstrated demand for such services and to
ensure that patients have access to high quality, comprehensive cardiac services.

**Donoghue Barrett & Singal**
One Beacon Street, Suite 1320
Boston, MA 02108–3106
T 617.598.6700
F 617.722.0276
www.dbslawfirm.com

Deborah Allwes, Director
Bureau of Health Care Safety and Quality
Department of Public Health
August 21, 2014
Page 2



Request

This notice is filed in accordance with the requirements of the Circular Letter to transfer Quincy Medical Center's cardiac catheterization service to St. Anne's Hospital. The transfer will allow Steward to implement a cardiac catheterization program at a location where the need for such services exists within the Steward ACO. In furtherance of this request, Steward offers the following information per the requirements of the Circular Letter:

1. In developing the foregoing request, Steward identified that diagnostic cardiac catheterization volume at Quincy Medical Center did not meet the Department's minimum requirements. The volume for Quincy Medical Center's service is below the threshold and has continued to decrease over the past few years. Quincy Medical Center's historical volume is reflected in the following chart:

**Quincy Medical Center Diagnostic Cardiac Catheterization Historical Procedure Volume**

| Year | Procedures |
|------|------------|
| 2012 | 65 |
| 2013 | 47 |
| Year-to-date 2014* | 15 |

*Through May 2014

As the chart shows, Quincy Medical Center's volume is well below the required 300 procedures per year. Due to the low number of procedures performed, Steward will transfer its license to St. Anne's Hospital to establish a service in accordance with the requirements of the Circular Letter. The license for Quincy Medical Center will be transferred to St. Anne's Hospital as part of the Steward ACO's plans to provide comprehensive cardiac care services to St. Anne's Hospital's service area.

2. St. Anne's Hospital developed projections for the first four years of operations for the new cardiac catheterization to be opened at its facility. The majority of patients will be referred through St. Anne's Hospital physicians or by physician practices affiliated with the Steward ACO. Volume projections will increase gradually, in keeping with the growth projected for a new service that is becoming fully operational. St. Anne's Hospital volume projections are set forth in the following chart:

Deborah Allwes, Director
Bureau of Health Care Safety and Quality
Department of Public Health
August 21, 2014
Page 3



### Saint Anne's Hospital Diagnostic Cardiac Catheterization Procedure Volume Projections

| Year | Projected Procedures |
|------|----------------------|
| Year 1 | 379 |
| Year 2 | 377 |
| Year 3 | 385 |
| Year 4 | 393 |

As indicated above, St. Anne's Hospital assumed growth for the diagnostic cardiac catheterization service. For the first years of operations, St. Anne's Hospital assumes an average growth rate of approximately 2% for the cardiac catheterization service. This projected growth accounts for the time related for the program to ramp up as well as for the Steward ACO's continued growth. Steward seeks to reduce leakage and outmigration over time through the use of St. Anne's Hospital's cardiac catheterization service. St. Anne's Hospital will experience greater demand for its services as it achieves these goals.

3. As part of the development of projections for the proposed cardiac catheterization service at St. Anne's Hospital, both the hospital and Steward examined where the projected patient population currently receives cardiac catheterization services. It was identified that many of St. Anne's Hospital patients are currently in need of cardiac catheterization and are often forced to travel out of the Steward network just to receive such care. Steward determined that a majority of patient volume will come from the prevention of outmigration to Boston and Providence, where many patients currently seek care. Offering cardiac catheterization services at St. Anne's Hospital will allow the hospital's patients to remain within the Steward network, decreasing fragmentation of care. This will also yield savings as anticipated by Ch. 224 through the appropriate provision of care within the local community, avoiding unnecessary use of high cost academic medical centers.. The major source of patients, however, will be those attributable to outmigration.

4. The Steward ACO was designed to provide a broad scope of health care services, ensuring that patients utilize services within the ACO. Goals for the Steward ACO include providing high quality health care in lower cost, community based settings as well as coordinating care delivery to reduce overall healthcare costs. Steward implemented a highly integrated community care model in the greater Fall River service area that includes St. Anne's Hospital. One key service required for such a model is comprehensive cardiovascular services. Steward lacked the ability to provide cardiac catheterization services as part of this care model due to the Department's moratorium on the establishment of new providers of cardiac catheterization services.

Deborah Allwes, Director
Bureau of Health Care Safety and Quality
Department of Public Health
August 21, 2014
Page 4



Steward has continued to develop the community care model in place within St. Anne's Hospital service area. By December 2013, Steward was caring for approximately 350,000 residents of this area. Since Steward assumed ownership of St. Anne's Hospital in 2010, the number of affiliated providers has greatly increased. Steward has also increased the number of patients to whom it provides care through its Steward Medical Group which serves as a significant source of patients. A key care demographic is cardiovascular care, which is essential to a fully integrated care model. Part of a successful cardiovascular service includes diagnostic cardiac catheterization, an important diagnostic tool. Without this service, physicians must disrupt care to send patients to other local providers of cardiac catheterization services.

Through its ACO affiliations, Steward will ensure St. Anne's Hospital cardiac catheterization service will be fully utilized. Prima CARE, Hawthorn Medical Associates, Steward Medical Group, and Steward Health Care Network ("SHCN") affiliated physicians experience sufficient patient demand for diagnostic cardiac catheterization services. These physicians now will have the option to have patients treated within the ACO network at St. Anne's Hospital as a local provider of services in the Fall River area. Patients currently have to be referred to non-Steward ACO local providers or seek care at hospitals in Boston and Providence. Offering diagnostic cardiac catheterization services will allow the Hospital and Steward to retain these patients who are forced to leave the ACO to receive care. This will have the added result of reducing leakage and outmigration of patients to other providers.

5. Steward will submit a plan to address any other facility within its ACO that does not meet current minimum volume requirements per 105 C.M.R. 130.900-130.982. If any other facility within Steward that provides cardiac catheterization service has not met or does not meet the Department's volume requirements for two (2) years in a row, that hospital will develop a plan to meet volume requirements within one (1) year. Such plan will be subject to the Department's approval. Any plan will be in addition to meeting the In-house Evaluation of Quality standards set forth in 105 C.M.R. 130.965.

6. Steward will provide the Department with information on St. Anne's Hospital diagnostic cardiac catheterization procedure volume data quarterly for the first twenty-four months of operations. Upon the expiration of the initial twenty-four months of operations, St. Anne's Hospital will monitor its compliance with the minimum volume requirements for such a service. If St. Anne's Hospital does not meet the minimum volume requirements, quarterly quality assessment and performance improvement program report findings, recommended actions, progress on implementation and supporting data will be submitted

Deborah Allwes, Director
Bureau of Health Care Safety and Quality
Department of Public Health
August 21, 2014
Page 5



to the Department. These reports will continue to be provided until the Department notifies St. Anne's Hospital and Steward to discontinue the submission of the reports.

Based on the foregoing reasons, Steward respectfully requests the Department's consent to transfer Quincy Medical Center's diagnostic cardiac catheterization service to St. Anne's Hospital license. The establishment of a diagnostic cardiac catheterization services at St. Anne's Hospital will allow for clinical alignment of local physicians, the hospital, and a fully integrated network for cardiovascular care. Patients will benefit from the availability of providers who can collaborate within the ACO on best practices for care and quality outcomes. Offering cardiac catheterization services at St. Anne's Hospital will represent a local, high quality, lower cost option for patients. This request complies with the requirements set forth the Circular Letter and Chapter 224 of the Acts of 2012.

We thank you for your consideration of this request. Please do not hesitate to contact Nicole Sexton, Esq. or me if you have any questions or require additional information.

Sincerely,

Andrew S. Levine

cc:     N. Hibble, Esq.
        C. Labins
        J. Maher, Jr, Esq.
        P. Murphy
        K. Whelan
        N. Sexton

# EXHIBIT 14



www.southcoast.org

November 28, 2014

Bernard Plovnick, Program Director
Department of Public Health
Determination of Need Program
99 Chauncy Street, 2nd Floor
Boston, MA 02116

Re:    <u>Steward St. Anne's Hospital Corporation Request for Approval of Significant Change
       Amendment to Previously Approved Project #5-3C08 – Southcoast Hospitals Group's
       Response to the Staff Recommendation Issued November 19, 2014.</u>

Dear Mr. Plovnick:

          Southcoast Hospitals Group, Inc. ( "Southcoast") respectfully submits the following
comments to the Determination of Need ("DoN") staff recommendation (the "Staff
recommendation") issued on November 19, 2014, for the approval of the Significant Change
Amendment request filed by Steward St. Anne's Corporation ("Steward" or "St. Anne's" or "the
Applicant") dated August 16, 2013.  In its filing, the Applicant proposes to build out shell space
originally included in its previously approved DoN Project Number #5-3C08 and to use the shell
space for the establishment of a new cardiac catheterization service.

<u>Southcoast Background</u>

Southcoast includes Charlton Memorial Hospital in Fall River, St. Luke's Hospital in New
Bedford, and Tobey Hospital in Wareham.  The hospitals that comprise Southcoast all operate
under a single license issued pursuant to M.G.L. ch. 111, §51.  At its Charlton campus in Fall
River, Southcoast operates a comprehensive cardiac program with angioplasty and an open heart
surgery program that was approved pursuant to a competitive process the Department established
under Section 429 of Chapter 159 of the Act of 2000.  As part of Southcoast's comprehensive
cardiac program, Southcoast also has established cardiac catheterization facilities on both the St.
Luke's campus in New Bedford and the Charlton Memorial campus in Fall River.  The cardiac
catheterization facilities at both campuses currently operate at less than 50% capacity.
Accordingly, there is more than sufficient existing capacity to meet the cardiac catheterization
needs of patients in this service area.  Moreover, Southcoast's cardiac care program consistently

101 Page Street, New Bedford, MA 02740
508-961-5555

demonstrates excellent outcomes, allows convenient access to care, and reports high levels of patient satisfaction.

## Department Recommendation Inconsistent with DoN Objective

Southcoast respectfully asserts that the Staff recommendation for approval of the Significant Change Amendment request is inconsistent with the objective of the Determination of Need Program which is "the allocation of health care resources...such that adequate health care resources are made reasonably available...at the lowest aggregate cost and to insure the non-duplication of services." In making determinations of need, the Department is required by statute to "advance this objective to the extent permitted under the governing rules and regulations" (105 CMR 100.001). The Staff recommendation ignores this statutory directive in proposing the addition of a cardiac catheterization laboratory that is clearly duplicative of an existing service which has more than sufficient capacity to serve the needs of the affected service area.

The approval of the Applicant's proposal would also be inconsistent with the sound planning process mandated by Chapter 224 of the Acts of 2012. Section 14 of Chapter 224 establishes the Health Planning Council and mandates that it develop a state health plan which includes an inventory of resources, including those pertaining to coronary care. Section 14 of Chapter 224 specifically contemplates that the state health plan will contain recommendations for the appropriate supply and distribution of those resources and that the Department would use those recommendations to make changes in its Determination of Need Program through the issuance of guidelines, new regulations or proposed statutory changes to reflect the results of the state health plan development process. Until recently, the Department's policy regarding cardiac catheterization services was consistent with the planning process noted above. As acknowledged in the November 19, 2014 Staff recommendation, the Department imposed a moratorium on the establishment of new cardiac catheterization services to be located within thirty (30) minutes of a hospital that provided primary angioplasty on a twenty-four (24) hour per day seven (7) day per week basis. As the Staff recommendation notes, this would have barred the Applicant's requested Significant Change Amendment because the service proposed for the space was not capable of being licensed.

However, at the same time that the Department was conducting this mandated resource review and need determination process (as indicated in the September 22, 2014 presentation to the Health Planning Council by the Department's Associate Commissioner, Madeline Biondolillo), the Department, without guidance or involvement by the Health Planning Council or the Public Health Council, issued Circular Letter DHCQ 14-6-617 (July 14, 2014) (the "Circular Letter"), thereby creating an exception to the cardiac catheterization moratorium for certain qualifying Accountable Care Organizations ("ACOs"). By this exception and without reconciling any of the public health policy that resulted in establishment of the cardiac catheterization moratorium, the Department decided to allow a very small group of health care providers to transfer existing

2

cardiac catheterization labs from one geographic area to another without consideration of the need for the cardiac catheterization service or the capacity of, and impact on, existing cardiac catheterization services in the area of relocation. The Circular Letter, although establishing a rule of general application and future effect, was not adopted through any public regulatory process and ignores statutory authority and health policy. Specifically the Circular Letter was promulgated in violation of the Administrative Procedure Act, M.G.L. ch. 30A which mandates that "a public hearing is required prior to the adoption, amendment or repeal of any regulation if … a public hearing is required by the enabling legislation of the agency or by any other law … or a public hearing is required as a matter of constitutional right." The Circular Letter constituted a regulation subject to the M.G.L. ch. 30A rulemaking process which required a public hearing, with the opportunity for notice and comment. The Circular Letter never received consideration and approval by the Public Health Council as is the case with all regulations adopted by the Department. Accordingly, the Circular Letter was issued in violation of all applicable requirements and therefore is invalid as a matter of law. There can be no DoN approval for a service that cannot be licensed by law.

**Failure to Comply with DoN Requirements**

Even assuming for the sake of argument that no legal impediment existed to licensure of the Applicant's proposed service, the Staff recommendation reveals a total failure to comply with the DoN review requirement to determine that the Steward St. Anne's significant change request "will satisfy, in whole or in part, health care requirements of the projected population of the applicable service area, without any duplication of services …." 105 CMR 100.533 (B)(1). Ensuring the non-duplication of services is an integral part of the objectives of the DoN program. Review Factor One requires that an applicant demonstrate that the proposed project not duplicate existing services (105 CMR 100.533(B)(1)). As required by 105 CMR 100.533(A), an applicant must make a "clear and convincing demonstration" that the project meets each of the governing review factors. In considering the Applicant's Significant Change Amendment, there has been an abject abandonment of the regulatory obligation to conduct a proper needs review and analysis of the proposal to establish a new cardiac service less than two (2) miles away from an existing cardiac services program. The Staff recommendation contains a candid admission of the failure to apply the required DoN criteria:

> Since cardiac catheterization services are not a DoN regulated
> service, the DoN program lacks a standard process for evaluating
> need for the proposed service upon which to determine whether the
> St. Anne's proposal would represent an unnecessary duplication of
> services. (Staff recommendation, p. 3).[1]

---

[1] The Staff recommendation states on page 3 that the "DoN program lacks a standard process for evaluating need … upon which to determine whether the St. Anne's proposal would represent an **unnecessary** duplication of services." (bold added). Both the objective of the DoN program set forth in 105 CMR 100.001 and the

3

Therefore, instead of undertaking a rigorous needs and capacity analysis of the service area, the Staff recommendation simply notes that the service area has a high rate of coronary heart disease ("CHD") discharges. The existence of a high rate of CHD does not answer the crucial question of whether an unmet need exists. As the Staff recommendation acknowledges: "While this data does not specifically indicate an unmet need in the St. Anne's service area, it does identify the service area as having a significantly higher than average need for cardiac catheterization service." (Staff recommendation, p. 4).

The Staff recommendation contains no indication of any effort to assess available capacity within the service area and to trace where patients may currently receive care. The St. Luke's cardiac catheterization lab currently operates at 22% of capacity and the Charlton lab operates at 50%. There is ample capacity within the service area. In its September 5, 2014 comments, Southcoast clearly demonstrated that the Applicant's proposal will duplicate existing services and that duplication will have a negative impact on the existing Southcoast comprehensive coronary program.[2]

**Erroneous Volume Projections and Impact on Existing Service**

The Department has based its decision in part upon faulty data estimates provided by Steward. Despite the looseness of Applicant's estimates, the Department incorporated these faulty data into its recommendations. Since Southcoast operates this program, Southcoast has actual data for each cardiologist performing cardiac catheterization procedures and by the referring primary care physician, including those aligned with Steward. Below are the actual volume data for Southcoast facilities in Fall River and New Bedford.

---

Factor One (105 CMR 100.533 (B)(1)) speak to the non-duplication of service without limiting the term to "unnecessary duplication." In addition, 105 CMR 100.533(B)(1) formerly read "unnecessary" duplication of service but was subsequently changed to make the standard stronger.

[2] In the Applicant's Letter of Intent in response to the Circular Letter , Steward suggested that the primary reason for moving the cardiac catheterization to St. Anne's was for population health management and to stem outmigration to academic medical centers (AMCs). When asked by DoN staff to substantiate that with data , in the Applicant's second email to the DoN Office dated November 10, 2014, Applicant admitted it does not know where its cardiac catheterizations are performed.

4

| Southcoast Health Diagnostic Cardiac Catheterizations | | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| Charlton (Fall River) | 1,569 | 1,603 | 1,774 |
| Steward Physicians | 575 | 560 | 595 |
| **Cases Remaining at Charlton If Application Approved** | **994** | **1,043** | **1,179** |
| St. Luke's (New Bedford) | 623 | 653 | 460 |
| Steward Physicians | 216 | 311 | 210 |
| **Cases Remaining at St. Luke's if Application Approved** | **407** | **342** | **$250^3$** |
| Total Program (Both Campuses) | 2,192 | 2,256 | 2,234 |
| Total Decrease in Cases | 791 | 871 | 805 |
| Percent Decrease/Impact | 36.1% | 38.6% | 36.0% |
| Residual Number of Cases at Charlton and St. Luke's | 1,401 | 1,385 | 1,429 |

We suspect that the number of cardiac catheterization cases estimated by Steward (741) in an email response to a Department staff inquiry had two errors associated with it: a) the number did not account for Steward's cases that originated at St. Luke's and were transferred to Charlton; and b) they subtracted interventional cardiac catheterizations from this number to arrive at 516 cases per year referred from the Steward network (which was used in the Staff recommendation) when in fact that was a diagnostic cardiac catheterization number only. There cannot be only 741 combined diagnostic and interventional cardiac catheterizations performed by Steward's cardiologists when the total diagnostic catheterizations in the 2014 Southcoast data show 805 procedures (i.e., 595+210). Correcting for these errors leads to a significantly different picture as to impact on cardiac patients in this region—dropping the number of procedures to be performed at St. Luke's **below the required 300 procedures per year level for diagnostic cardiac catheterization labs**, as the table above demonstrates. Clearly, the reduction of cardiac catheterization procedures below 300 per year at St. Luke's would adversely affect, and could result in closure of, the St. Luke's lab. As a result, there would be an impact on access to such

---

[3] Under the 300 minimum procedures.

services in the greater New Bedford and Wareham areas as residents would have to travel significantly further to Fall River where there would be two labs only a couple of miles apart.

The Applicant's volume projections assume the transfer of patient volume currently served by the Southcoast cardiac catheterization lab at its St. Luke's campus. This transfer of case volume is expected because the Applicant has indicated in its August 16, 2013 *Request for Significant Amendment* that several of its New Bedford physicians who currently perform diagnostic catheterization procedures at St. Luke's will be serving their patients at the proposed St. Anne's Fall River cardiac catheterization lab. Greater New Bedford cardiac patients of the Steward cardiologists would be significantly inconvenienced if they now had to travel to Fall River for their diagnostic cardiac catheterization. **While the approval of the Applicant's proposal is not anticipated to reduce the Charlton lab below the required 1,000 procedure level, it comes dangerously close to that level.**

### Fragmentation of Care

The approval of a new stand-alone facility offering cardiac catheterization services in Fall River will create significant disruption in the delivery of care across the spectrum of cardiac services. A patient receiving cardiac catheterization at St. Anne's may require transfer to another full-service facility for advanced cardiac care, interventional procedures, and surgical consults. Such fragmentation of the continuum of cardiac care threatens not only patient convenience and access, but more importantly the quality of clinical decision-making and collaboration that is necessary to the delivery of high quality cardiac care. It should be noted that in 2014 at Southcoast there were 738 Percutaneous Coronary Interventions (PCIs) while there were 2,234 diagnostic cardiac catheterizations, i.e., 33% of the diagnostic procedures were followed with a PCI. Based on experience, approximately 30% of all patients who receive a diagnostic cardiac catheterization proceed to an interventional procedure, including the potential for open heart surgery. If cardiac catheterization services are permitted at St. Anne's, it would be reasonable to expect that approximately 30% of the patients who receive diagnostic cardiac catheterization there would need to be transferred to another facility for an interventional procedure. This would result in unnecessary additional costs in connection with the transfer of patients and inconvenience to patients. Moreover, if the intention of the Applicant is to ensure that patients are only treated at facilities owned by the Applicant's ACO, patients will be transferred out of the geographic area to comprehensive cardiac programs owned by the Applicant. This will increase costs, inconvenience patients and potentially adversely affect patient care.

### Misapplication of Public Health Policy: July 2014 Circular Letter and ACOs

The Staff recommendation clearly indicates that the adoption of Circular Letter DHCQ 14-6-617 was the precipitating factor in allowing the consideration of the Applicant's Significant Change Amendment since, absent the issuance of the Circular Letter, the Applicant's proposed cardiac catheterization lab would not be licensable. Implicit in the policy behind the Circular Letter is

the concept that in order to be effective, an ACO must supply all possible health care services in-house or within the ACO as owned assets. Applying this assumption beyond cardiac catheterization services would suggest that ACOs should be excluded from the DoN process generally in order to allow the ACO to buy or build a full complement of services. This policy would result in significant duplication of services, waste and inefficiency and is inconsistent with the underpinnings of an ACO established by CMS – achieving the "Triple Aim" by "improving the patient experience of care (including quality and satisfaction); improving the health of populations; and reducing the per capita cost of health care."[4]  As mentioned above, the St. Luke's cardiac catheterization lab operates at approximately 22% capacity, and its existence would be seriously jeopardized by this duplication. The Charlton cardiac catheterization lab operates at 50% capacity.  Additional capacity in the same town would not address any access issue and would increase capacity and inefficiency which may affect quality.  Southcoast has historically worked well with the cardiologists referenced in the Applicant's proposals on behalf of the Applicant's patients and can continue to do so.  Southcoast is committed to working with the patients of all our cardiologists, including those affiliated with the Applicant's ACO, to achieve this "Triple Aim."  The Department use of the Circular Letter to set policy not only constitutes improper rulemaking but is inconsistent with the DoN regulations and the "Triple Aim."

## Conclusion

The Department's recommendation for approval of the Applicant's Significant Change Amendment relies on a Circular Letter that was promulgated in violation of law. Moreover, the Department and the Applicant have failed to comply with the DoN review factors and criteria. Approval of the Applicant's request for a Significant Change Amendment is not supported by law or sound health policy and will adversely affect the existing cardiac catheterization labs in the immediate geographic area served. For the foregoing reasons, the Applicant's Significant Change Amendment request should be denied. We respectfully request that this response be provided to the Public Health Committee with the Staff's final recommendation. We look forward to the Staff's final recommendation to the Public Health Council in December.

Sincerely,

Keith A. Hovan
President & CEO
Southcoast Hospitals Group
Southcoast Health System

---

[4] http://www.ihi.org/Engage/Initiatives/TripleAim/Pages/default.aspx

7

Parties of Record List

cc:     Applicant:                    Andrew S. Levine, Esq.
                                      Donoghue Barrett & Singal
                                      alevine@dbslawfirm.com


        Interested Party:             Howard Hawkins
                                      Southcoast Health
                                      hawkinsh@southcoast.org


        Other Parties of Record:      Sherman Lohnes
                                      Division of Health Care Facility Licensure & Certification
                                      sherman.lohnes@state.ma.us

                                      Lauren Nelson
                                      Bureau of Health Care Safety and Quality
                                      Lauren.nelson@state.ma.us

                                      Mary Byrnes
                                      Center for Health Information and Analysis
                                      mary.byrnes@state.ma.us

                                      Kate Scarborough
                                      Health Policy Commission
                                      Katherine.scarborough@state.ma.us

                                      Kiki Feldmar
                                      MassHealth
                                      kiki.feldmar@state.ma.us


cc:  Attorney General Martha Coakley
     Martha.coakley@state.ma.us

     Attorney Maura Healey
     Maura.healey@state.ma.us

     Secretary John Polanowicz
     Executive Office of Health and Human Services
     John.Polanowicz@state.ma.us

8

# EXHIBIT 15

MINUTES OF THE PUBLIC HEALTH COUNCIL

Meeting of December 10, 2014

MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH

PUBLIC HEALTH COUNCIL
MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH
Henry I. Bowditch Public Health Council Room, 2nd Floor
250 Washington Street, Boston MA

Docket: Wednesday, December 10, 2014 9:00 AM

1. **ROUTINE ITEMS:**
   a. Introductions
   b. Record of the Public Health Council Meeting November 12, 2014 **(Vote)**

2. **DETERMINATION OF NEED**
   a. Steward St. Anne's Hospital Corporation Request for Approval of Significant Change Amendments to Previously Approved Project #5-3C08- Southcoast Hospitals Group's Response to the Staff Recommendation Issued November 19, 2014. **(Vote)**

3. **FINAL REGULATION**
   Request for Approval to Promulgate Final Regulations: 105 CMR 222.000: *Massachusetts Immunization Information System* **(Vote)**

4. **FINAL REGULATION**
   Request for Approval to Promulgate Final Regulations: 105 CMR 158.000: *Licensure of Adult Day Health Programs.* **(Vote)**

5. **PRESENTATION**
   a. Prevention and Wellness: Innovation and Success

*The Commissioner and the Public Health Council are defined by law as constituting the Department of Public Health. The Council has one regular meeting per month. These meetings are open to public attendance except when the Council meets in Executive Session. The Council's meetings are not hearings, nor do members of the public have a right to speak or address the Council. The docket will indicate whether or not floor discussions are anticipated. For purposes of fairness since the regular meeting is not a hearing and is not advertised as such, presentations from the floor may require delaying a decision until a subsequent meeting.*

2

Public Health Council

Presented below is a summary of the meeting, including time-keeping, attendance and votes cast.

**Date of Meeting:** Wednesday, December 10, 2014
**Beginning Time:** 09:00 AM
**Ending Time:** 11:45 AM
**Attendance and Summary of Votes:**

| Board Member | Attended | Item 1b | Item 2 | Item 3 | Item 4 |
|---|---|---|---|---|---|
| | | Record of the Public Health Council Meeting November 12, 2014 | Steward St. Anne's Hospital Corporation Request for Approval of Significant Change Amendments to Previously Approved Project #5-3C08- Southcoast Hospitals Group's Response to the Staff Recommendation Issued November 19, 2014. *Motion was made by Meredith Rosenthal to table the DoN until further information could be provided by DPH, within the next 6 months. The Vote was made on this motion.* | Request for Approval to Promulgate Final Regulations: 105 CMR 222.000: *Massachusetts Immunization Information System* | Request for Approval to Promulgate Final Regulations: 105 CMR 158.000: *Licensure of Adult Day Health Programs.* |
| Cheryl Bartlett | Yes | Yes | Yes | Yes | Yes |
| Edward Bernstein | Yes | Yes | Yes | Yes | Yes |
| Derek Brindisi | Yes | Yes | Yes | Yes | Yes |
| Harold Cox | Absent | Absent | Absent | Absent | Absent |
| John Cunningham | Yes | Yes | Yes | Yes | Yes |
| Michele David | Absent | Absent | Absent | Absent | Absent |
| Meg Doherty | Yes | Yes | Yes | Yes | Yes |
| Michael Kneeland | Yes | Yes | Yes | Yes | Yes |
| Paul Lanzikos | Yes | Yes | Yes | Yes | Yes |
| Denis Leary | Yes. | Yes | Yes | Yes | Yes |
| Lucilia Prates-Ramos | Yes | Yes | Yes | Yes | Yes |
| Jose Rafael Rivera | Absent | Absent | Absent | Absent | Absent |
| Meredith Rosenthal | Yes | Yes | Yes | Yes | Yes |
| Alan Woodward | Yes | Yes | Yes | Yes | Yes |
| Michael Wong | Yes. | Yes | Yes | Yes | Yes |
| Summary | **12** Members attended | **12** Approved with votes | **12** Approved with Votes | **12** Approved with votes | **12** Approved with votes |



3

PROCEEDINGS

A regular meeting of the Massachusetts Department of Public Health's Public Health Council (M.G.L. C17, §§ 1, 3) was held on Wednesday, December 10, 2014 at the Massachusetts Department of Public Health, 250 Washington Street, Henry I. Bowditch Public Health Council Room, 2nd Floor, Boston, Massachusetts 02108.

Members present were:  Department of Public Health Commissioner Cheryl Bartlett (chair), Dr. Edward Bernstein, Mr. Derek Brindisi, Dr. Michael Kneeland, Ms. Lucilia Prates-Ramos, Dr. John Cunningham, Dr. Alan Woodward, Dr. Michael Wong, Mr. Paul Lanzikos, Mr. Dennis Leary, Ms. Meg Doherty, Dr. Meredith Rosenthal

Absent member(s) were:  Mr. Harold Cox, Dr. Michele David and Mr. Jose Rafael Rivera

Also in attendance was Attorney Tom O'Brien, General Counsel at the Massachusetts Department of Public Health.

Commissioner Bartlett called the meeting to order at 9:13 AM and reviewed the agenda.


1: MINUTES
b. Record of the Public Health Council Meetings of November 12, 2014

Commissioner Bartlett asked for a motion to approve the minutes from November 12, 2014.  Dr. Wong made a motion to approve the minutes, and Dr. Kneeland seconded the motion.  Dr. Woodward asked for one change to be made to the minutes.   All voted in favor of this change.

Before moving on in the agenda, Commissioner Bartlett took a moment to recognize Dr. Bernstein and Boston Medical Center for their 20 years of work with Project Asserts.  This innovative program identifies those who are at risk for or are in need of treatment for substance abuse. Dr. Bernstein stated that this began with the BSAS for people in the community who were concerned with substance abuse and bring them right to the emergency room for treatment.  This has been pleasure to work with them in this capacity.


ITEM 2:    DETERMINATION OF NEED
Steward St. Anne's Hospital Corporation Request for Approval of Significant Change Amendments to Previously Approved Project #5-3C08.

Bernie Plovnick, director for the DoN program presented the staff recommendation on the St. Anne's Hospital request for a significant change to build out 11,476 gross square feet of shell space on the hospital's ground floor for a diagnostic-only cardiac catheterization (cardiac cath) service as well as outpatient cardiology services.

Following the presentation, Commissioner Bartlett opened the floor to discussion.

Dr. Woodward asked what motivated the change in policy in July which had prohibited the establishment of any new cardiac cath services located within a 30 minute ambulance trip from an existing hospital with interventional cardiac services.

Dr. Biondolillo stated that this was one of the policy changes enumerated in a circular letter from HCQ and Office of Policy and Planning.  When there are changes in the health care delivery system, staff continually scan regulations and guidance to evaluate if an update is needed.  The timing of the circular letter had to do with several factors: the end of a large, controlled trial within the industry, which was a complex, multi-facility study. We made no big policy changes during the trial, because we didn't want to destabilize the process of the trial but we knew that at the end we would need to re-look at issues, because of the trial and because quite a lot of time had gone by since the policies were last reviewed. So the circular letter is based on our learning through the trial and within the time that had passed since we last evaluated these policies.



4

Commissioner Bartlett stated that health care reform under Chapter 224 requires us to review the systems of care and to undertake a comprehensive state health plan. While we couldn't review every service at this time, cardiac cath is one where the Office of Health Planning is beginning to focus.

Dr. Woodward asked for confirmation that this service would be for elective diagnostic procedures only and not provide services on a 24/7 basis.

Dr. Biondolillo stated that the circular letter articulated a number of mandates that DPH issued to encourage best practices. This letter speaks explicitly to volume minimums, effectively reminds facilities of these minimums and that they must be adhered to as a condition of operating a cath lab. But in addition, consistent with Chapter 224, this was determined to be an opportunity to allow health provider systems that had made an investment in health reform principles the ability to provide better continuity of care for patients within the network and to move an existing cardiac cath service from a facility that is not meeting volume minimums.

Dr. Woodward asked if, in the original DoN application, Steward was seeking to close their cath lab at Quincy that was operating below the minimum volume.

Dr. Biondolillo responded that this type of decision would not likely appear a DoN application but more likely to result from DPH discussions with facilities making applications.

Dr. Woodward inquired as to what hours the St. Anne's service plans to operate and whether they would be taking acute patients from the ED to their cath lab?

Dr. Biondolillo stated that the current regulations will apply with regard to hours of operation and OEMS transport protocols.

Dr. Cunningham asked if DPH concluded that this is the best care for patients? At the new facility rather than at one that already exists?

Dr. Biondolillo stated that DoN is responsible for ensuring that the care to be provided will not result in unnecessary duplication of services. The licensure requirements will be overseen by HCSQ per usual and it appears from the interface between DoN and HCSQ that the proposed service will not bring other parties' facilities below the required volume minimums. HCSQ looks more at quality of care than does DoN but in this case, quality standards do not seem to be negatively impacted.

Dr. Rosenthal expressed concern that "the ACO tail may be wagging the fee for service dog." The rationale for the exception makes sense in two circumstances: First, if the patients that are going to use this service are part of their ACO. The second is that the ACO has sufficient need for this service to make it cost effective. You don't want to send patients to other facilities if it is more cost effective to keep the diagnostic services in-house. She asked about the extent to which these services will be used by patients of the ACO and how much use will be by patients with primary care providers in the ACO?

Dr. Biondolillo replied that the analysis assumed that patients who will use this service will be coming from within the Steward system. She stated that the objective is that there be assurance of high quality services at all facilities and ensuring that all facilities that are operational meet the minimums. The transition from fee for service to accountable care will take time. The process is an evolution and DPH is part of the evolution.

Dr. Wong acknowledged the relationship between minimum volumes and quality. He expressed concern that in settings where the number of individuals needing the service is limited, providers will need to attract more patients to maintain sufficient volume. If there are existing facilities that have established their expertise in providing high quality services, are new facilities for cardiac cath services really necessary?



5

Dr. Biondolillo responded that we are balancing relying upon known quality standards while trying to make sure that our policy decisions don't prevent health reform from moving forward. The circular letter does speak to the issue of small point of service providers. A new facility has a glide-path to get up to speed with the minimums, and if they can do that, then they will be deemed able to provide the services. DoN looks at unnecessary duplication of services and does not limit a service to one single provider in an area. In this case, it did not appear that a new service will unduly affect other providers.

Mr. Plovnick stated that in table 2 of page 4 of the memo, DPH reproduced data from the applicant that showing the number of cardiac catheterizations currently performed on Steward patients in the area, and it is projected that some, but not all, of the diagnostic procedures will be performed at St. Anne's.

Dr. Woodward mentioned that if this wasn't an ACO issue, then we would say that it makes no sense to duplicate services. On the quality of care, we want to ensure that this is strictly diagnostic and not about acute patients. If a patient is determined to need an intervention, where are those patients going, two miles down the road or to one of Steward's other facilities?

Linda Bodenmann, Executive Vice President and Chief Operating Officer of SouthCoast and Dr. Margaret Ferrell, Physician-in-Chief for Cardiovascular Services, addressed the Council: This matter is much more than a DoN. Approval of the post-DoN application would be based on bad policy. In 2008, DPH implemented a moratorium on establishment of new diagnostic cath labs within 30 miles of an existing lab. This barred Steward's cath lab because Southcoast has primary angioplasty and is less than two miles from St. Anne's. But on August 13, 2013, Steward filed this application. At that time, DoN staff questioned whether it could be licensed due to the moratorium and no action was taken by the Department. Then in 2014, the Department created an exception. SouthCoast is also an ACO, also committed to health reform. The rule change affected Department regulations and should have gone through the regulatory process. There were concerns about the number of diagnostic cath labs that were below minimum volumes, and the circular letter allows establishment of a new cath lab within two miles of a program with primary, 24/7 access. The DoN standard is duplication, not unnecessary duplication. 86% of the population statewide has access to a PCI program, there is no need for an additional PCI program and 9 out of 12 existing diagnostic-only cardiac cath services in MA are operating below minimum thresholds, so that this recommendation is in contradiction to the recommendation regarding minimum volumes. We can continue to treat these patients rather than create expensive diagnostic services that aren't necessary. 210 of the cases at St. Luke's were done by physicians affiliated with Steward. If those physicians take 210 patients to St. Anne's, St. Luke's will be below volume minimums.

Craig Jesiolowski, President, St. Anne's Hospital, Dr. Mark Girard, Steward Hospital Group, and Andy Levine, Counsel for St. Anne's, came before the Council. As an ACO, we are committed to achieving the highest quality care while reducing total medical expense. Have determined that heart disease is prevalent among a significant group of patients, and many of these patients have 4-6 co-morbidities and they see multiple providers with much medical information that needs to follow these patients.

Dr. Rosenthal asked how many of the 379 patients projected by St. Anne's come from their primary care population?
[St. Anne's] All patients will be coming from the PCP, all are part of the ACO
Dr. Rosenthal- So these are all Medicare patients?
[St. Anne's] We don't define ACO as only Medicare patients. We don't define patients according to their insurance, we apply ACO management to everyone. We treat patients according to disease management, delivery of care, not insurance.

Dr. Woodward asked if it the service will be limited to 7 AM-3 PM, is all elective, and if the projection includes only patients from MA?
[St. Anne's] Patients are coming from Fall River and New Bedford and it would also serve our Taunton area patients, as there are no cardiac cath services in that area.

6

Dr. Woodward- Where do you send the patients if they need intervention
[St. Anne's]- elective intervention is according to provider and patient preferences. We think we achieve high quality and value of care if we keep it integrated within the system, but it is up to the patient. For the acute cases, then we will act in the best interest of the patient, and if time is of the essence they will be sent out of the network.

Mr. Lanzikos asked staff if they have a sense of how the capacity for this service compares in this service area as compared to others around state currently, and if this is approved, is it going to have more, less, or comparable capacity than others?

Dr. Biondolillo replied that we are in the process of doing health planning across 52 different service lines, and that PCI is under review. It will probably be a period of months before we will be able to answer more specifically. What we have done so far is to show that the rate of hospitalization and disease is quite high. We have not done an analysis of capacity yet.

Mr. Lanzikos asked in light of the analysis, why the matter is before the Council now, rather than waiting until completion of the health plan.

Dr. Biondolillo stated that we the timeframe for completion of the health plan is uncertain, but this application is before the Department and needs to be addressed in one way or another.

Mr. Lanzikos: what happens if this is postponed?

Dr. Biondolillo: We have to ask the applicant what happens.

Ms. Doherty asked Southcoast why the prevalence of CHD in the area is 74% higher than other parts of the state, and what is being done regarding disease prevention.

Dr. Biondolillo agreed with Ms. Doherty on the need for prevention with the high rate of disease.
Commissioner Bartlett asked if either party wished to comment.

Dr. Farrell: The rate of disease is incredibly high, and I think we all know the challenges of treating the population in New Bedford and Fall River due to various issues, but to say that opening a cath lab is the answer, as opposed to prevention services. Dr. Farrell questioned the idea of opening a new cath lab based on 2012 numbers.

Dr. Girard noted that prevention and wellness measures are an important part of the practice of population health management which is a core responsibility of an ACO.

Dr. Woodward asked if the Invasive Cardiac Services Advisory Committee ("ICSAC") has been consulted on this DoN?

Dr. Biondolillo stated that the ICSAC has met continuously to advise DPH on Department policy, including this issue currently being discussed as well as the circular letter, which is an extension of previous regulation and guidance. The ICSAC did not discuss the circumstances of this specific DoN.

Dr. Cunningham asked what is the role of the Council in procedures for updating policies.

Carol Balulescu, Deputy General Counsel stated that the matter before the Council is the DoN for the build out of shell space and about what the shell space is going to be used for. Approval of a cardiac cath service is a licensing issue, which is the authority of HCSQ. Denial of the DoN today would say that St. Anne's could not build out shell space for a cath lab, but not that St. Anne's cannot have a cath lab. The licensure regulations establish standards. It was a sub-regulatory letter in 2008 that put the brakes on the regs, establishing a moratorium on new cardiac



7

cath services, but the regulatory standards remain in place. It is only because St. Anne's wants to build out shell space, which was part of a previously approved DoN that they are before Council with this matter.

Dr. Cunningham asked what was the Council's role during the adoption of the previous circular letter about the moratorium.

Attorney Balulescu stated that circular letters or advisories generally do not come before Council.

Dr. Rosenthal asked if it was within the power of Council to table this motion and if so how, if the Council can request a hearing on the circular letter, and if Council can wait until the Health Planning Council has completed its review of cardiac cath services.

Attorney Balulescu stated that it is within Council's authority to approve or disapprove a DoN action and if Council determines that it lacks sufficient information, it has the ability to table and ask for additional information.

Dr. Wong stated that safety and quality trump health reform. In this situation, safety and quality may be at odds with the health reform act. He asked if, with respect to the 9 out of 12 diagnostic-only cardiac cath programs operating below the minimum volume threshold, does DPH have regulatory authority over them?

Dr. Biondolillo stated that the Department reviews data that the facilities are required to submit. If they are not meeting the volume minimum, they must submit a correction plan. If the plan that they submit is not sufficient, then the circular letter gives them 30 days to respond. This process is actively ongoing with HCSQ.

Dr. Wong asked if higher complication rates have been observed for those facilities that are not meeting the volume minimum.

Dr. Biondolillo stated that this has not been observed and that in cath labs in Massachusetts, such rates are extremely low.

Mr. Lanzikos stated that he does not understand the consequences, particularly to SouthCoast, of approving the DoN. He asked to see more information including the consequences to Southcoast if approved and more analysis of the impact to the existing program in comparison to the one proposed.

Dr. Biondolillo stated that the health planning process is more regionally focused and not intended to focus upon individual facilities.

Mr. Lanzikos requested additional staff analysis on this specific application, in this service area, on the population's morbidity and mortality, and a better understanding of what would happen to the existing program if this program were realized. Would it be mutually beneficial?

Mr. Plovnick reminded Council that there is another process that is still pending with HCSQ for approval of the cardiac cath service. In 1997, DPH ended DoN regulation of cardiac cath as a substantial change of service. The impact of numbers will be addressed in the HCSQ process.

Dr. Cunningham said that he would like better clarity on what is happening in 2014 for prevention as compared to 2012 and asked how long it would take to look at this?

Dr. Biondolillo stated that the Health Planning Council had decided to conduct a "level 3" analysis on cardiac cath with a more in depth focus on policy issues. Part of the reason why the process takes longer is because of the statewide focus.

Commissioner Bartlett asked Southcoast and St. Anne's to make a closing statement.



8

Dr. Farrell stated that 460 is the number of diagnostic caths at St. Luke's facility in 2014 annualized to the fiscal year. Also some confusion here regarding the Masscomm trials, they were PCI trials, and have little or no bearing on diagnostic catheterization. Commissioner Bartlett clarified that the trials were brought up in regards to timing of the circular letter, only.

Counsellor Levine spoke on behalf of St. Anne's. Regarding the circular letter: the applicant embraces the requirements in that letter. Mr. Levine also noted that the requirement that hospitals with cath labs report and are monitored by the Department are also contained within that circular letter. So it's a very comprehensive circular letter. In addition, Mr. Levine noted that the reason St. Anne's was before the Council that day was because of the decision to place the cath lab in that particular shell space. The circular letter gives other ACOs the right to open cath labs and were it not for the choice of using shell space, we would not be here.

Dr. Woodward asked if there could be an accommodation that ACO physicians can perform cardiac cath procedure in one location or another and that they can get the health records from each hospital sent to a lab that is two miles away.

Dr. Rosenthal moved to table the DoN pending further information from health planning, further clarification regarding the circular letter, and an assessment of the potential impact on public health based upon projections in this area.

Dr. Wong asked to make a friendly amendment that would require staff to come back to PHC in a time frame not to exceed 6 months.

Mr. Lanzikos moved to table the DoN, Ms. Prates- Ramos seconded the motion. All approved.

### ITEM 3: FINAL REGULATION
Request for Approval to Promulgate Final Regulations: 105 CMR 222.000: *Massachusetts Immunization Information System*

Following the presentation, Commissioner Bartlett opened the floor for discussion.

Dr. Woodward stated that there has been a 20% increase of usage since September with 500 providers. Mr. Cranston stated that the ultimate goal is to have all providers who administer vaccines to be submitting immunization data to the MIIS. Mr. Talebian confirmed that the total number of providers that will eventually be submitting date is approximately 3,000. Some provider sites are reporting as a group instead of individuals.

Dr. Woodward asked for DPH to clarify the comments submitted by local health departments saying it is unfair for DPH to require local boards of health to comply. Mr. Cranston responded that there is a perception that local boards are being held to more stringent standards, which is not the case. The law and the proposed regulations would apply equally to all providers who give immunizations.

Dr. Woodward inquired about the one complaint about the system freezing and whether there is pattern of complaints about this issue. Mr. Talebian stated that the vast majority of the times, the issues are at the end user side. It is often related to the internet bandwidth or other IT infrastructure at the provider office.

Mr. Brindisi commented that DPH used the term over immunizing for flu and if we have data? Mr. Talebian stated that there is no hard data, but we know covered rates are lower than they need to be. Our system that quantifies this information is primarily a national phone-based survey. . Once the MIIS has more complete information, we can better qualify this. Mr. Brindisi stated that for local boards of health to set up a system for entering flu immunization data real time during a flu clinic is difficult; typically they take the forms back to their offices and enter the data after the clinic. So if we really need the flu data in real time in order to prevent over immunization then we need to ensure it is a real issue. Mr. Cranston stated that real time data is also important for emergency

planning purposes as individuals have a hard time knowing if they were up to date on vaccinations which is important especially in outbreak situations.

Mr. Lanzikos asked for chain pharmacies, what entity is registered? Is it the individual pharmacy or the chain? Mr. Talebian stated that the whole chain is registered as one entity and typically reports data to us in aggregate but the data can be identified down to the individual site location. Chains have been very cooperative, Walgreens was a very early adopter of the system and several other chains are coming on board in the near future.

Ms. Doherty commented on the question on over immunization. The problem is that you have an aging population with dementia, an elderly person may be offered a flu vaccination at their local council on aging, then again at the pharmacy clinic and at their PCP. This happens more than you think and access to information is key. Dr. Cunningham commented that it was suggested to him that he receive a double dose. Mr. Talebian mentioned that it is important that the clinicians have immunization information in a timely manner

At the conclusion of the presentation, Commissioner Bartlett asked for a motion to approve. Dr. Woodward made the motion and Dr. Bernstein seconded. All approved.

### ITEM 4: FINAL REGULATION
Request for Approval to Promulgate Final Regulations: 105 CMR 158.000: *Licensure of Adult Day Health Programs*

Following the presentation, Commissioner Bartlett opened the floor for discussion.

Dr. Bernstein asked for clarification regarding discharge criteria at the day center.
Ms. Nelson responded that there are very specific requirements for an Adult Day Health Program to initiate discharge of a participant, including behavioral or safety concerns, or in the instance when a participant has a health condition that requires more intensive medical oversight than a Program can provide.

Mr. Lanzikos asked that of the 50 or so that are operating without certification, how will they identify to come into compliance? Are they self-identifying or being sought out, and what do we do if they say they aren't an adult day health program?
Ms. Nelson stated that the definition is clear and that we will be publishing sub-regulatory guidelines Lauren-definitions are quite clear, with sub-regulatory guidance and will plan on working with the community to ensure that they are all captured.

Mr. Lanzikos stated as far as RN staffing issues, is there a schedule with a bumper? If we schedule 24, 21 will show up. When determining ratios, will you be looking at scheduled participants or those that are anticipated.
Ms. Nelson stated that this will be staffed for the expectation for scheduled participants with the understanding that the number of participants fluctuate.
Ms. Allwes stated that Adult Day Health licensure and enforcement will be modeled after the licensure and enforcement mechanisms that the Department uses for similar facilities. DPH will be looking at the trend analysis based on the time of year and the week.

Ms. Doherty asked if anyone has considered the CPR requirement for bus service as many Programs offer bus services through Medicaid. Those who aren't Medicaid payors, how are they paying; are they public payors, and do we know if other payors, or types of insurance are willing to pay?
Ms. Nelson answered that we are not aware of what these other facilities have as far as payment terms and will learn of those as we go. Complaints from consumers will be handled in the same manner as the Department handles complaints regarding other types of facilities.

After no further comments, Commissioner Bartlett asked for a motion to approve the regulations. Dr. Rosenthal moved for approval and Mr. Lanzikos seconded. All approved.

10

**ITEM 5: PRESENTATION**
Prevention and Wellness: Innovation and Success

Following the presentation, Commissioner Bartlett opened the floor for discussion.

Carlene Pavlos, Director, Bureau of Community Health and Prevention and Lea Susan Ojamaa discussed chronic disease initiatives and how Massachusetts has become a national model and how the department integrated 9 individual programs operating separately, and how they came together. Ms. Pavlos and Ms. Ojamaa will return early 2015 to continue to update the Council on these matters.

Before the Commissioner closed the meeting, Dr. Kneeland thanked the Commissioner for her service as Commissioner of Public Health. During his 14 months on the Council, he recognized the work of DPH staff and is thankful for them for setting high standards for the residents of the Commonwealth, under the Commissioners leadership and wishes her well in her next endeavor.

Commissioner Bartlett asked for a motion to adjourn. Dr. Wong made the motion and Mr. Lanzikos seconded.

The meeting adjourned at 11:45AM on a motion by and passed unanimously without discussion.


LIST OF DOCUMENTS PRESENTED TO THE PHC FOR THIS MEETING:
1. Docket of the meeting
2. Minutes of the Public Health Council meeting of November 12, 2014
3. Steward St. Anne's Hospital Corporation Request for Approval of Significant Change Amendments to Previously Approved Project #5-3C08- Southcoast Hospitals Group's Response to the Staff Recommendation Issued November 19, 2014.
4. Request for Approval to Promulgate Final Regulations: 105 CMR 222.000: *Massachusetts Immunization Information System*
5. Request for Approval to Promulgate Final Regulations: 105 CMR 158.000: *Licensure of Adult Day Health Programs.*
6. Copies of all power point presentations (emailed upon conclusion of the meeting)

Commissioner Cheryl Bartlett, Chair



11

# EXHIBIT 16



# Statement of the Attorney General
## as to the

# Quincy Medical Center Transaction

**September 7, 2011**

**OFFICE OF ATTORNEY GENERAL MARTHA COAKLEY**
ONE ASHBURTON PLACE | BOSTON, MA 02108

STATEMENT OF ATTORNEY GENERAL
AS TO THE
QUINCY MEDICAL CENTER, INC. TRANSACTION

SEPTEMBER 7, 2011

The Attorney General, in accordance with her statutory duties under G.L. c. 180, § 8A(d), issues this statement (the "Statement") regarding the proposed transaction (the "Transaction") by which Quincy Medical Center, Inc. ("Quincy Medical Center") and its affiliated entities QMC ED Physicians, Inc. ("QMC ED") and Quincy Physician Corporation ("QPC") (collectively, the "Quincy Sellers"), propose to sell and transfer, as part of a "pre-packaged" sale in the Quincy Sellers' pending Chapter 11 bankruptcy proceedings,[1] substantially all of their health care assets and operations to Quincy Medical Center, A Steward Family Hospital, Inc., f/k/a Steward Medical Holdings Subsidiary Five, Inc. (the "Steward Buyer"), an indirect subsidiary of Steward Health Care System LLC (the "Steward Parent") (the Steward Buyer and the Steward Parent each individually and together, "Steward"), an affiliate of Cerberus Capital Management, L.P. ("Cerberus"). Steward also will assume, pursuant to the terms of the Transaction, certain liabilities of the Quincy Sellers.

The Attorney General notes that, effective November 6, 2010, the Steward Parent acquired the Caritas Christi health system, including its six Catholic faith-based hospitals in eastern Massachusetts (the "Caritas Transaction").[2] See Statement of the Attorney General as to the Caritas Christi Transaction dated October 6, 2010 (the "AG Statement in the Caritas Transaction"). On May 1, 2011, Steward acquired two additional for-profit Massachusetts hospitals.[3] On May 26, 2011, the Attorney General received written notice pursuant to G.L. c.

---

[1] The Quincy Sellers' Chapter 11 cases are being jointly administered under the case: In re: Quincy Medical Center, Inc., Case No. 11-16934-MSH, pending in the United States Bankruptcy Court, District of Massachusetts (the "Bankruptcy Court"). The Attorney General is a party in interest to these Chapter 11 proceedings pursuant to Section 1221(d) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") as "the attorney general of the State in which the debtor is incorporated, was formed or does business." See also BAPCPA, Section 1221(e) which provides as follows: "RULE OF CONSTRUCTION.--Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property." The public policy concerning the BAPCPA reforms includes the intent to ensure that the transfer of non-profit organizations to for-profit organizations through the bankruptcy process also conforms to state law.
  The Attorney General understands that the Quincy Sellers intend to seek post-closing, contingent upon the assent of the Attorney General, approvals from the Massachusetts Supreme Judicial Court concerning: (a) the use of the Quincy Sellers' donor-restricted funds, which, consistent with applicable general non-profit and charities law, are excluded assets under the APA, and (b) reorganization or dissolution, as may be appropriate or necessary.

[2] These hospitals now operate as Steward Carney Hospital, Inc. ("Steward Carney Hospital") (Dorchester), Steward Good Samaritan Medical Center, Inc. (Brockton), Steward Holy Family Hospital, Inc. (Methuen), Steward Norwood Hospital, Inc. (Norwood), Steward St. Elizabeth's Medical Center of Boston, Inc. (Brighton), and Steward St. Anne's Hospital Corporation (Fall River).

[3] These hospitals now operate as Merrimack Valley Hospital, A Steward Family Hospital, Inc. (Haverhill) and Nashoba Valley Medical Center, A Steward Family Hospital, Inc. (Ayer).

180, § 8A(d), that Morton Hospital and Medical Center, Inc., seeks to sell its assets and operations to Steward.[4]  While the Attorney General's review of this Transaction, consistent with Section 8A(d), necessarily is specific to Quincy Medical Center and its proposed sale to Steward, the Attorney General is mindful of the dynamic state of the Massachusetts hospital and health care markets, including market changes in light of Steward's recent and relatively rapid expansion, and, in the public interest, the Attorney General has taken such factors into consideration in her review.

## I.   INTRODUCTION

### 1.1   Transaction Overview

The hospital now known as Quincy Medical Center, a 196-licensed-bed acute care hospital in Quincy, Massachusetts, was founded in 1890 as Quincy City Hospital and operated for 109 years as a municipal hospital.  In 1999, with the approval of the City of Quincy and the Massachusetts Legislature, Quincy Medical Center became, and continued its operation as, a new non-profit, charitable organization.[5]

Quincy Medical Center is part of a health system with affiliated entities (individually and collectively, "Quincy").  The other Quincy Sellers, QMC ED and QPC, are both non-profit corporations controlled by Quincy Medical Center. QMC ED and QPC do not employ physicians; rather, their sole purpose is to own certain third-party payor contracts and provider numbers under which Quincy Medical Center services are billed to third-party payors.  Also, Quincy Medical Center holds a 20% interest in South Suburban Oncology Center Limited Partnership, a for-profit joint venture with Shields Oncology Services; and, QMC ED holds a 10% interest in BMC NAB Business Trust, which owns the Shapiro Ambulatory Care Center located on the Boston Medical Center campus.[6]

---

[4] See Statement of the Attorney General in the Morton Hospital and Medical Center, Inc. Transaction dated September 7, 2011 (the "AG Statement in the Morton Transaction").  In addition, Steward is in the process of acquiring two hospitals in Rhode Island, Landmark Medical Center in Woonsocket, and its subsidiary, Rehabilitation Hospital of Rhode Island in Smithfield.  Steward also has entered an asset purchase agreement to acquire Saints Medical Center, Inc., in Lowell Massachusetts, although the Attorney General has not yet received written notice pursuant to G.L. c. 180, § 8A(d) of such proposed transaction.

[5] The deed transferring the hospital premises from the City of Quincy (the "Deed") required compliance with the home rule petition that permitted the City's transfer of hospital assets and certain liabilities, Chapter 94 of the Acts of 1999 ("Chapter 94").  Among other things, Chapter 94 provides that: "the termination of any major clinical services, including, without limitation, emergency services, by the corporation at the new Quincy hospital shall require approval by a vote of at least two-thirds of the governing board of the corporation, and, in the case of emergency services, the approval of the city council and the mayor."  Chapter 94, Section 3(d).  The deed conveying the Quincy Medical Center property to the Steward Buyer will incorporate the requirements of Chapter 94.  Further, Chapter 94 required the transferee (Quincy Medical Center) to be and remain a non-profit corporation, which it has.  However, Chapter 94 acknowledged that Quincy Medical Center has all the rights, powers, and authorities of a non-profit corporation, including the right to sell substantially all of its assets to a for-profit entity.

[6] Other entities affiliated with or formed to support the operations of Quincy Medical Center that are not part of the Chapter 11 bankruptcy proceeding or included in the Transaction are: (a) Quincy Medical Center Foundation, Inc., a non-profit, charitable organization formed to generate philanthropic support for Quincy Medical Center; and (b)

The Transaction is the culmination of a review and evaluation process by Quincy Medical Center to address its increasing financial difficulties, including substantial outstanding debt, bond covenant breaches, outdated facilities, and need for capital. During this process, which started in approximately 2009, Quincy engaged outside consultants and advisors and reviewed and explored its options, which included: (a) remaining a stand-alone hospital, (b) clinically affiliating with other non-profit entities, (c) becoming part of another non-profit system, (d) transferring its assets to a for-profit entity, and (e) filing for bankruptcy.

On June 27, 2011, the Quincy Medical Center Board of Trustees (the "Board")[7] approved execution of the Asset Purchase Agreement with Steward, which subsequently was amended by a First Amendment to Asset Purchase Agreement dated August 15, 2011, and further amended by a Second Agreement to Asset Purchase Agreement dated September 7, 2011 (as amended, the "APA"). The Attorney General received formal notice of the Transaction from Quincy Medical Center, as required by G.L. c. 180, § 8A(d)(1), in a letter dated July 8, 2011 ("Transaction Notice"), which initiated this review.

*Initial Terms of the APA and the Transaction*

Key elements of the APA and the Transaction prior to the amendments of the APA are set forth below.

(a)     The Steward Buyer will pay purchase consideration for the assets to be transferred consisting of the following: (i) at least $35 million and up to $38 million, depending on the Transaction closing date (the "Closing"),[8] (ii) assumption of certain liabilities, and (iii) certain post-Closing commitments (defined in this Section 1.1, below).

(b)     The Steward Buyer will spend or commit to spend, within five years from the Closing, no less than $34 million in capital expenditures to improve, furnish, equip, and expand the services of the hospital post-Closing (referred to herein as "Steward Quincy Medical Center"), including no less than $15 million within the first year post-Closing and another $10 million in the second year post-Closing.[9]

---

Quincy Medical Center Auxiliary, Incorporated, a non-profit, charitable organization that fundraises for the benefit of Quincy Medical Center.

[7] The 11-member Board consists of: four community representatives, two Mayoral appointees from the community, four physicians (including the Medical Staff President who serves *ex officio*), and the Chief Executive Officer (who serves *ex officio*).

[8] A later Closing date reduces the purchase consideration as follows—if the Closing occurs: (a) on or prior to October 1, 2011 ($38 million), (b) after October 1 and on or prior to November 1, 2011 ($37 million), and (c) after November 1, 2011 ($35 million). In addition, as a result of an August 15, 2011 auction in the Bankruptcy Court, the purchase price shall be increased by $115,000, which shall be allocated towards the Steward Buyer's winning bid of the 10% ownership interest in BMC NAB Business Trust held by QMC ED (see First Amendment to Asset Purchase Agreement dated August 15, 2011).

[9] Within that capital expenditure obligation, Steward commits no less than five million dollars in each of the first and second years post-Closing in information technology ("IT") investment. Over the first 12 to 18 months post-

3

    (c)     During years six through ten post-Closing, the Steward Buyer shall, in addition to capital investment for program expansions and service line developments, spend or commit to spend an estimated range of approximately $4 million annually or $20 million in aggregate for the routine needs of Steward Quincy Medical Center, based on an average of 110% to $125% of the annual depreciation expense of Steward Quincy Medical Center.

    (d)     The Steward Buyer will maintain an acute care hospital in Quincy providing at least the same scope of services as Quincy Medical Center currently provides, and the Steward Buyer will not close or limit the services provided at Steward Quincy Medical Center immediately prior to Closing, for ten years post-Closing, except that the Steward Buyer may close or limit such services if Steward Quincy Medical Center, beginning six-and-one-half years post-Closing, has experienced two consecutive fiscal years of negative operating margins (after year-three post-Closing) and given the Massachusetts Department of Public Health ("DPH") at least 18 months prior written notice of its intent to close; accordingly, the no-close commitment of the Steward Buyer is ten years post-Closing but is qualified from year six-and-one-half through ten post-Closing (as clarified and enhanced by the Section 1.1(p), below, the "No-Close Period").

    (e)     The Steward Buyer's obligations are also subject to any applicable restrictions and convents contained in the Deed (see footnote 5, above).

    (f)     The Steward Buyer will maintain charity care and community benefit expenditures at least at the current levels for Quincy Medical Center during the No-Close Period.

    (g)     A local governing board for Steward Quincy Medical Center will be maintained, composed of medical staff members, community leaders, and appropriate executive officers, which shall be subject to the authority of the Steward Buyer's board of directors, certificate of incorporation, and bylaws, and which shall, subject to such authority, have responsibility, in accordance with DPH regulations as applicable, for the following decisions concerning Steward Quincy Medical Center: (i) approval of borrowings in excess of $500,000, (ii) additions or conversions which constitute substantial changes in service, (iii) approval of capital and operating budgets, including prioritization of capital investments, (iv) approval of the filing of an application for Determination of Need, (v) development of strategic plans for the community served by Steward Quincy Medical Center, (vi) medical staff credentialing, and (vii) community benefit planning.

---

Closing, Steward shall ensure the full deployment of Meditech 6.0 and Advance Clinical Systems and computerized physician order entry. In addition, the Steward Quincy Medical Center's intensive care unit ("ICU") beds will be rolled into Steward's electronic ICU monitoring system, providing 24/7 remote intensivist coverage. The APA also provides that Steward shall, consistent with relevant law: (a) wire community-based physicians who become part of Steward Network Services, Inc., with electronic medical records; (b) afford physicians access to Steward's managed care contracts, medical management/care management infrastructure, Steward quality and safety group's medical management systems, and medical malpractice insurance through Steward's off-shore company; and (c) afford opportunity for senior Quincy Medical Center physicians to take leadership positions on Steward's system-wide committees for quality and safety. APA Section 8.20(f).

4

(h)     The Steward Buyer will offer comparable employment and terms of employment for the approximately 1,100 Quincy employees at the time of Closing, and the Steward Buyer will recognize each bargaining unit provided for under existing collective bargaining agreements.

(i)     The Steward Buyer will continue to use the "Quincy Medical Center" name or some reasonably similar name.

*Additional Terms of the Amended APA and the Transaction*

In addition, at the urging of the Attorney General, Steward has agreed to the following.

(j)     The Steward Buyer's capital expenditure obligation in years six through ten post-Closing has been clarified to include a minimum aggregate commitment of at least $10 million, in addition to the commitment to spend an average of 110% to 125% of annual depreciation.

(k)     If the Steward Buyer fails to meet its minimum capital expenditure obligations under the APA in the first five years post-Closing, the Steward Buyer shall donate such unspent amounts to a Massachusetts health care charity, after written notice to and approval by the Attorney General.

(l)     During the No-Close Period, the Steward Buyer will not close or reduce the number of its 22 inpatient, geriatric psychiatric beds.

(m)     For so long as the Steward Buyer operates Steward Quincy Medical Center, the Steward Buyer shall continue to provide the community benefit outreach services to the substantial Asian population in the service area, which currently include an Asian Outreach Coordinator position, a chest clinic, and the provision and training of medical interpreters, subject to such changes over time that may be necessary or appropriate to ensure that such community benefit programs remain properly aligned with the needs and interests of Steward Quincy Medical's patients and the community post-Closing.

(n)     The Steward Buyer's obligation to offer comparable employment to all employees at Closing applies to those employees on short-term disability, maternity leave, vacation, or leaves of absence with a specified date of return; and further, the Steward Buyer will set initial terms and conditions of employment for all transferred employees (as defined in the APA) consistent with APA Section 9.2(a) and will recognize bargaining units provided for under collective bargaining agreements that expired in 2011.

(o)     The No-Close Period is, in essence, seven years unqualified and an additional three years qualified; and further, the Steward Buyer must provide DPH with certain financial performance information in any notice of intent to close, and the Steward Buyer must provide not only DPH but also the Attorney General with an 18-month notice of negative financial performance, along with a subsequent six-month notice of an intent to close.

(p)     For as long as the Steward Buyer operates Steward Quincy Medical Center (not just during the ten-year No Close Period), Steward Quincy Medical Center shall maintain charity

5

care and community benefits programs pursuant to the Attorney General's Community Benefits Guidelines for Non Profit Hospitals.

(q) For as long as the Steward Buyer operates Steward Quincy Medical Center (not just during the ten-year No Close Period), Steward Quincy Medical Center will adopt and implement charity care policies generally consistent with the current Quincy Medical Center charity care policies and will comply with the Recommended Hospital Debt Collection Practices set forth in the Attorney General's Community Benefits Guidelines for Non Profit Hospitals. In addition, the Steward Buyer will continue to accept Medicare and Medicaid patients consistent with current Quincy Medical Center practices, to accept emergency room patients regardless of ability to pay consistent with applicable law, and to provide culturally and linguistically appropriate services consistent with those currently provided at Quincy Medical Center.

(r) The Steward Buyer may not sell or transfer a majority interest in Steward Quincy Medical Center for five years post-Closing, except as part of an otherwise permitted sale of the Steward health system as a whole or Steward Medical Holdings LLC ("Steward Medical Holdings"), which holds the Steward secular hospitals, including the Steward Buyer.

(s) The Steward Buyer committed that the following APA provisions will apply to any successor-in-interest to the Steward Buyer: (i) ongoing obligations for community benefit and charity care, including debt collection practices, (ii) regulatory cooperation; (iii) the no-closure commitments, including maintaining at least the current scope of services and maintaining current community benefit and charity care expenditure levels for the No-Close Period, (iv) the capital expenditures commitment in years six through ten post-Closing; (v) the local governing board commitment, (vi) the donor-naming commitment; provided that only items (i) and (ii) apply if the Steward Buyer satisfies the No-Close Period criteria (including notice provisions) and otherwise could close the hospital rather than sell it or if the sale occurs after the tenth anniversary of the Closing. Also, the Steward Buyer will give the Attorney General at least 90 days prior notice of any sale.

(t) The Steward Buyer, notwithstanding its for-profit status, will fully cooperate with any investigation, inquiry, study, report, or evaluation conducted by the Attorney General under her oversight authority of the non-profit charitable hospital industry to the same extent and subject to the same protections and privileges as if Steward were a public charity.

(u) The Steward Buyer agrees that all naming commitments made in the past to Quincy donors will be honored.

(v) Quincy Medical Center has reserved funds to assure that endowment funds and other donor-restricted gifts, which are excluded from the Transaction, are appropriately segregated and used for appropriate purposes, as well as the reorganization or dissolution of the Quincy entities post-Closing, as may be appropriate or necessary. To that end, Quincy Medical Center shall be subject, along with Steward, to a Transition, Windup, and Reorganization Agreement with the Attorney General (described in Section 5.3, below).

6

(w)    The scope of the existing assessment and monitoring of Steward by the Attorney General and DPH has been clarified to include expressly the monitoring, assessment, and evaluation of the impact of the Transaction on health care costs, access, and services within the communities served by Steward, consistent with an Assessment and Monitoring Agreement with the Attorney General (described in Section 5.2, below).

(x)    The Attorney General shall have the right to enforce certain post-Closing provisions of the APA related to the public interest (e.g., No-Close Period, capital expenditures, community benefits, charity care), subject to an Enforcement Agreement with the Attorney General (described in Section 5.1, below).

## 1.2    Statutory Basis for Attorney General Review

Under G.L. c. 180, § 8A(d), the Attorney General reviews transactions involving the sale or transfer of non-profit hospital assets or operations to for-profit entities.  Section 8A(d)(1) provides, in part:

> *"A nonprofit acute-care hospital . . . shall give written notice of not less than 90 days to the attorney general . . . before it enters into a sale, lease, exchange, or other disposition of a substantial amount of its assets or operations with a person or entity other than a public charity. . . . When investigating the proposed transaction, the attorney general shall consider any factors that the attorney general deems relevant, including, but not limited to, whether:*
>
> *(i)    the proposed transaction complies with applicable general nonprofit and charities law;*
> *(ii)    due care was followed by the nonprofit entity;*
> *(iii)    conflict of interest was avoided by the nonprofit entity at all phases of decision making;*
> *(iv)    fair value will be received for the nonprofit assets; and*
> *(v)    the proposed transaction is in the public interest."*

The results of her investigation and review inform her in responding to the Transaction approval sought by the Quincy Sellers from the Bankruptcy Court.  Bankruptcy Court approval is required for the Transaction to proceed.[10]

## 1.3    Questions Posed

Consistent with the prior Section 8A(d) reviews by the Office of the Attorney General concerning the Caritas Transaction and the conversion of The Nashoba Community Hospital

---

[10] The disposition of endowment funds and other donor-restricted assets, which are excluded from the Transaction, as well as the reorganization or dissolution of Quincy charitable entities, as may be appropriate or necessary, are subject to the post-Closing review and approval of the Massachusetts Supreme Judicial Court and subject to the oversight of the Attorney General.  See Exhibit 5.3, Transition, Wind-up, and Reorganization Agreement.

7

Corporation d/b/a Deaconess Nashoba Hospital (the "Nashoba Transaction"),[11] in considering the above statutory factors, the Attorney General seeks to answer the following questions.

(a)     Did the Board comply with applicable general non-profit and charities law in its decision to sell to a for-profit entity? Compliance with several aspects of applicable general non-profit and charities law are addressed in paragraphs (b) through (e), below. In addition, consistent with relevant charities law, public charities, which hold their assets in charitable trust for the benefit of the public, cannot sell their assets and operations to a for-profit entity simply because they may operate better or more effectively with private equity. Charitable board members considering for-profit conversion must act in accordance with the legal doctrine of *cy pres*.[12] The record must support the Board's application, based on the facts and circumstances in this case, of the relevant "impossible or impracticable" *cy pres* legal standard, namely, that: (i) Quincy Medical Center could not continue to survive in its current charitable form as a stand-alone community hospital, and (ii) there was no reasonably viable non-profit option for the continuation of Quincy Medical Center's current operations.

(b)     Did Quincy Medical Center carefully, thoughtfully, and deliberately explore and evaluate available options? The Board's determination to sell and transfer the assets and operations of Quincy Medical Center to a for-profit entity, where assets are held for the benefit of private owners and no longer held for the benefit of the public, must have been considered and approved in a deliberative manner that carefully evaluated all options.

(c)     Did Quincy Medical Center appropriately and effectively assure disclosure of, and then manage, any conflicts of interest related to the Transaction? Consistent with relevant law, conflicts of interest concerning charitable organizations are not necessarily inappropriate or harmful, but they must be disclosed and appropriately handled to assure that private or individual interests (e.g., including those of physicians, employees, management, unions, vendors, or other third parties) do not take priority over those of the institution and the public it serves.

(d)     Is the purchase consideration, taken as a whole, fair and reasonable? Quincy Medical Center should receive fair value for the charitable assets it holds for the benefit of the public.

(e)     Is the Transaction in the public interest? As set forth in Section 4.5, below, the Attorney General is authorized to, and did, consider a variety of factors to assess whether the Transaction is in the public interest.

---

[11] See Statement of the Attorney General as to The Deaconess Nashoba Hospital Transaction dated December 20, 2002 (the "AG Statement in the Nashoba Transaction").

[12] *Cy pres* means "as near as possible" and is the legal principle that requires charitable funds to be used according to the charitable purposes for which they are held, unless it is impossible or impracticable to continue to do so. The application of this standard under charities law protects charitable assets, including non-profit hospitals subject to Section 8A(d) review, from improper diversion to for-profit entities.

8

**1.4    Review Process**

The Attorney General, principally through her Non-Profit Organizations/Public Charities Division, and also involving her Antitrust Division and Health Care Division, conducted an investigation of the Transaction in the context of the above statutory factors by, among other actions: (a) holding a public hearing in Quincy on August 9, 2011, (b) posting the Transaction Notice, the APA, and all other exhibits to the Transaction Notice on the Attorney General's website, (c) accepting comments from other health care providers, employees, unions, and members of the public, (d) obtaining information from health care providers interested in or potentially impacted by the Transaction, (e) holding meetings and discussions with interested parties, (f) reviewing financial records, minutes, reports, and other documents provided in response to document production requests of the Attorney General, (g) submitting interrogatories to be answered under oath to all members of the Board and senior management and reviewing the responses to same, (h) interviewing key Board members and senior management, including the former Interim Chief Executive Officer and the current Chief Executive Officer (who is the former Chief Financial Officer) of Quincy, (i) interviewing Steward's President and Chief Executive Officer, as well as Steward's Executive Vice President of Corporate Strategy and Management, (j) consulting with other state agencies and with local and state officials, and (k) retaining the services of consultants and outside counsel to assist the Attorney General in her analysis.

During her review, the Attorney General urged and Steward agreed to expand its commitments to the Attorney General and the public through amendments to the APA and Transaction enhancements as described in Sections 1.1(j) through (x), above. Among other commitments, Steward has agreed to clarify the scope of its existing agreement with the Attorney General to include the monitoring, assessment, and evaluation of the impact of the Transaction on health care costs, access, and services within the communities served by Steward, as described in Sections 1.1(x), above.

## II.    FINDINGS: SUMMARY

For the reasons and with the conditions set forth in Sections IV and V of this Statement, the Attorney General makes the following findings.

2.1    The Board determined that: (a) Quincy Medical Center could not continue to survive in its current charitable form as a stand-alone community hospital, and (b) there was no reasonably viable non-profit option for the continuation of Quincy Medical Center's current charitable operations. Quincy Medical Center has filed for bankruptcy. If the Transaction does not occur, Quincy Medical Center most likely will run out of cash and close by year-end. No non-profit bidder submitted a response to Quincy Medical Center's request for proposals ("RFP") prior to its filing for bankruptcy on July 1, 2011. Subsequent to its bankruptcy filing, no non-profit qualified bidder has submitted in Bankruptcy Court a competing bid to Steward's "stalking horse" bid to purchase the assets of the Quincy Sellers. Accordingly, the Attorney General finds that the record supports a reasonable basis for the Board's determination, consistent with applicable general non-profit and charities law.

2.2    While noting the Attorney General's process recommendations referenced in Section III and in Section 4.2, below, the Board complied with standards of due care. Starting in approximately 2009, the Board actively explored the following options: (a) remaining a stand-alone hospital, (b) clinically affiliating with other non-profit entities, (c) becoming part of another non-profit system, (d) transferring its assets to a for-profit entity, and (e) filing for bankruptcy. In doing so, it retained the services of qualified, independent consultants and advisors and reached a decision only after a thoughtful and deliberative, albeit expedited, process directed by the Board, through its executive committee (the "Executive Committee").[13]

2.3    While noting the Attorney General's process recommendations referenced in Section III and in Section 4.3, below, there was no self-dealing or conflict of interest mismanagement concerning the Transaction. Members of the Board and senior management had no existing financial interests or business relationships with Steward. Steward's obligation to offer all Quincy Seller employees at the time of Closing, including senior management, comparable employment with Steward at Closing was an APA provision sought and negotiated by the Board. No financial terms and conditions have been negotiated between Steward and members of Quincy senior management with respect to future service. No member of Quincy senior management will receive an increase in salary, incentive payment or bonus, or other form of compensation as consideration for identifying or finding Steward or for negotiating, effectuating, or entering into the Transaction. The interests of current Board members in future service on the Steward Quincy Medical Center board arises out of a local governance condition sought and negotiated by the Board. With respect to the selection of Board members to serve on the Steward Quincy Medical Center board, such individuals were not nominated by Quincy Medical Center or appointed by Steward until after the APA was executed (such appointments are to be effective upon Closing).

2.4    The purchase consideration for the assets and operations of Quincy Medical Center is fair and reasonable. Compensation for the charitable assets was the result of the evaluation of an RFP process, negotiations with two interested for-profit bidders, and final terms and conditions negotiated and determined in an arm's length manner unaffected by personal or other interests. From an industry benchmarking perspective (e.g., earnings before interest, depreciation, and amortization ("EBIDA") multiple), the compensation is above the range of comparables for similar transactions. While the $35 to $38 million purchase price consideration under the APA (amount tied to date of Closing; see footnote 8), in and of itself, is fair and reasonable, the additional Steward obligations under the APA, including commitments to charity care, community benefits, minimum operational period, and capital expenditures, also are of value to the public.

2.5    The Transaction serves the public interest. As noted in the AG Statement in the Caritas Transaction, there are risks to the public intrinsic in any change of control, including a non-profit to for-profit conversion. In making its determination, the Board considered such risks and attempted to mitigate them with APA post-Closing commitments in the public interest (see

---

[13] The Executive Committee of the Board consists of the Board Chair (a community Board member in the banking industry), two additional community Board members (one in the banking industry and one an attorney), and the Interim President and Chief Executive Officer (with vote), as well as the Chief Financial Officer (without vote).

10

Sections 1.1 (a)-(i), above). In addition, consistent with the public interest, the Attorney General has worked to enhance the Transaction, including with additional protections and transparency (see Sections 1.1(j)-(x), above). Furthermore, public input concerning the Transaction almost universally acknowledged that the most likely alternative to the Transaction – the closure of Quincy Medical Center – was unacceptable and not in the best interests of the community.

## III.   PUBLIC COMMENTS AND PROCESS RECOMMENDATIONS

During the review process, the Attorney General received comments from a variety of sources, the majority of which were supportive of the Transaction. Attached in Appendix A is a summary of such sources and commentary, including at the August 9, 2011 public hearing.

As an educational tool for charities, the Attorney General notes the process recommendations set forth in Appendix B of the AG Statement in the Morton Transaction.

## IV.   CONCLUSIONS AND FINDINGS: DETAIL AND DISCUSSION

### 4.1.   The Transaction complies with applicable general non-profit and charities law.

Applying the relevant "impossible or impracticable" *cy pres* legal standard under applicable general non-profit and charities law, the Board determined that: (a) Quincy Medical Center could not continue to survive in its current charitable form as a stand-alone community hospital, and (b) there was no reasonably viable non-profit option for the continuation of Quincy Medical Center's current charitable operations. The Attorney General's analysis concerning the first part of the Board's determination is set forth in this Section 4.1. The Attorney General's analysis concerning the second part of the Board's determination is set forth in Section 4.2, below.

*Analysis*

Quincy's financial distress resulted in violation of its days cash on hand bond covenant in 2009. In March 2010, Quincy engaged the law firm Casner & Edwards, LLP as special counsel to the Board to apprise the bondholders of Quincy's financial situation and to begin to prepare creditors for a merger, acquisition, or potential bankruptcy filing. In approximately March of 2011, Quincy engaged Navigant Consulting and Navigant Capital Advisors (individually and together, "Navigant"), national firms with experience in merger and acquisition transactions specializing in advising health care clients facing strategic, financial, and other challenges. In an April 19, 2011 presentation, Navigant advised the Board that Quincy was not generating sufficient cash flow to service its debt and make routine capital expenditures, despite performance improvements and cost reduction efforts that had been implemented since 2009 or additional ones that Navigant could identify. Given Quincy Medical Center's high debt and its inability to meet bond covenant requirements, the Board determined that Quincy Medical Center could no longer survive as a stand-alone community hospital; the Board also determined that bankruptcy likely was the only vehicle to attract a capital partner and to restructure and recapitalize Quincy in order to continue its operations.

11

Regarding Quincy Medical Center's ability to survive in its current charitable form as a stand-alone community hospital, the Attorney General requested and reviewed relevant documents and information, including financial, utilization, and market data pertaining to Quincy and the markets served, as well as interrogatory responses from, and interviews with, Board members and senior management concerning Quincy's financial and operational viability. Such data included the following: audited and internal financial statements, including balance sheets, income statements, and cash flow statements, capital budgets, internal operating statements, data available from the Massachusetts Division of Health Care Finance and Policy and the Massachusetts Health Data Consortium, and Quincy inpatient and outpatient utilization statistics. The Attorney General engaged Health Strategies & Solutions, Inc. ("HS&S") to assist with the review of this data, Quincy, and the Transaction.

Below is a summary of utilization and financial information for Quincy Medical Center for the past several years, including data to support the Attorney General's finding that the record shows a reasonable basis for the Board's determination that it is impracticable, if not impossible, for Quincy Medical Center to continue operations in its current charitable form as a stand-alone community hospital.

### QUINCY MEDICAL CENTER (QMC) UTILIZATION[14]

| Measure | FY2008 | FY2009 | FY2010 | FY2011 (9 mos.) | FY2011 (ann.) | % Δ 2008-2010 |
|---|---|---|---|---|---|---|
| QMC discharges | 6,643 | 6,604 | 6,064 | 4,499 | 5,999 | (8.7%) |
| MA hospitals total discharges | 857,055 | 862,233 | N/A | N/A | N/A | 0.6% |
| | | | | | | |
| QMC total patient days | 33,514 | 33,114 | 31,537 | 22,774 | 30,365 | (5.9%) |
| | | | | | | |
| QMC ALOS | 5.0 | 5.0 | 5.2 | 5.1 | 5.1 | 4.0% |
| MA hospitals ALOS | 4.8 | 4.6 | N/A | N/A | N/A | (4.2%) |
| | | | | | | |
| QMC average daily census | 91.6 | 90.7 | 86.4 | 83.24 | 83.24 | (5.6%) |
| QMC occupancy percentage for licensed beds | 46.7% | 46.3% | 44.1% | 42.6% | 42.6% | (5.9%) |
| MA hospitals median occupancy percentage for licensed beds | 62.7 | 61.3 | N/A | N/A | N/A | (2.2%) |
| QMC occupancy percentage for staffed beds | 70.5% | 78.2% | 74.5% | 71.7% | 71.7% | 5.5% |
| MA hospitals median occupancy percentage for staffed beds | 70.5% | 68.1% | N/A | N/A | N/A | (3.4%) |
| | | | | | | |
| QMC ED visits | 39,123 | 38,597 | 37,896 | 28,587 | 38,116 | (3.1%) |
| QMC outpatient surgery cases | 2,715 | 2,704 | 2,500 | 1,782 | 2,376 | (7.9%) |

---

[14] In the data tables in this Section 4.1, the abbreviation "QMC" means "Quincy Medical Center" as defined above. Sources for the data in this chart include the following: Quincy Medical Center financial and utilization statements and monthly financial reports, October 2007 to June 2011, and the Massachusetts Division of Health Care Finance and Policy: Study of the Reserves, Endowments, and Surpluses of Hospitals in Massachusetts, May 2010. FY 2011 data are based on nine months (October 1, 2010 to June 30, 2011). Occupancy percentage for Quincy Medical Center licensed beds is based on 196 licensed beds. Occupancy percentage for Quincy Medical Center staffed beds is based on 130 staffed beds for FY 2008 and 116 staffed beds for FY 2009 to FY 2011.

(a)   Quincy Medical Center's discharge volume and patient days have declined over the past several years.  Both FY 2010 and annualized FY 2011 discharges are more than 8% lower than FY 2008 discharge volume.

(b)   Quincy Medical Center's average length of stay ("ALOS") remained relatively constant from FY 2008 to FY 2011 YTD.  Quincy Medical Center's ALOS is higher than the most recently available Massachusetts hospital median.

(c)   Quincy Medical Center's outpatient surgery volume decreased by 7.9% between FY 2009 and FY 2010, and is projected to drop an additional 5.0% in FY 2011.

### QUINCY MEDICAL CENTER (QMC) FINANCIAL PERFORMANCE[15]
#### ($ in thousands)

| Measure | FY2007 | FY2008 | FY2009 | FY2010 | FY2011 (9 Mos.) | FY2011 (Ann.) |
|---|---|---|---|---|---|---|
| QMC net patient service revenue | $99,086 | $96,323 | $101,709 | $97,298 | $72,464 | $96,619 |
| QMC total revenues | $106,348 | $104,960 | $109,397 | $103,002 | $76,070 | $101,427 |
| QMC total operating expenses | $109,850 | $107,448 | $111,018 | $108,831 | $83,955 | $111,940 |
| QMC total operating margin $ | ($3,502) | ($2,488) | ($1,621) | ($5,829) | ($7,885) | ($10,513) |
| QMC total operating margin % | (3.3%) | (2.4%) | (1.5%) | (5.7%) | (10.4%) | (10.4%) |
| QMC total net income | $913 | ($2,755) | ($1,760) | ($5,928) | ($8,262) | ($11,016) |
| QMC total net margin | 0.9% | (2.6%) | (1.6%) | (5.8%) | (10.9%) | (10.9%) |
| MA hospital median total margin | 3.0% | 1.4% | 2.2% | 2.6% | N/A | N/A |
| | | | | | | |
| QMC FTEs per adjusted occupied bed | N/A | 3.61 | 3.66 | 3.56 | 3.58 | 3.58 |
| MA hospitals median FTEs per adjusted occupied bed | 2.95 | 3.09 | 3.04 | N/A | N/A | N/A |

(a)   Quincy Medical Center had both a negative operating margin and negative total net income in each year from FY 2008 to FY 2010; these figures are projected to decline further in FY 2011.  Quincy Medical Center financial performance has not enabled the organization to generate funds to sufficiently maintain and invest in facilities, infrastructure, programs and services, and major equipment.

---

[15] Sources for the data in this chart include the following:  Quincy Medical Center financial and utilization statements and monthly financial reports, October 2007 to June 2011, and Ingenix Almanac of Hospital Financial and Operating Indicators, 2011.  FY 2011 data are based on nine months (October 1, 2010 to June 30, 2011).

## QUINCY MEDICAL CENTER (QMC) FINANCIAL POSITION[16]
### ($ in thousands)

| Measure | 9/30/07 | 9/30/08 | 9/30/09 | 9/30/10 | 6/30/11 | %Δ 2007-2010 |
|---|---|---|---|---|---|---|
| QMC cash and cash equivalents | $933 | $4,760 | $4,799 | $3,026 | $3,072 | 224.3% |
| QMC investments | $18,118 | $13,658 | $12,603 | $13,758 | $5,997 | (24.1%) |
| QMC total current assets | $21,563 | $21,416 | $22,317 | $19,728 | $21,500 | (8.5%) |
| QMC accounts payable | $17,008 | $15,107 | $11,741 | $12,843 | $22,254 | (24.5%) |
| QMC total current liabilities | $28,155 | $24,114 | $21,899 | $21,581 | $21,116 | (23.3%) |
| QMC current ratio | 0.77 | 0.89 | 1.02 | 0.91 | 1.02 | 19.4% |
| MA hospitals median current ratio | 1.52 | 1.46 | 1.50 | 1.55 | N/A | 2.0% |
| United States hospital median current ratio (100-199 beds) | 2.05 | 1.89 | 1.98 | N/A | N/A | N/A |
| QMC days cash on hand (all sources) | 66.1 | 64.8 | 59.2 | 58.6 | 41.0 | (11.4%) |
| MA hospitals median days cash (all sources) | 62.9 | 69.9 | 78.7 | N/A | N/A | N/A |
| United States hospital median days cash (100-199 beds) | 81.6 | 71.0 | 115.7 | N/A | N/A | N/A |

(a)   Quincy Medical Center's cash and cash equivalents are very limited and the organization's liquidity position is poor.  Quincy Medical Center's investments declined by more than 67% from September 30, 2007 to June 30, 2011.  Quincy Medical Center's days cash on hand have fallen consistently over the past several years, and as of June 30, 2011, they were approximately one-half of the most recently available median level for Massachusetts hospitals.

(b)   Over the first nine months of FY 2011, Quincy Medical Center's accounts payable have almost doubled.

---

[16] Sources for the data in this chart include the following:  Quincy Medical Center financial and utilization statements and monthly financial reports, October 2007 to June 2011, and  Ingenix Almanac of Hospital Financial and Operating Indicators, 2011.

## QUINCY MEDICAL CENTER (QMC) FINANCIAL POSITION[17] (Continued)

| Measure | 9/30/07 | 9/30/08 | 9/30/09 | 9/30/10 | 6/30/11 | %Δ 2007-2010 |
|---|---|---|---|---|---|---|
| QMC total assets | $70,870 | $88,827 | $84,606 | $79,364 | $71,215 | 12.0% |
| QMC total long term debt | $36,225 | $60,076 | $59,452 | $58,794 | $55,629 | 62.3% |
| QMC total liabilities | $64,380 | $84,189 | $81,352 | $80,375 | $76,744 | 24.8% |
| QMC total net assets | $6,490 | $4,637 | $3,254 | ($1,012) | ($7,924) | (115.6%) |
| QMC long-term debt to capitalization | 84% | 93% | 95% | 102% | 117% | 21% |
| Massachusetts hospital median long-term debt to capitalization | 31% | 36% | 38% | N/A | N/A | N/A |
| United States hospital median long-term debt to capitalization (100-199 beds) | 35% | 35% | 36% | N/A | N/A | N/A |
| | | | | | | |
| QMC equity financing | 9.2% | 5.2% | 3.8% | (1.3%) | (11.1%) | (114%) |
| Massachusetts hospital median equity financing | 48.9% | 49.0% | 38.1% | 39.2% | N/A | N/A |
| United States hospital median equity financing (100-199 beds) | 52.0% | 45.9% | 49.2% | N/A | N/A | N/A |

(a) From September 30, 2007 to June 30, 2011, Quincy Medical Center's long-term debt and total liabilities both increased by more than $12 million. Overall, Quincy Medical Center has a negative net asset position, which has deteriorated significantly over the first nine months of FY 2011.

(b) Quincy Medical Center's long-term debt to capitalization ratio, which measures the organization's reliance on debt, increased substantially between September 30, 2007 and September 30, 2010. This measure is nearly three times higher than the most recent state and national hospital medians and indicates that Quincy Medical Center is highly leveraged. Quincy Medical Center's equity financing percentage declined from 9.2% as of September 30, 2007 to negative (1.3%) as of September 30, 2010; this is reflective of the organization's negative net asset position.

(c) On July 1, 2011, Quincy Medical Center filed for Chapter 11 bankruptcy with the Bankruptcy Court.

*Financial Capacity of Steward*

In her review of the Transaction, the Attorney General also considered the financial capacity of Steward. Steward management reports that the organization has in excess of $100 million in unrestricted cash availability, and access to an additional $400 million through approved financing. Steward management also reports that the organization has a forward

---

[17] Sources for the data in this chart include the following: Quincy Medical Center financial and utilization statements and monthly financial reports, October 2007 to June 2011, and Ingenix Almanac of Hospital Financial and Operating Indicators, 2011.

commitment of $400 million from the Steward Parent, out of a fund with approximately $2.5 billion available.[18]

Steward expects to receive an additional $50 million by 2016 in government funding, by achieving "meaningful use" of IT, including electronic health records. Steward also has current annual earnings before interest, taxes, depreciation and amortization of more than $80 million. Accordingly, Steward's reportedly available resources are more than sufficient to finance the Transaction and fund post-Closing commitments.

*Key Findings*

Quincy Medical Center's financial performance and position have deteriorated substantially over the past several years. Quincy does not have the resources to meet current and long-term financial obligations, as evidenced by its recent bankruptcy filing. It is impracticable, if not impossible, for Quincy Medical Center to remain independent.

Based on a tour of the grounds and facilities, as well as interviews with management and Board members, Quincy Medical Center requires significant capital investment to upgrade, maintain, and improve existing facilities and equipment. Without a capital partner, Quincy Medical Center will not be able to continue its operations as a community hospital provider of acute care and other health care services.

The APA capital expenditures commitment by Steward over the next ten years (including $34 million over the first five years post-Closing, and at least $10 million in the following five years) will provide funding to address existing deficiencies and meet ongoing needs. In addition, Steward's reportedly available resources are more than sufficient to finance the Transaction and fund post-Closing commitments.

## 4.2    The Board and senior management complied with standards of due care.

Members of the Board, as well as senior managers, are fiduciaries and must at all times in their dealings with Quincy act in a manner consistent with their obligations of due care and loyalty. The duty of care means that these individuals must act prudently, act in good faith, and exercise reasonable judgment. For the reasons set forth below, the Attorney General finds that the Board and senior management acted consistent with that duty.

The Attorney General requested and reviewed relevant documents and information, including financial data, organizational and governance documents, transactional documents, business records, and minutes of Board and committee meetings, as well as interrogatory responses from, and interviews with, Board members and senior management concerning Quincy's consideration of alternative transactions as well as the Transaction.

Below is a summary of the record evidencing due care by the Board, including Quincy's initial exploration of clinical affiliations, and consideration of increasing financial pressures,

---

[18] Steward's capital commitment in the Caritas Transaction is $400 million by November 6, 2014.

16

bankruptcy filing, potential merger or acquisition and related RFP process, and, ultimately, selection of Steward.

*Board and Executive Committee Documentation*

As a threshold matter, the Attorney General notes that the Board met regularly, kept and approved minutes of its regular meetings, and received regular reports from committees and management at Board meetings. Regular meetings of the Board generally lasted approximately two hours, and attendance by Board members was generally good. However, the Attorney General notes that neither the Board nor its Executive Committee generated minutes of the numerous special meetings of the Board, executive sessions of regular meetings of the Board, or Executive Committee meetings where topics such as filing for bankruptcy, the RFP process, including meetings with Navigant and counsel, or the review of the two final proposals from for-profit bidders were discussed. Quincy stated that its practice of not taking minutes during this review period was implemented primarily due to the highly confidential and sensitive nature of the discussions, including the potential bankruptcy filing, as well as the relative speed of the proceedings. The Board's practice in this regard left a poor record of the Board and Executive Committee's meetings and deliberations throughout the process leading to approval of the Transaction.

Based on her review of the Transaction, including interviews of Board members and Quincy senior management and document production review, the Attorney General finds that Quincy's approach of not taking minutes during the review process was a deviation from the Board's typical documentation practices and was implemented primarily in light of the speed of the process and the highly confidential and sensitive nature of the discussions, including the potential bankruptcy filing. The Attorney General also finds that, notwithstanding the lack of minutes, the Board and its Executive Committee did meet regularly, including with consultants and advisors, met with increasing frequency as the RFP process progressed and as financial pressures increased, and satisfied the fiduciary of obligation of due care concerning the RFP process and the Board's review and approval of the Transaction. In addition, six written presentations to the Board and Executive Committee by Navigant were maintained, five of which are included as exhibits to the Transaction Notice.[19] The documents produced, substantiated by interviews and interrogatory answers, reflect that Quincy, working with its consultants and advisors, engaged in a detailed, if expedited, RFP process, and that the bulk of the RFP process work with Navigant was conducted by the Executive Committee.

The Attorney General emphasizes to charitable organizations, that, while concerns regarding speed and confidentiality are understandable, deliberations related to potential non-profit hospital acquisitions should be carefully and consistently documented; and further, confidentiality concerns do not override the need for charities to document significant and sensitive deliberations and votes, including those in executive sessions. In addition, charities can implement procedures to address such confidentiality concerns (e.g., entering executive sessions and treating draft minutes as confidential, controlled documents that are not emailed, mailed, or posted on governance intranet sites, but rather, distributed and collected at meetings). The

---

[19] The first Navigant presentation to the Board on February 4, 2011, which set forth Navigant's qualifications to assist and advise Quincy, is not a Transaction Notice exhibit.

Attorney General refers to her process recommendations concerning minutes set forth in Appendix B(4) of the AG Statement in the Morton Transaction.

*Increasing Financial Pressures/Clinical Affiliations (2006-2011)*

The minutes of the regular meetings of the Board produced to the Attorney General show: (a) a pattern of financial problems, which were consistently reported to and discussed by the Board, and (b) ongoing efforts by the Board to address the financial situation, including a focus on cost reductions and increasing volume. In 2006, due to declining financials, Quincy engaged the health care consulting firm FTI Cambio, which identified performance improvement opportunities and recommended governance reforms. Quincy continued to experience financial difficulty. Financial reports delivered to the Board during 2007 show consistent losses, and there appears to have been some concern related to Quincy's accountants being able to consider Quincy a going concern. The Board discussed options including refinancing, possible performance improvements, and governance reforms.

In 2009, Boston Medical Center, largely due to its own financial difficulties, could no longer sustain, and terminated, its ten-year relationship of clinical affiliation and support to Quincy Medical Center. Quincy Medical Center next pursued a clinical affiliation with South Shore Hospital, which was not successful and only lasted approximately eight months, in part due to the difficulties of a more or less horizontal provider affiliation and in part due to lack of support from the Quincy Medical Center medical staff (the "Medical Staff") for such affiliation.

In or around 2009, Quincy Medical Center defaulted on its days cash on hand bond covenant. As noted in Section 4.1, above, Quincy engaged Casner & Edwards in March 2010 to apprise the bondholders of Quincy's financial situation and to begin to prepare creditors for a merger, acquisition, or potential bankruptcy filing. In compliance with requirements under the bond documents, Quincy engaged a consultant, Alvarez & Marsal Healthcare Industry Group ("Alvarez & Marsal"), to identify potential performance improvement initiatives. At the March 16, 2010, Board meeting, these events were reported to the Board. In one of its reports to the Board, Alvarez & Marsal noted that Quincy's situational assessment included the recent termination of the ten-year Boston Medical Center affiliation, the short-lived South Shore Hospital affiliation and the lack of Medical Staff support for such affiliation, the search for a new tertiary care affiliation partner, the transition of the Quincy Board Chair, declining Quincy Medical Center volumes, worsening financials, increasing competitive pressures, the violation of bond covenants, and the departure in April of 2010 of the Quincy Chief Executive Officer, Dr. Gary Gibbons, a vascular surgeon, all of which had a cumulative disruptive effect on Quincy Medical Center operations.

During 2010, Quincy continued to search for another clinical affiliation partner and had communications with several non-profit organizations, including Beth Israel Deaconess Medical Center, Caritas Christi, Partners HealthCare, and Tufts Medical Center ("Tufts"). In May of 2010, Quincy Medical Center engaged John Kastanis, an experienced health care senior administrator, as Interim Chief Executive Officer, in part to allow Quincy Medical Center to focus on addressing issues that involved major change. In June 2010, Quincy entered a new clinical affiliation with Tufts.

In late 2010 and early 2011, the Board continued to receive and review detail on the declining financials and to consider revenue opportunities and the advice provided to the Board from Quincy's consultants and advisors. Continued losses were reported in the financial reports, and the Board discussed various cost-cutting measures, including management eliminations and restructuring and lowering vendor costs. Throughout this time, the Board and its Executive Committee were focused on Quincy's financial and operational issues, including an upcoming call with bondholders. The Board continued to receive reports on the findings of Alvarez & Marsal and Quincy's efforts to implement its consultant's recommendations.

Quincy's developing clinical affiliation with Tufts was a positive one. However, Tufts could provide Quincy with clinical expertise and resources but could not provide a capital infusion. Since Tufts had a clinical affiliation with one of the hospitals owned by Vanguard Health Systems, Inc. ("Vanguard"), Quincy and Vanguard explored opportunities, and Vanguard made an acquisition proposal to the Board in or around February 2011. Vanguard is a national operator of for-profit hospitals, including two licensed Massachusetts hospitals, with three hospital facilities, in Worcester, Framingham, and Natick.

Despite these efforts, Quincy continued to experience into 2011 significant financial losses, deterioration in financial performance, erosion of cash position, deferred facility maintenance and equipment upgrades, and continuing reduction in average daily census and outpatient volume.

*RFP Process regarding Merger/Acquisition (2011)*

Consistent with its obligation to pursue and consider all reasonably viable non-profit options before considering conversion to a for-profit, Quincy determined that it required the services of an independent financial advisor, including to assess its strategy concerning creditors. As noted in Section 4.1, above, Quincy engaged Navigant in or around March of 2011. The Board had considered both Navigant and Alvarez & Marsal, and the Board selected Navigant due to its experience with distressed community hospitals. Soon after its engagement, Navigant confirmed the Board's understanding that Quincy's cash flow was insufficient to service its debt and fund necessary capital expenditures. The Board, primarily through its Executive Committee, worked with Navigant to develop an RFP to send to potential merger or acquisition partners for a "stalking horse" bidder in connection with a bankruptcy filing. The Board's priorities included ensuring the continued availability of acute care hospital services in the community and protecting Quincy employees. Throughout this time, Quincy also was advised by its outside legal counsel, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz Levin"), on, among other things, the RFP process and the fiduciary obligations of Board members. In April 2011, the Board engaged O'Neill and Associates as an advisor concerning strategic communications during the RFP process and bankruptcy.

In April 2011, Navigant presented the Board with a list of 23 potential partners for Quincy, including 11 non-profit and 12 for-profit organizations and both regional and national provider systems. These 23 providers were contacted during the RFP process. Ten of them (five non-profit and five for-profit) signed confidentiality agreements with Quincy and, in May 2011,

received an RFP. Only two providers submitted a response to the RFP – Vanguard and Steward, both for-profit entities.

In June 2011, the Board, primarily through its Executive Committee, pursued due diligence and negotiations in earnest with both for-profit entities. Both potential partners made presentations to the Board in June 2011. The Board's criteria to evaluate the proposals included: (a) a long-term commitment to maintaining a full-service acute care hospital in Quincy and the services and programs currently offered by Quincy Medical Center, (b) fair value for Quincy's assets and operations, (c) a commitment to fund capital expenditures, (d) a commitment to abide by the Chapter 94 Deed restriction (see footnote 5), (e) a plan for meaningful local input into the hospital's clinical and operational decisions, (f) plans for Quincy employees, including recognizing current unions, and (g) access to resources such as a physician network, competitive managed care contracts, greater discounts on purchasing hospital supplies, strong IT infrastructure, including electronic medical records software, participation in research and teaching programs, administrative and operational support, and clinical specialty services not currently provided at Quincy. (Transaction Notice at pp. 8-9).

In evaluating the proposals, the Board understood and valued the recent clinical affiliation it had with Tufts and the relationship Tufts had with Vanguard. Despite that synergy, the Board applied the above criteria and determined that the Steward proposal was superior and in the best interests of Quincy and the community it serves, and consistent with Quincy's obligations to creditors, for reasons including the following: (a) a longer No-Close Period (by five years), (b) a higher purchase price (by $25-28 million), (c) a larger capital commitment in the five years post-closing (by $7 million), and (d) acceptance of Deed restrictions (see footnote 5) versus requiring removal of Deed restrictions prior to Closing.[20]

The Board's evaluation criteria also included another factor – a description of how the provision of health care services in Quincy's service area related to the purchaser's current operations and strategic plans. (Transaction Notice at p. 9). Given that Steward Carney Hospital and Quincy Medical Center are approximately four miles apart, the Board pursued in negotiations, and the Attorney General pursued in interviews, Steward's plans concerning the delivery of services post-Closing at both Steward Carney Hospital and Steward Quincy Medical Center. The Board understood that after the two hospitals are part of the same system, Steward may make changes to administrative services or the distribution of clinical services across the two hospitals in order to achieve efficiency, cost savings, or other improvements, but that Steward will do so subject to the commitments made in each of the two separate acquisition transactions.

At its June 27, 2011 Board meeting, which lasted approximately three and one-half hours, the Board approved unanimously (with one voting Board member absent) the Transaction and the filing of the petition in Bankruptcy Court.

---

[20] The Attorney General notes that, other than the four physician members on the 11-member Board (one of whom is the Medical Staff President), the Board did not actively solicit input from its Medical Staff, largely due to the sensitivities of a potential bankruptcy filing.

*Key Findings*

The record reviewed by the Attorney General demonstrates involvement by an engaged and committed Executive Committee and Board. Although the RFP process itself was expedited in light of Quincy's deteriorating financial situation, the Board carefully evaluated all options, including the only two bids received, which were both from for-profit entities. In approving the Transaction, the Board acted diligently, deliberatively, and in the best interests of Quincy, consistent with its fiduciary duty of care (and with its duty of loyalty, which is described in Section 4.3).

The Attorney General finds that the Board appropriately applied the "impossible or impracticable" *cy pres* legal standard under applicable general non-profit and charities law. As noted in the Attorney General's process recommendations set forth in Appendix B(1) of the AG Statement in the Morton Transaction, a charitable organization that cannot continue its charitable operations in its current form first must determine if there is a reasonably viable non-profit option for continuing such operations prior to selling its assets and operations to a for-profit entity. Since no non-profit bidder submitted a response to Quincy's RFP or submitted a competing bid to Steward's "stalking horse" bid in the Bankruptcy Court to purchase the Quincy Sellers, the Board reasonably determined that it had no reasonably viable non-profit option.

In addition, in making its determination to enter into the Transaction, the Board reasonably relied on the advice of qualified, independent consultants and advisors. The Attorney General notes that is consistent with the fiduciary obligations of a Board member, including the duty of care, to rely on information, opinions, and reports of professional third parties as to matters which the Board member reasonably believes to be within the competence of such professional or expert. *See* G.L. c. 180, § 6C.

## 4.3    The Board and senior management complied with standards for disclosure and managing conflicts of interest.

Consistent with the duty of loyalty, the members of the Board and senior management, as fiduciaries, must act in the best interests of the organization rather than themselves. When their personal interests are implicated, the interests must be disclosed and appropriately handled to assure that decisions are truly made in the interests of the charity. For the reasons set forth below, the Attorney General finds that the Board and senior management acted consistent with those standards.

The Attorney General requested and reviewed relevant documents and information, including the Quincy conflict of interest bylaws language, as well as interrogatory responses from, and interviews with, Board members and senior management concerning conflict of interest disclosures and the Transaction.

Quincy Medical Center has appropriate conflicts of interest language in its bylaws requiring disclosures of potential conflicts and annual acknowledgements. Based on their interrogatory answers, no Board member has a material financial, business, or personal relationship with Steward. However, neither the Board nor the Executive Committee considered

21

or disclosed potential conflicts of interest that members of the Board, including its Executive Committee, may have had with respect to potential partners being solicited during the RFP process.[21] As set forth in Appendix B(3) of the AG Statement in the Morton Transaction, the Attorney General notes process recommendations for charitable organizations concerning the appropriate disclosure and management of conflicts of interest, particularly when a potential for-profit conversion is being considered.

Prior to the APA execution, no Board member, or any family member of any such individual, had any direct or indirect financial relationship with or business interest in Steward or Cerberus. Consistent with a desire by the Board for local participation in governance post-Closing, members of the Board will be nominated by Quincy and appointed by Steward to serve as members of the Steward Quincy Medical Center local governing board effective upon Closing. In an interview of Steward senior management, the Attorney General was informed that Steward does not compensate the members of its local governing boards and does not intend to do so with respect to individuals serving on the Steward Quincy Medical Center board.

Prior to the APA execution, no member of the Quincy senior management team, or any family member of any such individual, had any direct or indirect financial relationship with or business interest in Steward. The current members of the Quincy senior management team, like all Quincy employees, are expected to be employed by Steward post-Closing. However, no financial terms and conditions have been negotiated between Steward and members of Quincy senior management with respect to future employment. Based on interrogatory responses from and interviews with Quincy representatives, no member of Quincy senior management will receive an increase in salary, incentive payment or bonus, or other form of compensation as consideration for identifying or finding Steward or negotiating, effectuating, or entering into the Transaction.

*Key Findings*

While noting the Attorney General's process recommendations set forth in Appendix B of the AG Statement in the Morton Transaction, the Attorney General finds that there was no self-dealing or conflict of interest mismanagement. Board members and senior management had no existing financial interests or business relationships with Steward. Further, the Attorney General finds that there was no undue influence on the Board members concerning their review, negotiation, and consideration of the two final proposals, and that the Board acted in the interests of Quincy (and not any private individual or group of individuals) in establishing the criteria for, negotiating, and entering into the APA and the Transaction.

## 4.4   The Transaction purchase price is consistent with fair market value.

The duty of care, to which the Board and senior management are subject, obligates the organization to obtain the best possible arrangement for its assets. The Attorney General

---

[21] One Board member, who serves on the Executive Committee, also serves as a member of the Tufts Board of Governors, which is an advisory, not governing, body. Tufts was one of the 23 entities solicited by Navigant on behalf of Quincy as a potential partner; it received an RFP (but did not submit a response).

requested and reviewed relevant documents and information, including documents and information referenced in Sections 4.1, 4.2, and 4.3, above, as well as interrogatory responses from, and interviews with, Board members and management concerning the value of Quincy Medical Center.

The Transaction purchase consideration is defined to be the sum of: (a) cash purchase price of $38 million (if Closing occurs on or before October 1, 2011), $37 million (if Closing occurs after October 1 and on or before November 1, 2011), or $35 million (if Closing occurs after November 1, 2011), (b) the assumption of certain liabilities, and (c) Steward's post-Closing commitments set forth in Section 8.20 of the APA (and summarized in Section 1.1., above). APA, Section 3.1.

In evaluating the fairness of the purchase price and the value to Quincy, the Attorney General's review included the above, as well as the following issues.

*Industry Benchmarks*

In FY 2010, Quincy Medical Center had EBIDA of approximately $1.4 million. This is based on a net loss of ($5.8 million), interest of $2.9 million (added back), and depreciation/amortization of $4.2 million (added back). The purchase price of between $35 million and $38 million is approximately 25 times Quincy Medical Center's EBIDA. This is significantly higher than the typical range for hospital acquisitions. Quincy Medical Center's annualized FY 2011 EBIDA has declined to negative ($2.4 million).

In FY 2010, Quincy Medical Center had patient service revenue of approximately $97 million. The purchase price of between $35 million and $38 million is approximately 0.36 to 0.39-times annual patient service revenue. Data compiled by Irving Levin Associates (August 2011) for six comparable transactions indicates a range for purchase price at 0.2 to 1.0-times annual patient service revenue. The Transaction price, as a multiple of annual patient service revenue, falls within the range for these transactions.

*Market Response*

The purchase price is the result of a diligent and active search for a partner or buyer that would address the problems facing Quincy. Absent process failures, including mismanaged conflicts of interest, none of which have been identified in the Attorney General's review (see Sections 4.1, 4.2, and 4.3, above), it is such a process that is the best indicator of market value. As set forth in the AG Statement in the Caritas Transaction, the best determinant of fair market value, particularly in the complex marketplace of health care where sellers may have significantly divergent conditions and negotiating positions, is neither opinions nor industry ranges, but rather, the market response to a carefully designed and managed sale process.

Facing a deteriorating financial condition, Quincy engaged Navigant in March 2011 to reach out to other non-profit and for-profit organizations that may have had an interest in an affiliation with or acquisition of Quincy, in a broad-based, systematic, and comprehensive manner, including the RFP process described in Section 4.2, above. Only two parties submitted

a response to Quincy's RFP, and Quincy pursued diligent and arms-length negotiations concerning these two proposals from for-profit bidders. Moreover, no qualified bidder submitted a proposal to challenge Steward's "stalking horse" bid to purchase the assets of the Quincy Sellers during the Bankruptcy Court sale process. Although Quincy did not engage Navigant or any other third party to provide a separate fairness opinion, Quincy did rely on Navigant to provide market data concerning the Transaction purchase consideration, including Navigant's reporting to the Board during its April 19, 2011 presentation that the "likely valuation for Quincy Medical Center is in the range of $15 million to $25 million." (Transaction Notice Ex. L at p. 13).

*Other*

The Attorney General's financial advisor, HS&S, reviewed the Transaction, as well as the indicators of value. HS&S advised the Attorney General that: (a) the purchase consideration for the Transaction is commercially reasonable; it not only is consistent with the fair value of Quincy but exceeds the fair value of Quincy, and (b) there is no compelling need to complete an independent financial valuation of Quincy. As such, the Attorney General has concluded that a separate fairness opinion is not necessary.

Moreover, there is substantial independent support for the fairness of the purchase consideration of the Transaction inherent in: (a) a review of industry experience for health systems in a distressed financial position, (b) the restrictions placed on the future use of the assets, and perhaps most importantly, (c) the RFP process that Quincy undertook to explore alternatives to the Transaction.

*Key Findings*

The Attorney General finds that the Transaction affords Quincy Medical Center, and the public it serves, fair value for its assets and operations. The purchase consideration for the Transaction is commercially reasonable and exceeds the fair value of Quincy Medical Center. There is no compelling need to complete an independent financial valuation of Quincy Medical Center.

**4.5    The Transaction is in the public interest.**

For the reasons set forth above and below, the Attorney General finds that the Transaction is in the public interest.

The Attorney General requested and reviewed all of the documents, information, and interrogatory responses previously disclosed, as well as interviews with key Board members and members of both Quincy and Steward senior management.

As noted in Section III, above, much of the public commentary that the Attorney General received was supportive of the Transaction. As noted in Section 1.1, above, components of the Transaction that are beneficial to and consistent with the public interest include: (a) paying Quincy at least $35 million and as much as $38 million, which will be applied to towards the

24

discharge of Quincy's secured and unsecured debt, (b) committing no less than $34 million in Steward Quincy Medical Center capital expenditures within five years post-Closing, with $15 million to be expended in the first year post-Closing and another $10 million in the second year post-Closing, (d) committing no less than an additional $10 million in capital expenditures in years six through ten post-Closing, (e) not closing Quincy Medical Center and maintaining an acute care hospital in Quincy that shall provide at least the same scope of services as Quincy Medical Center currently provides during the No-Close Period, which is essentially seven years unqualified and an additional three years qualified post-Closing, subject to certain performance and notice criteria for the final three years, (f) maintaining charity care pursuant to the Attorney General's Community Benefits Guidelines for Non Profit Hospitals for as long as the Steward Buyer operates Steward Quincy Medical Center, including maintaining the current levels of charity care during the No-Close Period, (g) maintaining community benefit programs pursuant to the Attorney General's Community Benefits Guidelines for Non Profit Hospitals for as long as the Steward Buyer operates Steward Quincy Medical Center, including maintaining the current levels of community benefit expenditures during the No-Close Period, (h) not closing or reducing the number of the 22 inpatient, geriatric psychiatric beds during the No-Close Period, (i) maintaining Quincy Medical Center's current Asian outreach services, which include the funding of an Asian Outreach Coordinator position, a chest clinic, and the provision and training of interpreters, subject to such changes over time that may be necessary or appropriate to ensure that such community benefit programs remain properly aligned with the needs and interests of Steward Quincy Medical Center's patients and the community post-Closing, (j) maintaining a local governing board for Steward Quincy Medical Center, with designated responsibilities consistent with DPH requirements, subject to the authority of the Steward Buyer's board of directors, organizing documents, and bylaws, (k) not selling or transferring a majority interest in Steward Quincy Medical Center for five years post-Closing, except as part of an otherwise permitted sale of the Steward health system as a whole or Steward Medical Holdings, (l) offering comparable employment positions to the approximately 1,100 Quincy employees at the time of Closing, as well as setting initial terms and conditions of employment for all transferred employees (as defined in the APA) consistent with APA Section 9.2(a) and recognizing bargaining units provided for under collective bargaining agreements that expired in 2011, (m) honoring naming commitments made by Quincy in the past to donors, (n) adopting and implementing debt collection practices generally consistent with Quincy Medical Center's current debt collection practices and the Recommended Hospital Debt Collection Practices set forth in the Attorney General's Community Benefits Guidelines for Non Profit Hospitals, (o) continuing to accept Medicare and Medicaid patients, to accept emergency room patients regardless of ability to pay consistent with applicable law, and to provide culturally and linguistically appropriate services consistent with those currently provided at Quincy Medical Center, (p) committing that the following APA provisions will apply to any successor-in-interest to the Steward Buyer (after 90 days prior notice of such sale to the Attorney General): ongoing obligations for community benefit and charity care, including debt collection practices; regulatory compliance; the no-closure commitments, including maintaining at least substantially the same services and maintaining current community benefit and charity care expenditure levels for the No-Close Period; the capital expenditures commitment in years six through ten post-Closing; the local governing board commitment, and the donor-naming commitment; provided that only the community benefits/charity care and regulatory cooperation and regulatory cooperation obligations will apply if the Steward Buyer satisfies the No-Close Period criteria

(including notice provisions) and otherwise could close the hospital rather than sell it or if the sale occurs after the tenth anniversary of the Closing, (q) agreeing that the Attorney General shall have the right to enforce certain post-Closing provisions of the APA related to the public interest, (r) funding (through a Quincy Medical Center reserve) and assuring, with the cooperation of both Quincy and Steward, that endowment and other donor-restricted funds are appropriately segregated and used for appropriate purposes, as well as the reorganization or dissolution of the Quincy entities, as may be appropriate or necessary, (s) confirming that the Steward Buyer, notwithstanding its for-profit status, will fully cooperate with any investigation, inquiry, study, report, or evaluation conducted by the Attorney General under her oversight authority of the non-profit charitable hospital industry to the same extent and subject to the same protections and privileges as if Steward were a public charity, (t) clarifying that the existing assessment and monitoring of Steward by the Attorney General and DPH includes the impact of the Transaction on health care costs, access, and services within the communities served by Steward, and (u) agreeing that if Steward fails to meet its minimum capital expenditure obligations under the APA during the first five years post-Closing, Steward shall donate such unspent amounts to a Massachusetts health care charity, after written notice to and approval by the Attorney General.[22]

As stated in the AG Statement in the Nashoba Transaction (at pp. 19-20):

The change of ownership structure from a non-profit community based organization to a for-profit organization ultimately answerable to the shareholders creates a significant alteration in the amount of local control and input the community will have in the hospital's future direction and operations. This change also raises question about the level of charity care provided by [the for-profit] and the disposition of restricted funds held by the hospital to be used for the provision of health related services.

As in the Nashoba Transaction, the Board was aware of and attempted to mitigate against these risks by prioritizing and negotiating certain post-Closing obligations of Steward, including concerning charity care (APA Section 8.20(a) and (i)), community benefits (APA Section 8.20(a) and (i)), No-Close Period (APA Section 8.20(d)), and local governing board (APA Section 8.20(e)). As part of her review process, the Attorney General was able to confirm enhanced commitments from Steward with respect to each of these APA post-Closing commitments in the public interest. See Section 1.1(j)-(x), above.

Moreover, at the August 9, 2011 public hearing concerning the Transaction, many speakers focused on the public interest element of the Attorney General's statutory review. While expressing some reservations about the operation of Steward Quincy Medical Center post-

---

[22] As a result of the Transaction, Steward Quincy Medical Center, as a for-profit, will pay local property tax and sales tax, and presumably, the capital expenditure commitments will generate economic activity. As stated in the AG Statement in the Caritas Transaction (p. 25, footnote 11): "The Attorney General does not dispute the value of those jobs and revenues to employees, contractors, and local communities. Nevertheless, all of those expenditures, as with virtually any expenditure by a health care provider, will eventually be paid for by the public through state and federal taxes that support Medicare, Medicaid, and other state and federal payer programs, as well as by premium dollars. As such, these factors were not necessary to the Attorney General finding that the Transaction is in the public interest."

Closing as a for-profit organization, including concerns about continuing to provide cost-effective care and services needed by vulnerable populations in the community, as well as respect for patient dignity and patient and employee rights, almost all speakers acknowledged that the most likely alternative to the Transaction – the closure of Quincy Medical Center – was unacceptable and not in the best interests of the community.

As noted in the preamble, above, the Attorney General, as part of the review required under Section 8A(d) and her assessment of whether the Transaction is in the public interest, took into consideration Steward's recent and relatively rapid expansion in the marketplace. Both the Antitrust Division and the Health Care Division of the Office of the Attorney General, along with the Non-Profit Organizations/Public Charities Division, participated in this review. The Antitrust Division conducted a non-public antitrust review of the Transaction to determine if the Transaction had the potential to substantially lessen competition in violation of state and federal antitrust laws and harm the public interest. The Antitrust Division concluded, based upon its interviews of market participants, review of relevant documents and data, and consultations with its economic expert, that the Transaction poses little present antitrust risk and that no enforcement action is warranted at this time. Nor does the Attorney General conclude that the Transaction is against the public interest based on this antitrust analysis.[23]

The Attorney General is committed to monitoring and evaluating the impact of the Transaction, as well as the Caritas Transaction and any other Steward acquisitions, on the relevant marketplace. As stated in the AG Statement in the Caritas Transaction (Appendix A, p. A-9), in the event that Steward, a community-hospital based health care system, can provide effective care in a local setting without raising costs to the public, reducing services, or limiting access or choice, the public would be well-served, and the Attorney General wants to document and understand the basis of that success. In the event the effort is not successful, the Attorney General wants to document and understand the basis of that failure. While some would prefer that the Attorney General use this Section 8A(d) review process to, in essence, regulate the conduct of Steward, the Attorney General strongly supports transparency, believes solutions must be system-wide, and views her role as working, with others, to better inform the executive branch, the Legislature, policy makers, and the public. The evaluations undertaken as part of the Assessment and Monitoring Agreement will further that objective, consistent with the provisions of G. L. c. 180 § 8A(d)(5). The Attorney General is conducting its assessment and monitoring of Steward, which runs until November 6, 2015, through its Health Care Division.[24]

---

[23] It should be noted that many health care providers in the Commonwealth are exploring various new business arrangements. While such arrangements have the potential to benefit consumers if they seek to contain costs and achieve quality goals, they also have the potential to harm consumers if such arrangements result in markets that enable the merged entity to seek to extract supra-competitive price increases which will be passed on to patients and their employers. The Attorney General will continue to aggressively enforce the antitrust laws to ensure that any projected benefits of consolidation among health care providers are not outweighed by anticompetitive effects.

[24] As noted in the AG Statement in the Caritas Transaction (Appendix A, p. A-8), "Steward's stated objective is to improve and further develop a community-hospital based health care system capable of (i) managing risk, (ii) providing high quality, local, and accessible care, and (iii) reducing out-migration of patients who now obtain services, otherwise available at a Caritas Hospital, at higher cost, less accessible settings. By keeping significantly more of that patient care, and the associated revenues, within the Steward system, Steward states it will provide an appropriate return to its investors while providing a lower-cost alternative to the public. If achieved in the manner described, this model may well provide an attractive alternative to systems centered around academic medical

*Key Findings*

The Transaction serves the public interest. As noted in the AG Statement in the Caritas Transaction, there are risks to the public intrinsic in any change of control, including a non-profit to for-profit conversion. In making its determination, the Board considered those risks and attempted to mitigate them with APA post-Closing commitments in the public interest (see Section 1.1 (a)-(i), above). In addition, consistent with the public interest, the Attorney General has worked to enhance the Transaction, including with additional protections and transparency (see Section 1.1(j)-(x), above). Furthermore, public input concerning the Transaction almost universally acknowledged that the mostly likely alternative to the Transaction – the closure of Quincy Medical Center – was unacceptable and not in the best interests of the community.

## V.     ANCILLARY AGREEMENTS

In connection with her review of the Transaction, the Attorney General, consistent with the authority of her office and G.L. c. 180, § 8A(d), has required the various parties to enter into the following agreements to better ensure compliance with Transaction matters related to the public interest.

5.1     An Enforcement Agreement, materially in the form attached hereto as Exhibit 5.1, by and among the Attorney General, the Quincy Sellers, and the Steward Buyer, and with the Steward Parent as guarantor, with respect to the enforcement of certain post-Closing provisions of the APA. Subsequent to the Closing, Quincy may not be in a position, nor have the resources, to monitor and enforce the post-Closing obligations of Steward. The Attorney General's findings of public interest are expressly predicated on those obligations and, as such, she obtained from Steward and Quincy the right to enforce those provisions on behalf of the public.

5.2     An Assessment and Monitoring Agreement, materially in the form attached hereto as Exhibit 5.2, by and among the Attorney General, Quincy Medical Center, and Steward clarifying that the scope of the existing assessment and monitoring agreement with the Attorney General concerning Steward includes monitoring, assessment, and evaluation of the impact of the Transaction on health care costs, access, and services within the communities served by Steward, certain aspects of which will be conducted by DPH consistent with G.L. c. 180A § 8A(d)(5).

5.3     A Transition, Windup, and Reorganization Agreement, materially in the form attached hereto as Exhibit 5.3, by and among the Attorney General, Quincy Medical Center, and the Steward Buyer with respect to the identification, segregation, and future use of donor-restricted funds, including endowment funds, and other corporate transition, windup, and reorganization matters concerning charitable entities and assets, as may be appropriate or

---

centers or large physician groups. A community-hospital based health care system is, however, untested in Massachusetts, and the Attorney General is not in a position to evaluate or predict Steward's likelihood of success." With less than one year of Steward operating performance in Massachusetts, the impact of Steward's market presence in the Commonwealth has not yet been measured.

28

necessary. Quincy Medical Center has reserved funds, and Steward has agreed to cooperate, to assure that such purposes are accomplished, including the appropriate disposition of donor-restricted funds.

## VI.   CONCLUSION and NOTICE WAIVER

For the reasons and subject to the conditions set forth above, the Attorney General finds that: (1) it is impracticable, if not impossible, for Quincy Medical Center to continue to survive in its current charitable form and that the Transaction complies with applicable general non-profit and charities law, (2) while noting the Attorney General's process recommendations referenced in Section III and Section 4.2, due care was followed by the Board and senior management, (3) while noting the Attorney General's process recommendations referenced in Section III and Section 4.3, there was no self-dealing or conflict of interest mismanagement concerning the Transaction, (4) the Transaction affords Quincy fair value for its assets and operations, and (5) the Transaction is in the public interest.

Based on the foregoing, and subject to the security and transparency afforded by the agreements set forth and described in Section V, above, the Attorney General hereby: (1) waives the obligation of Quincy Medical Center under Section 8A(d)(1) to provide her office at least 90 days prior written notice of the Transaction, and (2) states her intent to assent to a motion to be filed by Quincy with the Bankruptcy Court seeking the Court's approval of the Transaction as contemplated by and consistent with this Statement.

## APPENDIX A
## PUBLIC COMMENTARY

As referenced in Section III of the Statement, the Attorney General received comments from a variety of sources concerning the Transaction, including those summarized below.

The August 9, 2011 public hearing was conducted jointly by the Attorney General and DPH; it was held at the Quincy High School and lasted nearly three hours. Approximately 50 individuals testified concerning the Transaction. The majority of speakers were unequivocally in support of the Transaction. Elected or municipal officials who spoke in favor of the Transaction included the Mayor of the City of Quincy, a state Senator, two state Representatives, and representatives of a Congressman's office and the Quincy City Council. Other individuals from the community who spoke in favor of the Transaction include representatives from Quincy Asian Resources, Manet Community Health Center ("Manet"), South Shore Elder Services, Norwell Visiting Nurse Association and Hospice, the Interfaith Social Service Agency, Atrius Health, the Quincy Chamber of Commerce, the South Shore Chamber of Commerce, and the Massachusetts Building Trades Council, as well as Quincy and Steward senior management, Board members, physicians, employees, including union representatives, and nurses from both Quincy Medical Center and Steward-affiliated hospitals.

One constituency at the public hearing who expressed some reservation about the Transaction were members of the Massachusetts Nurses Association ("MNA"), including nurses who work at Steward hospitals. While generally supportive of the Transaction, the MNA representatives expressed concerns arising primarily from their view that Steward was not honoring the terms of a contractual agreement with the MNA concerning a defined benefit pension plan. Interpreting and enforcing the terms of collective bargaining agreements, and related contractual disputes between labor and management, is not the role or within the authority of the Office of the Attorney General concerning Section 8A(d) reviews of non-profit hospital conversions, which are conducted under the authority of Massachusetts non-profit and charities law and principally by the Attorney General's Non-Profit Organizations/Public Charities Division. With the active encouragement of the Attorney General, Steward and the MNA are pursuing the due process options available to them to resolve this management/labor dispute, including arbitration.

In addition, while generally supportive of the Transaction, management from Manet, a federally funded health center in Quincy, expressed concerns regarding the market impact of Steward's operation of the hospital and its potential effect on the delivery of primary care services in the Quincy service area. As noted in Section 4.5, above, the Attorney General's Antitrust Division reviewed the Transaction and found that the Transaction poses little present antitrust risk, that no enforcement action is warranted at this time, and that the Transaction is not against the public interest based on this antitrust analysis. In addition, some of the conditions requested by Manet, such as continued community benefit programs and charity care, as well as post-Closing monitoring of Steward and the impact of the Transaction on costs, access, and services in the market, are addressed by the Attorney General's requested enhancements to the Transaction. (See Section 1.1(j)-(x), above, and Exhibits 5.1-5.3).

30

## TABLE OF EXHIBITS

Exhibit 5.1    Enforcement Agreement

Exhibit 5.2    Assessment and Monitoring Agreement

Exhibit 5.3    Transition, Windup, and Reorganization Agreement

1168051

31

Exhibit 5.1     Enforcement Agreement

**D R A F T**

# ENFORCEMENT AGREEMENT

This Enforcement Agreement (the "Agreement") is entered into as of the ____day of September, 2011 by and among **MARTHA COAKLEY**, as she is the Attorney General of the Commonwealth of Massachusetts (hereinafter on behalf of herself and her successors and assigns, the "Attorney General"), **QUINCY MEDICAL CENTER, INC.** a Massachusetts not-for-profit corporation, and its affiliates **QMC ED PHYSICIANS, INC. and QUINCY PHYSICIAN CORPORATION.** (collectively the "Sellers"), **QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.,** a Delaware corporation f/k/a **STEWARD MEDICAL HOLDINGS SUBSIDIARY FIVE, INC.** ("Purchaser") and **STEWARD HEALTH CARE SYSTEM, LLC,** a Delaware limited liability company, as Guarantor ("Guarantor").

## RECITALS

The Sellers and the Purchaser are parties to an Asset Purchase Agreement, dated June 30, 2011, as amended by a First Amendment to Asset Purchase Agreement, dated August 15, 2011 and a Second Amendment to Asset Purchase Agreement, dated September ___, 2011 (as so amended, the "Asset Purchase Agreement"), pursuant to which the Sellers are selling substantially all of their assets used in the operation of a health care system to the Purchaser.

The transactions contemplated by the Asset Purchase Agreement are required to be reviewed by the Attorney General pursuant to G.L. c.180, § 8A(d).  In connection with such review, the Attorney General has identified certain provisions of the Asset Purchase Agreement that relate to the public interest, which include certain post-closing commitments of the Purchaser, and wishes to have the right to enforce such provisions as a third party beneficiary thereof, as more specifically set forth herein.

## TERMS

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, it is agreed as follows:

1.      Defined Terms.  All capitalized terms used herein and not otherwise defined herein shall have their meanings as defined in the Asset Purchase Agreement.

2.      Enforcement of Certain Provisions.  Notwithstanding the provisions of Section 13.13 of the Asset Purchase Agreement, the Attorney General shall be a third-party beneficiary of, and shall have the right to enforce Sections 8.20(a)-(e) and (i)-(l) (Post-Closing Obligations) and 9.1 (Offers of Employment) of the Asset Purchase Agreement (the "AG's Enforceable Provisions"), in each case in accordance with the terms and conditions of the Asset Purchase Agreement.

3.      Consent Required.  The written consent of the Attorney General shall be required for any waiver of, or amendment to, Section 2.3 (Assumption of Liabilities) of the Asset

**D R A F T**

Purchase Agreement, any amendment to the AG's Enforceable Provisions, or any other amendment to the Asset Purchase Agreement that affects the Attorney General's rights hereunder.

      4.    <u>Effect on Agreement</u>.  All of the terms, conditions, covenants, provisions, representations, and warranties contained in the Asset Purchase Agreement and any documents executed in connection therewith shall remain in full force and effect except as modified hereby.

      5.    <u>Remedies</u>.  Each of the Purchaser and the Guarantor recognizes that monetary damages will be inadequate for the Purchaser's breach of the AG's Enforceable Provisions and this Agreement.  In addition to any legal remedies the Attorney General may have, the Attorney General shall be entitled to specific performance, injunctive relief, and such other equitable remedies as a court of competent jurisdiction may deem appropriate, without the requirement to post any bond in connection therewith.

      6.    <u>Enforceability</u>.  The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision of this Agreement or contained in the Asset Purchase Agreement.

      7.    <u>Amendment</u>.  This agreement may be amended only by a writing executed by each of the parties.

      8.    <u>Waiver</u>.  Any waiver by any party of any breach hereof by another party shall not be deemed to be a waiver of any subsequent or continuing breach or breach of any other provision hereof, by such party.

      9.    <u>Execution</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any one counterpart.

      10.    <u>Contract Under Seal</u>.  This Agreement shall be deemed to be a contract under seal, to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

      11.    <u>Jurisdiction/Venue.</u>  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties solely in the courts of the Commonwealth of Massachusetts and each of the parties (a) consents to the jurisdiction of such courts in any such action or proceeding and (b) waives any objection to venue laid therein and any defense of inconvenient forum to the maintenance of any action or proceeding so brought.

**D R A F T**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the first day above written.

**ATTORNEY GENERAL OF THE**
**COMMONWEALTH OF MASSACHUSETTS**


By: _____
    Name:
    Title:

**QUINCY MEDICAL CENTER, INC.**


By: _____
    Name:
    Title:

**QUINCY ED PHYSICIANS, INC.**


By: _____
    Name:
    Title:

**QUINCY PHYSICIAN CORPORATION**


By: _____
    Name:
    Title:

**QUINCY MEDICAL CENTER, A STEWARD**
**FAMILY HOSPITAL, INC., f/k/a STEWARD**
**MEDICAL HOLDINGS SUBSIDIARY FIVE,**
**INC.**


By: _____
    Name:
    Title:

D R A F T

The undersigned Guarantor hereby guarantees the obligations of the Purchaser under the AG's Enforceable Provisions and this Agreement.

**STEWARD HEALTH CARE SYSTEM LLC**

By: _____
     Name:
     Title:

1168144

Exhibit 5.2     Assessment and Monitoring Agreement

D R A F T

## ASSESSMENT AND MONITORING AGREEMENT

This Assessment and Monitoring Agreement (the "Assessment and Monitoring Agreement") is entered into as of the _____ day of September, 2011 by and among **MARTHA COAKLEY**, as she is the Attorney General of the Commonwealth of Massachusetts (hereinafter on behalf of herself and her successors and assigns, the "Attorney General"), **QUINCY MEDICAL CENTER, INC.**, a Massachusetts non-profit, charitable corporation ("QMC"), for itself and on behalf of its non-profit charitable affiliates QMC ED Physicians, Inc. and Quincy Physician Corporation (collectively, together with QMC, the "Quincy Entities"), and **STEWARD HEALTH CARE SYSTEM LLC**, a Delaware limited liability company (together with its current and future affiliates, successors and assigns, collectively, "Steward").

## RECITALS

The Quincy Entities and a subsidiary of Steward are parties to an Asset Purchase Agreement, dated June 30, 2011, as amended by a First Amendment to Asset Purchase Agreement, dated August 15, 2011 and a Second Amendment to Asset Purchase Agreement, dated September ___, 2011 (as so amended, the "APA"), pursuant to which the Quincy Entities are selling substantially all of their assets used in the operation of a health care system to a Steward subsidiary.

The Attorney General and Steward are also parties to an Assessment and Monitoring Agreement, dated October 20, 2010 (the "Caritas Monitoring Agreement"), pursuant to which the Attorney General, on behalf of the public, is overseeing and studying the impact of a prior transaction in which Steward acquired certain Massachusetts hospitals.

The transactions contemplated by the APA (the "Transaction"), are required to be reviewed by the Attorney General, pursuant to G.L. c.180, § 8A(d).  In connection with such review, which review includes consideration of the public interest, as well as the health care assessment provisions of G.L. c. 180, § 8A(d)(5), the Attorney General wishes to evaluate, assess, and monitor the impact of certain aspects of the Transaction, and wishes to better enable the Department of the Public Health (the "Department") to evaluate, assess, and monitor the impact of certain other aspects of the Transaction on the availability, access, and cost of health care services within the communities served by Steward's acute care hospitals, including the hospital being acquired in the Transaction, and any other Massachusetts hospitals acquired by Steward (the "Communities") for the time period covered by the Caritas Monitoring Agreement, subject to the rights and responsibilities of a subsidiary of Steward under Section 8.20 of the APA, all as more specifically set forth herein.

## TERMS

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**D R A F T**

1.     Attorney General Monitoring Responsibilities. The Attorney General shall, on behalf of the public, (a) oversee Steward's compliance with certain post-Closing conditions of the APA pursuant to that certain Enforcement Agreement by and among the Attorney General, Steward, and the Quincy Entities, dated as of September___, 2011, including, without limitation, establishing a baseline for the commitments set forth in Section 8.20(a) of the APA, and (b) evaluate, assess, and monitor the impact of the Transaction on (i) the cost of health care, by price, total medical expense, or other appropriate measures of cost impact as determined by the Attorney General, (ii) changes in treatment and referral patterns including, without limitation, those related to physician recruitment and contracting, and (iii) consumer options and choice within the Communities, all in accordance with the terms and conditions of this Assessment and Monitoring Agreement. Notwithstanding the foregoing, the parties hereto acknowledge that (x) the health care system is rapidly changing and the Attorney General may, in consultation with Steward but otherwise in her sole discretion, determine that additional metrics or areas of inquiry, not otherwise under the primary responsibility of the Department pursuant to Section 4 hereinafter, are required to adequately measure and assess the impact of the Transaction on the provision of health care services to the Communities, and (y) certain aspects of the evaluation and assessment may incorporate, rely upon, or support otherwise independent investigations by the Attorney General of costs within the Massachusetts health care system. For purposes of this Assessment and Monitoring Agreement, the evaluation, assessment, and monitoring undertaken by the Attorney General, including all responsibilities referenced in this Assessment and Monitoring Agreement, shall be referred to as the "Attorney General Study." While focused on the Communities, the Attorney General Study will take into account, incorporate, and provide comparisons to broader regional and state trends and use, to the extent possible, publicly available information.

2.     Cooperation with Attorney General. Steward shall cooperate, at its sole cost and expense, in providing information reasonably required by the Attorney General, and any individual or firm retained by the Attorney General, in connection with the Attorney General Study. Consistent with applicable law including, without limitation, that governing public records, information provided shall be subject to appropriate safeguards with respect to the confidentiality of information that Steward provides and nothing in this Assessment and Monitoring Agreement is to be construed as a waiver by Steward of any rights it may have to assert that information it provides pursuant hereto is not subject to public disclosure under applicable law. Notwithstanding the foregoing, Steward recognizes and acknowledges that the purpose and intent of this Assessment and Monitoring Agreement and the Attorney General Study conducted hereby is to periodically inform the public about the impact of the Transaction and, in the furtherance thereof, information and data provided by Steward may be used in an aggregated form in reports released to the public. Steward shall be provided with a draft copy of any report prior to its issuance and shall have a reasonable opportunity to comment on the form or content of the aggregated information released therein. The provisions of this Section 2 relate only to information requested and provided with respect to the Attorney General Study and do not alter, restrict, limit, waive, expand, or further define any rights or

2

**D R A F T**

obligations of the Attorney General, with respect to information demanded, requested, obtained from, or delivered by, Steward pursuant to the authority of her office under existing law in matters other than the Attorney General Study.

3.      Payment of Costs, Fees and Expenses of the Attorney General Study. The costs, fees, and expenses of the Attorney General in undertaking the Attorney General Study including, without limitation, the fees and expenses of any individuals or firms retained by the Attorney General to assist in conducting the Attorney General Study shall be payable from the trust account or accounts funded by Steward and established pursuant to Section 3 of the Caritas Monitoring Agreement. Steward shall have no further obligation to the Attorney General or any individual or firm retained by the Attorney General under this Assessment and Monitoring Agreement for such costs, fees and expenses.

4.      Department Monitoring Responsibilities under G.L. c.180 § 8A(d)(5). The Attorney General, Steward, and QMC acknowledge that the Department will conduct an evaluation, assessment, and monitoring of the impact of the Transaction on the availability of, and access to, health care services within the Communities in accordance with the provisions of G.L. c. 180, § 8A(d)(5) (the "Department Study"). The costs, fees, and expenses of the Department in undertaking the Department Study including, without limitation, the fees and expenses of any individuals or firms retained by the Department to assist in conducting the Department Study shall be payable from the trust account or accounts funded by Steward and established pursuant to Section 4 of the Caritas Monitoring Agreement. Steward shall have no further obligation to the Department, or any individual or firm retained by the Department, under G.L. c.180 § 8A(d)(5), for such costs, fees and expenses. By his signature hereinafter, the Commissioner of the Department of Public Health hereby acknowledges the provisions of this paragraph 4.

5.      Enforceability/No Assignment. The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision of this Agreement. This Agreement may not be assigned by QMC or Steward without the written consent of the Attorney General or by the Attorney General without the written consent of QMC and Steward. The terms hereof shall be binding upon any successor to the interests of QMC or Steward.

6.      Amendment. This Assessment and Monitoring Agreement may be amended only by a writing executed by each of the parties.

7.      Waiver. Any waiver by any party of any breach hereof by another party shall not be deemed to be a waiver of any subsequent or continuing breach or breach of any other provision hereof, by such party.

8.      Execution. This Assessment and Monitoring Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement,

3

**D  R  A  F  T**

and any of the parties hereto may execute this Assessment and Monitoring Agreement by signing any one counterpart.

9.    Contract Under Seal.  This Assessment and Monitoring Agreement shall be deemed to be a contract under seal, to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

10.    Jurisdiction/Venue.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Assessment and Monitoring Agreement shall be brought against any of the parties solely in the courts of the Commonwealth Massachusetts and each of the parties (a) consents to the jurisdiction of such courts in any such action or proceeding and (b) waives any objection to venue laid therein and any defense of inconvenient forum to the maintenance of any action or proceeding so brought.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4

**D R A F T**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the first day above written.

**ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS**

By: _____
    Name:
    Title:

**QUINCY MEDICAL CENTER, INC.**

By: _____
    Name:
    Title:

**STEWARD HEALTH CARE SYSTEM LLC**

By:_____
Name:
Title:

Acknowledged:

_____
John Auerbach, Commissioner
Department of Public Health

1168142

5

Exhibit 5.3     Transition, Windup, and Reorganization Agreement

**D R A F T**

## TRANSITION, WINDUP, AND REORGANIZATION AGREEMENT

This Transition, Windup, and Reorganization Agreement (the "Agreement") is entered into as of the _____ day of September, 2011 by and among **MARTHA COAKLEY**, as she is the Attorney General of the Commonwealth of Massachusetts (hereinafter on behalf of herself and her successors and assigns, the "Attorney General"), **QUINCY MEDICAL CENTER, INC.** a Massachusetts non-profit, charitable corporation ("QMC"), for itself and on behalf of its non-profit charitable affiliates, including QMC ED Physicians, Inc., and Quincy Physician Corporation (collectively, together with QMC, the "Quincy Entities" and each a "Quincy Entity"), and **QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.,** a Delaware corporation **f/k/a Steward Medical Holdings Subsidiary Five, Inc.** ("Steward").

### RECITALS

Certain of the Quincy Entities and Steward are parties to an Asset Purchase Agreement, dated June 30, 2011, as amended by a First Amendment to Asset Purchase Agreement, dated August 15, 2011, and a Second Amendment to Asset Purchase Agreement, dated September _____, 2011 (as so amended, the "Asset Purchase Agreement"), pursuant to which the Quincy Entities are selling substantially all of their assets used in the operation of a health care system to Steward.

The Attorney General, through her Non-Profit Organizations/Public Charities Division (the "Division") wishes to establish a framework for the orderly dissolution or reorganization of the Quincy Entities and the handling of all funds donated to a Quincy Entity and held for charitable purposes (the "Quincy Endowment Funds") following the closing of the transactions contemplated by the Asset Purchase Agreement (the "Closing"), all as more specifically set forth herein.

### TERMS

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Effective Date; Termination.  This Agreement shall be effective as of the date hereof.  This Agreement (a) shall automatically terminate if the Asset Purchase Agreement is terminated prior to the Closing and (b) may be terminated in writing by the Attorney General if she determines that the obligations of the parties hereunder have been fulfilled.

2.      Windup, Dissolution, Consolidation, or Merger.  On or prior to the first anniversary of the Closing date, QMC shall, consistent with the applicable provisions of G.L. c. 180, other public charities law, and federal and state tax law, cause the windup and dissolution, or the consolidation or merger, of the Quincy Entities, such that only those Quincy Entities with remaining assets, missions, and purposes shall survive (each, a "Surviving Quincy Entity").

**D R A F T**

3.    Reorganization.  On or prior to the first anniversary of the Closing date and as may be appropriate or necessary, QMC shall cause each Surviving Quincy Entity to be reorganized consistent with its mission and purpose.  Any change to the mission or purpose of any Surviving Quincy Entity shall be approved by the Division, and, if required, by order of the appropriate Massachusetts court.

4.    Quincy Endowment Funds.  On or prior to the first anniversary of the Closing date, QMC shall cause all Quincy Endowment Funds, together with all applicable donor instruments and use and financial documentation, to be (a) transferred to, or retained by, the appropriate Surviving Quincy Entity and (b) thereafter held and used for the donor-specified purposes and term.  Any changes in the ownership, management, or use conditions of any fund constituting a Quincy Endowment Fund shall be approved by the appropriate Massachusetts court, with the prior assent of the Attorney General, or as otherwise provided by G.L. c. 180A, § 5.

5.    Payment of Expenses.  QMC shall retain the services of an accounting firm and a law firm to assist it with the performance of its obligations hereunder.  The fees, costs, and expenses of such services and any other expenses associated with QMC's performance of its obligations hereunder shall be paid from the reserve of [$250,000 set aside by QMC in connection with (Insert language from the Plan and Disclosure Statement to be filed with the bankruptcy court)].

6.    Steward Cooperation.  Steward shall cooperate with QMC's efforts to carry out its obligations under this Agreement and shall permit any Steward employees who are former employees of QMC and whose expertise or knowledge may be valuable to QMC in carrying out its obligations under this Agreement to cooperate and assist QMC therewith.

7.    Schedules.  Attached hereto are the following schedules, each of which is incorporated herein by reference.  QMC shall provide the Division with any updates and amendments of and to such schedules within two calendar weeks of any changes, and shall provide information to supplement such schedules as may be reasonably requested by the Division from time to time.

7.1    Quincy Entities.  A listing of all Quincy Entities together with their principal address, EIN, AGO registration number, and principal contact person.

7.2    Quincy Endowment Funds.  A listing of all Quincy Endowment Funds held by each Quincy Entity together with the name of the fund, the purpose, restriction or other limitations on the fund, the value of the fund at the last date of determination, and the location where information regarding the fund, including donor, use and financial history, are maintained.

**D R A F T**

7.3    Remaining Assets.  A listing of all other assets held by each Quincy Entity subsequent to the Closing, including, by category and Quincy Entity, a description of the assets and their estimated aggregate value.

8.    Segregation of Documents and Instruments.  All instruments and other documents evidencing the donation of any part of the Quincy Endowment Funds and any reports of activities involving the Quincy Endowment Funds shall be segregated by QMC from the assets being sold pursuant to the Asset Purchase Agreement.  To the extent any such instruments, documents, or reports are transferred to Steward, Steward shall use its best efforts to maintain such assets separately until they are transferred to QMC pursuant to Section 4 hereof.

9.    Enforceability/Assignment.  The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision of this Agreement.  This Agreement may not be assigned by QMC or Steward without the written consent of the Attorney General or by the Attorney General without the written consent of QMC and Steward.  The terms hereof shall be binding upon any successor to the interests of QMC or Steward.

10.    Amendment.  This agreement may be amended only by a writing executed by each of the parties.

11.    Waiver.  Any waiver by any party of any breach hereof by another party shall not be deemed to be a waiver of any subsequent or continuing breach or breach of any other provision hereof, by such party.

12.    Execution.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any one counterpart.

13.    Contract Under Seal.  This Agreement shall be deemed to be a contract under seal, to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

14.    Jurisdiction/Venue.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties solely in the courts of the Commonwealth of Massachusetts and each of the parties (a) consents to the jurisdiction of such courts in any such action or proceeding and (b) waives any objection to venue laid therein and any defense of inconvenient forum to the maintenance of any action or proceeding so brought.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

3

**D R A F T**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the first day above written.

**ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS**

By: _____
    Name:
    Title:

**QUINCY MEDICAL CENTER, INC.**

By: _____
    Name:
    Title:

**QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.**

By: _____
    Name:
    Title:

1168134