EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STEWARD HEALTH CARE SYSTEM LLC,

    Plaintiff,

v.

SOUTHCOAST HEALTH SYSTEM, INC.,

    Defendant.

CIVIL ACTION NO. 1:15-cv-14188

# DEPOSITION SUBPOENA AND SUBPOENA DUCES TECUM
## DIRECTED TO JOHN POLANOWICZ

To:   John Polanowicz
c/o Daniel N. Marx, Esq.
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210

Greetings:

YOU ARE HEREBY COMMANDED, in accordance with the provisions of Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, to appear and testify in the above-captioned matter before a Notary Public in and for the Commonwealth of Massachusetts, or before some other officer authorized by law to administer oaths, commencing at 9:30 a.m. on Tuesday, March 1, 2016, at the offices of Verrill Dana, LLP, One Boston Place, Suite 1600, Boston, Massachusetts 02108-4407, and to bring with you and produce documents responsive to Schedule A attached hereto for inspection and copying.

Hereof fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

Dated at: Boston, Massachusetts, this 22nd day of February, 2016.

_____
Joyce N. Shwierawski
Notary Public

My Commission Expires: 3/9/18

Subpoena Issued at the Request of

_____
Thomas O. Bean, BBO No. 548072
VERRILL DANA, LLP
One Boston Place, Suite 1600
Boston, MA  02108-4407
(617) 309-2600

2

## SCHEDULE A

## DEFINITIONS

In addition to the definitions set forth in Massachusetts District Court Local Rule 26.5, which are incorporated herein by reference, the following definitions shall apply to the documents requested pursuant to this Subpoena and to your response to this Subpoena.

1. The term "ACO Exception Circular" means the copy of the document attached hereto as Exhibit 1 and all drafts and non-identical copies thereof.

2. The term "Administrative Procedures Act" refers to Massachusetts General Laws, c. 30A.

3. The term "Communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

4. The term "Concerning" means referring to, describing, offering evidence of, or constituting.

5. The term "DPH" means the Massachusetts Department of Public Health, including its agents, employees, attorneys, and representatives.

6. The term "You," "Your," and "Yourself" means John Polanowicz.

7. The term "Moratorium Circular" means the copy of the document attached hereto as Exhibit 2.

8. The term "Steward" means, individually and collectively, Steward Health Care System, LLC, and Steward St. Anne's Hospital Corporation, their employees, agents, representatives and attorneys, including, without limitation, Andrew Levine and the law firm of Donoghue, Barrett, & Singal, LLP.

3

## INSTRUCTIONS

1. The documents produced in response to this Subpoena shall be organized either to correspond to the categories in the Documents Requested below (the "Requests"), or as they are kept in the ordinary course of business.

2. Each of the Requests shall be construed independently and shall not be limited by any other Request, except that documents responsive to more than one request need be produced only once.

3. Each of the Requests shall be construed as requesting documents that are not subject to the attorney-client privilege, work product doctrine, and/or other applicable privileges.

4. The Requests demand production of all documents responsive hereto which are in the possession, custody or control of the recipient, its employees, counsel, agents, representatives, independent contractors or consultants, whether engaged directly or indirectly through counsel.

5. If any of the Requests cannot be answered in full, then you should answer them to the extent possible, specifying each reason for your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

6. If there are no documents responsive to any particular request, please state so in writing.

7. Where any copy of any document sought herein, whether a draft or final version, is not identical to any copy thereof by reason of alterations, notes, comments, initials, underscoring, indication of routing or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

8.  Hard copies of documents, documents stored electronically and any other electronically stored information are to be produced in a searchable portable document format (".pdf") with a Concordance load file containing standard metadata fields including, without limitation, (a) Date created/sent; (b) Author; (c) recipients; (d) cc — copies; and (e) bcc — blind copies. All documents in Excel format are to be produced in native format. All documents being produced are to be delivered on a flash drive, DVD or CD-ROM.

9.  In the event that any document requested herein was formerly in your possession, custody or control, and has been lost, destroyed or otherwise disposed of, you are requested to furnish a list identifying each such document and stating the following information with respect to each such document:

    (a)  The document's title, if any, and the nature and subject matter of its contents;

    (b)  The identity of the Person(s) who prepared or authored the document, and, if applicable, the person(s) to whom the document was sent or was intended to be sent;

    (c)  The date on which the document was prepared or transmitted; and

    (d)  The date on which the document was lost, destroyed or otherwise disposed of, the manner and conditions of and reasons for such destruction or other disposition, and the Person(s) requesting and performing the destruction or other disposition.

10. Any ambiguity in a discovery request shall be construed to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

11. Whenever necessary to bring within the scope of any requests herein documents that might otherwise be construed to be outside such request's scope:

    (a)  The use of a verb in any tense shall be construed as the use of that verb in all other tenses; and

5

    (b)    The use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa.

12. Each paragraph, subparagraph, clause and word herein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

13. All documents called for by the Requests as to which You claim privilege or other grounds for non-production shall be listed chronologically as follows:

    (a)    the full identity of the document including:

        i.    the date of the document;

        ii.    the title of the document;

        iii.    the document's authors, addresses, recipients, or parties;

        iv.    the nature of the document (e.g., letter, memorandum, etc.);

        v.    the individual or source from whom or which you claimed it; and

        vi.    the document's present location and identity of its custodian.

    (b)    whether your objection or refusal is directed to the entire document or part thereof;

    (c)    if your objection or refusal goes to part of the document, specify the exact part or parts of the document to which your objection or refusal is directed;

    (d)    the specific factual basis that gives rise to the objection or refusal; and

    (e)    the specific legal ground on which the objection or refusal is based.

14. The time period for the Requests, unless otherwise stated, is January 1, 2013, to June 30, 2015.

## REQUESTS

1. All Documents Concerning Communications between You and Steward regarding Your potential employment by Steward.

2. All Documents Concerning Communications between You and Steward Concerning the Moratorium Circular and/or the ACO Exception Circular.

3. All Documents Concerning Your compliance with Massachusetts General Laws c. 268A with respect to Your potential employment by Steward, including, without limitation, Documents sent by You or on Your behalf to (a) then-Governor Deval Patrick or anyone acting on his behalf, and/or (b) the State Ethics Commission, to comply with G.L. c. 268A.

4. All Documents Concerning any decision by You to recuse Yourself from discussions and decisions Concerning the ACO Exception Circular including, without limitation, Documents pursuant to which You provided notice of such decision to any persons.

5. All Documents Concerning whether to promulgate the ACO Exception Circular pursuant to the Administrative Procedures Act and/or the reasons the ACO Exception Circular was not promulgated pursuant to the Administrative Procedures Act.

9137224_3

# Exhibit 1

**The Commonwealth of Massachusetts**
Executive Office of Health and Human Services
Department of Public Health
Bureau of Health Care Safety and Quality
99 Chauncy Street, 11th Floor, Boston, MA 02111
617-753-8000

DEVAL L. PATRICK
GOVERNOR

JOHN W. POLANOWICZ
SECRETARY

CHERYL BARTLETT, RN
COMMISSIONER

Circular Letter: DHCQ 14-6-617

TO: Chief Executive Officers, Acute Care Hospitals

FROM: Madeleine Biondolillo, MD
Associate Commissioner

Deborah Allwes, BS, BSN, MPH
Director, Bureau of Health Care Safety and Quality

DATE: July 14, 2014

RE: Policy Updates for Cardiac Catheterization Services

The purpose of this Circular Letter is to inform you of updated policies related to the provision of hospital-based cardiac catheterization services licensed by the Department of Public Health (the Department or DPH) pursuant to 105 CMR 130.900-.982. The three issues addressed in this document are:

1. Clarification of requirement to meet volume minimums for cardiac catheterization services;

2. Amended policy applicable only to certain Accountable Care Organizations (ACOs) regarding the moratorium on new cardiac catheterization services; and

3. New policy regarding percutaneous coronary intervention (PCI) services.

**Clarification of requirement to meet volume minimums for cardiac catheterization services:**

Hospitals must meet the facility and operator volume minimums set forth in the DPH hospital licensure regulations. These minimums include:

1. For a hospital performing only diagnostic procedures - 300 diagnostic procedures per year.
2. For hospitals performing both diagnostic and therapeutic (interventional) procedures - 600 procedures per year, of which at least 200 are percutaneous coronary interventions (PCIs).

Page 1 of 4

3. For interventionalists, current minimum is 75 PCI procedures per year. However, consistent with current national guidelines supported by the Department's Invasive Cardiac Services Advisory Committee (ICSAC), the Department plans to revise the regulation to reflect a minimum of 50 per year (averaged over two years).

If a hospital has not met, or does not meet, for two years in a row, the DPH volume minimums -- in addition to meeting quality assurance as described in 105 CMR 130.965: In-house Evaluation of Quality -- the hospital must develop a plan, for approval by DPH, to meet the volume minimums within one year. If the hospital does not submit a plan that is accepted by the Department, the hospital may be required to cease performing cardiac catheterization procedures within thirty days of receipt of notice from the Department that either the plan is not accepted, or that the Department did not receive a plan as required. Any hospital that has not met the volume minimums for the past two years should submit by September 30, 2014 its plan to meet the volume minimums within one year to: the Hospital Complaint Unit Manager at the Bureau of Health Care Safety and Quality, at Debbie.Ulin@state.ma.us. For future instances of non-compliance with the volume minimums, the plan should be submitted within 90 days of the hospital's identification of non-compliance.

### Accountable Care Organization Proposals for a New Cardiac Catheterization Service:

The moratorium on establishment of a new cardiac catheterization service within 30 minutes of an existing percutaneous coronary intervention (PCI)-capable hospital remains in effect, **except under the following limited circumstances.**

1. A hospital that proposes a new cardiac catheterization service within the geographic limitation set by the moratorium is part of a health care system recognized as a Pioneer ACO, a Medicare Shared Savings Plan ACO, or other ACO designation to be determined by the Department; the hospital system has an existing cardiac catheterization service at another hospital within its system that does not meet the minimum diagnostic volume (300 procedures); and the hospital system is proposing to transfer the existing service license to establish a new diagnostic cardiac catheterization service at another hospital in the same ACO system.

2. The ACO will document, to the Department's satisfaction, the projected volume of diagnostic cardiac catheterization procedures at the proposed new site and the underlying assumptions associated with the volume projection, including:

    a. where the patient population the ACO assumes it would treat at the new site is currently receiving diagnostic cardiac catheterization procedures; and
    b. how the ACO anticipates ensuring these patients will use the service at the new diagnostic cardiac catheterization site.

3. The hospital agrees to supply the Department with its diagnostic cardiac catheterization procedure volume data on a quarterly basis for the first twenty-four months of operation of the new cardiac catheterization service. After that period, consistent with the DPH hospital licensure regulation, if the hospital has not met the regulatory volume minimum, the hospital shall submit to the Hospital Complaint Unit Manager at the Bureau of Health Care Safety

and Quality, its quarterly quality assessment and performance improvement (QAPI) program report findings, recommended actions, progress on implementation and supporting data, as described in 105 CMR 130.965: In-house Evaluation of Quality. The hospital will continue to submit these reports until the hospital receives a notice from the Department to discontinue submission of the reports.

4. If a hospital receives approval from DPH for a transfer as proposed in #1 above, the transfer of the existing cardiac catheterization service failing to meet the minimum volume requirement shall occur within sixty days after notice of an approval to create a new cardiac catheterization service at the hospital seeking the new service as a condition of the approval, and prior to licensure of the cardiac catheterization service at the new site.

An eligible ACO should submit to the Department a letter of intent to transfer the location of a cardiac catheterization service from one hospital license to another within its ACO. The letter shall describe which hospital will close its cardiac catheterization service and which will open a proposed new cardiac catheterization service. The letter will include the information described in #2, above. It must also include language acknowledging that the ACO will submit:

a. **a plan to address any other facility within the ACO that is not meeting the current volume minimums under licensure, as summarized in "Clarification of requirement to meet volume minimums for cardiac catheterization services" above;** and
b. the information required in #3 above.

The letter should be sent to the Director, Bureau of Health Care Safety and Quality, at Deborah.Allwes@state.ma.us. Upon written approval by the Department, the hospital may proceed with the Department's architectural plan review process for the new cardiac catheterization service.

*Such approval of a new diagnostic cardiac catheterization service under the above terms in no way guarantees that service will be approved in the future, through any separate DPH process, to provide emergency or non-emergency angioplasty at that site.*

### New Percutaneous Coronary Intervention Services:

At its meeting on April 17, 2014, based on the recommendation of its PCI Oversight Subcommittee, the Department's ICSAC voted to recommend to the Department that upon consideration of several factors, including the declining PCI volume in Massachusetts and that at least eighty-six percent of the population lives within a 30-minute ambulance ride of a PCI-capable hospital, there is no demonstrable need for any additional emergency or non-emergency PCI programs in the Commonwealth and that any additional programs may have an adverse impact on the existing quality of PCIs performed[1].

The ICSAC further recommended that if there are changes to the current state of PCI volume or services in Massachusetts, new emergency or non-emergency PCI programs should be

---

[1] An application for primary PCI that was filed before April 17, 2014 is pending Department action.

considered solely on the basis of evaluating a patient-based need assessment for PCI services through a comprehensive review of:

a. Geographic need for PCI services, through a demonstration of a lack of availability of emergency PCI services within a 30-minute ambulance drive from the proposed facility and a facility that currently provides this service;
b. A detailed program proposal to DPH that would assure quality and safety of the PCI procedures performed at the proposed center; and
c. An impact assessment, to be performed by DPH and in conjunction with the ICSAC, to assess the potential impact of any new PCI program on existing PCI programs in Massachusetts in terms of quality, safety and procedural volumes.

The Department has adopted the ICSAC's recommendations and therefore these terms are in effect.

Questions about this letter should be directed to: Nancy Murphy at Nancy.Murphy2@massmail.state.ma.us

# Exhibit 2

**The Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**
**Department of Public Health**
**Bureau of Health Care Safety and Quality**
**99 Chauncy Street, 2nd Floor, Boston, MA 02111**
**617-753-8000**

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

JUDYANN BIGBY, MD
SECRETARY

JOHN AUERBACH
COMMISSIONER

## MEMORANDUM

**Circular Letter: DHCQ 08-05-486**

To:  All Ambulance Services
     Acute Care Hospital Chief Executive Officers
     Acute Care Hospital Directors of Emergency Services
     EMCAB Members

From: Paul I. Dreyer, Ph.D., Director
      Bureau of Health Care Safety and Quality

      Jon Burstein, M.D., FACEP, Medical Director
      Office of Emergency Medical Services

      Abdullah Rehayem, Director
      Office of Emergency Medical Services

Re:   Implementation of Statewide STEMI Triage (Point-of-Entry) Criteria

Date: May 5, 2008

### Background

After extensive review and input from the Massachusetts Chapter of the American Heart Association, the Massachusetts Hospital Association, the Massachusetts College of Emergency Physicians, the Massachusetts Medical Society, the EMS community, the Department of Public Health's Invasive Cardiac Services Advisory Committee and Office of Emergency Medical Services' (OEMS) Medical Services Committee and Emergency Medical Care Advisory Board, as well as review by national experts in the field, the Department is moving forward with implementation of point-of-entry (POE) criteria to allow for direct delivery of patients with ST-elevation myocardial infarction (STEMI) from the field to hospitals capable of providing 24-hour percutaneous coronary

intervention (PCI). Currently, there are three special projects allowing for this ambulance redirection, in Boston, Cambridge, and Winchester. The data developed through these projects have supported the international findings (in Canada, Wisconsin, and North Carolina, among other places) that this will improve care for STEMI patients eligible for PCI by reducing the time from symptom onset to reperfusion by PCI. A recent article on the Ottawa experience may be found in the January 17, 2008 edition of the *New England Journal of Medicine*.

## The New Statewide STEMI Treatment Protocols

To implement the change in the point-of-entry plan, the Statewide Treatment Protocols for Acute Coronary Syndrome have been revised to incorporate criteria for the redirection of certain STEMI patients. The revised protocols, which are available on the Department's website at
http://www.mass.gov/Eeohhs2/docs/dph/emergency_services/treatment_protocols_703.pdf ,
state on page 30:

> "If the patient's ECG is consistent with STEMI, and the patient is hypotensive, in congestive heart failure, has contraindications to thrombolytics, or the nearest PCI-capable hospital *as established in a Department approved STEMI POE plan* is within 30 minutes further transport, medical control may order transport direct to the PCI facility."

A flowchart of the protocol as described in the Statewide Treatment Protocols is attached (see Algorithm for Cardiac Point-of-Entry for ALS Transported Patients).

In brief, a patient with a STEMI diagnosed by field 12-lead ECG is to be transported directly to a PCI-capable hospital as long as such transport does not add more than 30 minutes to field time, or the patient meets certain specific clinical criteria regardless of distance, and the destination change is so ordered by the online medical control physician. Note that this POE protocol applies only to patients with STEMI; because other forms of acute coronary syndrome do not generally need time-sensitive PCI, there should be NO change in destination for the vast majority of patients with potential cardiac syndromes. Medical control (i.e., physician) concurrence with the presumptive diagnosis of STEMI is required for destination change under the protocol. Destination alterations under this plan will be subject to medical review. While all Massachusetts paramedics are already trained in acquisition and interpretation of 12-lead electrocardiography, a STEMI-recognition training program will be made available to reinforce their capabilities.

Until full implementation of EMS electronic data collection, **the Department is requiring** that copies of the trip records and 12-lead electrocardiograms of all patients with destination altered to a PCI-capable hospital be submitted to OEMS within 90 days of the event, UNLESS the service involved was part of a Special Project Waiver for this protocol as of May 5, 2008.

2

### Regional Point-of-Entry Plans

With the exception of those ambulance services participating in the special projects mentioned above, the bypassing of the nearest hospital for STEMI patient transport to a PCI-capable hospital may only begin in a region after that region's STEMI POE plan has been approved by the Department. The Regional EMS authorities are responsible for creating the POE plans for their regions. The Regional Offices will receive separate instructions regarding submissions of cardiac POE plans to OEMS. As part of the process of developing these plans, OEMS expects that the regional authorities will convene representatives of the regions' hospitals, EMS agencies, and physicians to prepare the POE plans. OEMS staff, such as Dr. Burstein, will be available to attend any such meetings to discuss the initiative. We also hope that sub-regional network planning for STEMI care grows out of this process, as has already occurred in many parts of the Commonwealth.

Assuming timely approval of the plans, **the Department expects full implementation of the program by the end of 2008.** Until full implementation in an EMS Region, standard current point-of-entry criteria will apply in that region. PCI hospitals enrolled in this program must meet stringent time-to-treatment and quality improvement criteria as conditions for maintaining their status.

### New Cardiac Catheterization Services

The Department will monitor the existing system for the impact and effectiveness of the cardiac point-of-entry plans. To that end, effective immediately, the Department will not accept an application for approval of a new cardiac catheterization service if the hospital is located within 30 minutes travel time (via emergency ambulance) of a hospital that currently provides primary angioplasty 24 hours/day, seven days/week.

### Goals

This STEMI protocol is only a small part of the Commonwealth's collaborative efforts to improve care for patients with acute coronary syndromes. We hope and expect that community, EMS, and hospital partners will continue to strive to improve coronary care and survival through means such as AED placement, training, improved EMS dispatch and deployment policies, and hospital and EMS systems designed for rapid treatment, and when needed, transfer of cardiac patients to appropriate facilities for their care. New policies facilitating this might include, for example:
- ED rapid ECG acquisition and physician evaluation,
- Hospital multidisciplinary teams for rapid treatment of ACS,
- ED/EMS planning for rapid transfer of STEMI "walk-ins",
- "Sub-regional" ED and hospital policies linking with PCI centers for standardized treatment regimens and communications pathways,
- ED and hospital policies minimizing drips in transferred cardiac patients,
- Hospital and medical system policies to assure that STEMI patients are referred back to their local facilities for convenient continuing care.

If you or your organization has questions regarding this policy, please contact Tom Quail, RN, Clinical Coordinator for OEMS, at 617-753-7318 or by email at tom.quail@state.ma.us . Dr. Burstein or other OEMS staff will also gladly be available to discuss this policy and may be contacted at 617-753-7300 or by email at jon.burstein@state.ma.us .

Thank you for your cooperation and continued assistance in providing quality EMS care to patients throughout the Commonwealth.

Attachment: Algorithm for Cardiac Point-of-Entry for ALS Transported Patients

cc    DPH Invasive Cardiac Services Advisory Committee
       OEMS Regional Medical Directors

4

## Algorithm for Cardiac Point-of-Entry for ALS Transported Patients (1)



(1) Patients in arrest, with compromised airway, or transported by BLS will go to the nearest facility
(2) Ambiguous cases transported by ALS will go to nearest facility
(3) Bypassing the nearest facility must be approved by On Line medical control
(4) PCI facility will be notified
(5) Use Patient preference/history and established relations if multiple PCI facilities